# TITLE 14

# ZONING AND LAND USE CONTROL[1]

**CHAPTER**

1. MUNICIPAL PLANNING COMMISSION.
2. ZONING ORDINANCE.
3. SUBDIVISION REGULATIONS.
4. SIGNS.
5. MOBILE HOME PARKS.
6. MODEL HOMES.
7. FENCES AND WALLS.
8. EROSION AND SEDIMENT CONTROL.
9. LANDSCAPING AND SCREENING REQUIREMENTS.
10. SITE LIGHTING REQUIREMENTS.
11. ARCHITECTURAL DESIGN STANDARDS.

## CHAPTER 1

## MUNICIPAL PLANNING COMMISSION

**SECTION**

14-101. Creation and membership.
14-102. Organization, powers, duties, etc.

**14-101. Creation and membership**. Pursuant to the provisions of Tennessee Code Annotated, § 13-3-101 there is hereby created a city planning commission, hereinafter referred to as the planning commission. The planning commission shall consist of seven (7) members, of whom five (5) shall be citizen members appointed by the mayor, one (1) shall be the mayor or his designate and one (1) shall be a member of the board of commissioners selected by said board of commissioners to serve as its liaison. The liaison selected by the board of commissioners shall be a voting member of the planning commission. The individual term of the five (5) appointed members shall be for a period of three (3) years. Members may be re-appointed each year to provide continuity. Should an appointed member vacate his position, the mayor shall appoint a replacement. The member selected by the board of commissioners, including the present liaison member, shall serve at the pleasure of the board of commissioners. All members of the planning commission shall serve as such

---

[1] Municipal Code reference
Fee schedule; zoning, signs, etc.: appendix A

without compensation. It is recommended that some of the membership, whenever possible, be recognized practitioners in any of the following fields: architecture, engineering, urban planning, residential/commercial construction, or landscaping. (Ord. #00-02, April 2000, as amended by Ord. #00-11, Oct. 2000, and Ord. #14-201, March 2014)

**14-102. Organization, powers, duties, etc**. The planning commission shall be organized and shall carry out its powers, functions, and duties in accordance with Tennessee Code Annotated, title 13 and Tennessee Code Annotated, § 6-54-133, and additionally, the following:

(1) Exterior appearances of all proposed construction except, single family detached residential structures and associated accessory structures.

(2) Construction, exterior alteration, moving, demolition or change in use of either land and/or buildings in commercial or historical districts and planned developmental proposals of any nature.

(3) Signs, lighting and parking.

(4) Fences and landscaping.

(5) All subdivision entrance treatments.

(6) Wireless transmission facilities. (1989 Code, § 11-102, as amended by Ord. #14-201, March 2014)

## CHAPTER 2

## ZONING ORDINANCE

**SECTION**
14-201. Land use to be governed by zoning ordinance.

**14-201. Land use to be governed by zoning ordinance**. Land use within the City of Lakeland shall be governed by the City of Lakeland Zoning Ordinance and any amendments thereto.[1]

---

[1]The City of Lakeland Zoning Ordinance, and any amendments thereto, are published as separate documents and are of record in the office of the city recorder.

Amendments to the zoning map are of record in the office of the city recorder.

## CHAPTER 3

## SUBDIVISION REGULATIONS

**SECTION**
14-301. Subdivision standards to be governed by subdivision regulations.

**14-301. Subdivision standards to be governed by subdivision regulations**. Subdivisions within the City of Lakeland shall be governed by subdivision regulations as adopted by the Lakeland Municipal Planning Commission, according to the provisions of Tennessee Code Annotated, § 13-4-303. (as replaced by Ord. #02-21, Dec. 2002)

# CHAPTER 4

## SIGNS

SECTION
14-401. Purposes, applicability and effect.
14-402. Definitions, interpretations, and computations.
14-403. Signs exempt from regulations.
14-404. Permitted signs: location, size, and number
14-405. Prohibited signs.
14-406. Design and construction standards.
14-407. Interstate corridor signs.
14-408. Administration and penalties.
14-409. Permits and fees.
14-410. Variances.
14-411. Inspection, removal and safety.
14-412. Nonconforming signs.
14-413. Severability.

**14-401. Purposes, applicability and effect.** (1) Purposes. The purposes of these regulations are: to encourage the effective use of signs as a means of communication in the city; to maintain and enhance the pleasing look of the city, which attracts to the city major events of regional interest; to preserve Lakeland as a community that is attractive to business; to improve pedestrian and traffic safety; to minimize the possible adverse effects of signs on nearby public and private property; and to implement relevant provisions of the comprehensive plan, as updated from time to time.
In that context, the city continuously invests in parks, landscaping, quality public facilities and other features and amenities that enhance the attractiveness of the community; a major purpose of this chapter is to ensure that signs in the community are compatible with the high quality image that the city seeks and in which the city continuously invests.

(2) Applicability. A sign may be erected, placed, established, painted, created or maintained in the city in conformance with the standards, procedures, exemptions and other requirements of this chapter. Signs exempt from regulations under § 14-403 of this chapter, shall not otherwise be subject to this chapter.

(3) Effect. The effect of this chapter, as more specifically set forth herein, is:

(a) To establish a permit system to allow a variety of types of signs in commercial and industrial zones, and a limited variety of signs in other zones, subject to the standards and the permit procedures of this chapter;

(b) To allow certain signs that are small, unobtrusive and incidental to the principal use of the respective property on which they are located, subject to the substantive requirements of this chapter, but without requirement for permits;

(c) To provide for temporary signs in limited circumstances;

(d) To prohibit all signs not expressly permitted by this chapter; and

(e) To provide for the enforcement of provisions of this chapter.

(4) Transitional provisions. (a) All holders of permits for signs issued legally prior to month, date, year may erect the signs which are the subject of such permits within the times allowed by such permits, and such signs shall then be treated as though they had been erected prior to month, date, year. However, such permits may not be extended or amended unless the sign that is the subject of such permit will conform to all of the requirements of this chapter.

(b) All violations of the sign regulations repealed by the adoption of this chapter shall remain violations of the ordinances of the city and all penalties and enforcement remedies set forth hereunder shall be available to the city as though the violation were a violation of this chapter. However, if the effect of this chapter is to make a sign that was formerly nonconforming become conforming, then enforcement action shall cease except to the extent of collecting penalties (other than removal of the sign) for violations that occurred prior to month, date, year. (1989 Code, § 4-201, as replaced by Ord. #03-41, June 2003, and Ord. #16-245, Oct. 2016)

**14-402. Definitions, interpretations, and computations.**

(1) Definitions. The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning.

(a) "Abandoned sign." A permitted sign that was erected on the property in conjunction with a particular use, that use having been subsequently discontinued for a period of thirty (30) days or more, or a permitted temporary sign for which the permit has expired.

(b) "Accessory building or structure." A structure detached from a principal building located on the same lot and customarily incidental and subordinate to the principal building or use.

(c) "Animated sign." Any sign that uses movement, projection, or change of lighting or other electrical impulses to depict action or create a special effect or scene, except LED displays on restaurant menu boards. Variable display signs, beacons and moving message boards are considered to be animated signs under this article.

(d) "Attention-attracting device." Any device or object visible from any public right-of-way which is primarily designed to attract the

attention of the public to a business, institution, sign or activity through such means, including but not limited to illumination, color, size or location.  Attention-attracting devices or objects oftentimes incorporate illumination, which may be stationary, moving, turning, blinking (including animation) or flashing.  Attention-attracting devices may or may not convey a message and can include, but are not limited to, search lights, beacons, strobe lights, strings of lights, barber poles, internally illuminated translucent canopies or panels, electronically controlled message boards (time/temperature signs, gas price signs, public service announcements, etc.), banners, streamers, propellers and inflatable objects (including strings of balloons) or other device designed to attract attention.  Approved traffic-control devices are not considered to be attention-attracting devices.

(e)     "Awning." Any rigid or non-rigid material, such as metal, fabric, or flexible plastic that extends from the exterior wall of a building and is supported by or attached to a frame.

(f)     "Awning sign." A sign located on an awning.

(g)     "Background area."  The entire area of a sign on which copy could be placed, as opposed to the copy area, where copy is in fact posted or painted (see also "face of sign").

(h)     "Backlighted (back lit) sign." A sign consisting of a cabinet containing a light source surrounded by one (1) or more translucent faces.

(i)     "Banner." Any sign printed or displayed upon cloth or any other flexible material, with or without frames or insignia.

(j)     "Beacon." Any light with one (1) or more beams regardless of intensity directed into the atmosphere or directed at one (1) or more points not on the same site as the light source; also, any light with one (1) or more beams that rotate or move.

(k)     "Building marker." Any sign indicating the name of a building and date and incidental information about its construction. Such sign typically is cut into a masonry surface or made of bronze or other permanent material.

(l)     "Code enforcement official." A person designated by the city manager or manager's designee to administer and enforce the provisions of this chapter.

(m)     "Building, principal." A building that contains the principal activity or use located on a lot.

(n)     "Building sign." Any sign attached to any part of a building, as contrasted to a "ground sign."

(o)     "Building wall." An exterior load-bearing or non-load-bearing vertical structure that encompasses the area between the final grade elevation and eaves of the building, and used to enclose the space within the building.  A porch, balcony or stoop is part of the building structure and may be considered as a building wall.

(p) "Canopy." A roof structure constructed of rigid materials, including but not limited to, metal, wood, concrete, plastic, or glass, which is attached to and supported by a building, or which is free-standing and supported by columns, poles or braces extended from the ground. Unlike a marquee, a canopy generally has very limited vertical surface area; and unlike an awning, a canopy is generally supported by vertical elements rising from the ground at two (2) or more corners.

(q) "Canopy sign." Any sign that is a part of or attached to a structural protective cover over a door, entrance, window or outdoor service area. A marquee is not a canopy sign.

(r) "Changeable copy sign (manual)." Any sign designed so that letters or numbers attached to the sign can be periodically changed manually to indicate a different message.

(s) "Changing sign (automatic)." A sign, such as an electronically or electrically controlled public service time, temperature and date sign, message center or reader board, where different copy changes are shown on the same lamp bank.

(t) "Channel letter." The outline of a letter, with metal sidewalls into which a neon tube, fiber optics or LEDs are placed. A channel letter's sign prevents the neon from having a run together appearance. The depth of the channel letter may vary. Variations include: open channel letter, reverse channel letter, and front and back lit letters.

(u) "Charitable/nonprofit event." An event which takes place entirely or partially within the City of Lakeland and the organization holding the event is classified as a nonprofit or charitable organization.

(v) "Commercial message." Any sign, wording, logo, or other representation, except for the actual name of the business, that, directly or indirectly, names, advertises or calls attention to a business, product, service or other commercial activity.

(w) "Construction sign." Any sign bearing the names of contractors, architects, engineers, and the like, or advertising, promotions, price ranges and similar information, that is placed at a construction site that has received development plan approval from the City of Lakeland.

(x) "Copy." The wording and advertising display on a sign surface.

(y) "Copy area." The area in square feet of the smallest geometric figure that describes the area enclosed by the actual copy of the sign. For wall or canopy sign, the copy area limits refer to the message and the illuminated background.

(z) "Directory sign." A ground or building sign that lists tenants or occupants of a building or project, with unit numbers, arrows or other directional information.

(aa)   "District." Any section of the city for which the zoning regulations governing the use of buildings and property, the height of buildings, the size of yards and the intensity of uses are uniform.

(bb)   "Double-faced "V" type back to back signs." Those configurations or multiple sign structures, as those terms are commonly understood.  In no instance shall these terms include two (2) or more signs which are not physically contiguous or connected by the same structure or cross-bracing or, in the case of the back-to-back or "V" type signs, located no more than three feet (3') apart at their point of connection.

(cc)   "Erected." Attached, altered, built, constructed, reconstructed, enlarged or moved.

(dd)   "Exempt sign." Any sign which is exempt from the permit requirements established herein.

(ee)   "Existing sign." Any sign lawfully erected, mounted or displayed prior to adoption of this chapter.

(ff)   "Face of sign."  The entire area of sign on which copy could be placed; the area of a sign which is visible from one (1) direction as projected on a plane (see also "background area").

(gg)   "Finished grade." The elevation of the land surface of a site after completion of all site preparation work.

(hh)   "Flashing sign." A sign which contains an intermittent or flashing light source, or which includes the illusion of intermittent or flashing light by means of animation, or an externally mounted light source.  A sign, the illumination of which is not constant in intensity when in use, and which exhibits sudden and marked changes in lighting effects. A sign that automatically and periodically changes its message more than once per day shall be considered a flashing sign under this chapter. LED displays on restaurant menu boards are not considered flashing signs.

(ii)   "Ground sign." A sign attached to the ground, as contrasted to a "building" sign.

(jj)   "Ground sign, principal." A sign that is permanently attached to the ground and is the primary identifier of the property from adjacent public rights-of-way or private properties and meets the requirements of this chapter, but not including a ground sign that conforms to the definition of "incidental sign."

(kk)   "Holiday decorations." Displays erected on a seasonal basis in observance of religious, national or state holidays, which are not intended to be permanent and contain no advertising material or commercial message.

(ll)   "Identification sign." A sign bearing the address of the premises or name of occupant, but containing no logo or commercial message.

(mm) "Illegal sign." A sign that contravenes this chapter, or a nonconforming sign for which a permit required under a previous ordinance was not obtained.

(nn)   "Illuminated sign (internally)." A sign that transmits light through its face or any part thereof.

(oo)   "Incidental sign." A sign, generally informational, that has a purpose secondary to the use of the site on which it is located, such as "no parking," "entrance," "loading only," "telephone," and similar information and directives.  No sign with a commercial message legible from a position off the site on which the sign is located shall be considered incidental.

(pp)   "Institutional sign." A sign bearing a message related to an institutional use, where such sign is located on the same premises as such use.

(qq)   "Institutional use." For the purpose of determining allowable signage, a primary or secondary school (public or private), college or university including extension facilities, religious institution, or other use operated by a public agency or nonprofit organization and permitted as a use in one (1) or more residential zoning districts of the city.  A daycare facility shall be considered an institution regardless of ownership or operation.

(rr)   "Interstate sign." A monument-style sign located on a parcel zoned commercial and also having no less than one thousand (1,000) linear feet of lot frontage upon directly upon the right-of-way of Interstate 40 and installed in accordance with § 14-407(1) of this chapter.

(ss)   "Landscaped area." A portion of the site or property containing vegetation to exist after construction is completed. Landscaped areas include, but are not limited to, natural areas, buffers and screening measures, streetscapes, lawns and plantings.

(tt)   "Lighting." The method or manner by which a sign is illuminated during the period from thirty (30) minutes prior to sundown and thirty (30) minutes after sunrise.

(uu)   "Logo."  The graphic or pictorial presentation of a message, including, but not limited to, the use of shapes, designs, decorations, emblems, trademarks, symbols or illustrations, or the superimposition of letters or numbers or any other use of graphics or images other than the sequential use of letters and numbers.

(vv)   "Lot." A parcel of land whose boundaries have been established by some legal instrument, such as a recorded deed or plat, and which is recognized as a separate legal entity for purposes of transferring title.  This term shall include any number of contiguous lots, or portions thereof, upon which a single principal building and its accessory buildings are located or intended to be located.

(ww)   "Marquee." A roof-like structure that cantilevers from the wall of a building over its principal entrance that has no vertical supports other than the wall from which it cantilevers.

(xx)   "Marquee sign." A sign attached to or mounted to or on top of a marquee.

(yy)   "Menu board." An accessory sign providing items and prices associated with a drive-thru window.

(zz)   "Model home sign." A temporary sign designating a furnished model home.

(aaa)   "Neon." A tasteless, colorless, inert gas - When an electric current is discharged through it, neon produces a reddish-orange glow. Neon is also used synonymously with a type of luminous tube sign where a glass tube is bent to a desired shape, fitted with an electrode at each end, the atmosphere is pumped and burned out, and the resulting vacuum is filled with a rare gas, such as neon, helium, argon, mercury vapor or a combination of gases.

(bbb)   "New project real estate sign." A sign announcing space available for sale, rent or lease within a new project or a project having undergone renovation efforts equal to twenty-five percent (25%) of its value.

(ccc)   "Nonconforming sign." A sign erected or otherwise in use that met the requirements of the city at time it was erected or otherwise put in use, but does not conform to the requirements of this chapter.

(ddd)  "Off-premise sign (off-site sign)." A sign that directs attention to a business, commodity, or service offered at a location other than the premises on which the sign is erected.  Any sign that is not an on-premise sign as defined herein shall be considered an off-premise sign.

(eee)   "On-premise sign (on-site sign)." A sign that directs attention to a business, commodity or service located or offered on the premises on which the sign is erected.  For the purpose of this chapter, common access easements, common reserved areas or common open space shall be considered.

(fff)   "Opaque." Not clear or translucent--not allowing light to show through.

(ggg)   "Open channel letter." A channel letter which has no face and in which the neon tubing is visible.

(hhh)  "Owner." A person recorded as such on official records and including duly authorized agent or notary, a purchaser, a devisee, judiciary; any person having a vested or contingent interest in the property in question.

(iii)   "Pennant." Any lightweight plastic, fabric or other material, whether or not containing a message of any kind, which is suspended from a rope, wire, string or pole, usually in series, and which is designed to move in the wind.

(jjj) "Person." Any association, company, corporation, firm, organization or partnership, singular or plural, of any kind.

(kkk) "Pole sign." A sign mounted upon the ground but which by reason of height, width or other characteristics does not qualify as a "principal ground sign," characterized by a free standing exposed frame, mast or pole and not attached to any building.

(lll) "Political sign." A sign attracting attention to political candidates or issues.

(mmm) "Portable sign." Any sign not permanently attached to the ground or other permanent structure or a sign designed to be transported, including, but not limited to, signs designed to be transported by means of wheels; signs made as A-frames or T-frames; balloons used as signs; umbrellas used for commercial messages; and signs attached to or painted on vehicles or trailers parked and visible from the public right-of-way.

(nnn) "Portico." A porch or walkway, open to the outside air that is covered by a roof supported by columns or pillars, typically leading to the entrance of a building. A portico is considered a "canopy" for purposes of determining signage.

(ooo) "Poster box." A box installed on a wall for the purpose of displaying posters of shows at a theater.

(ppp) "Premises." An area of land with its appurtenances and buildings which, because of its unity of use, may be regarded as the smallest conveyable unit of real estate.

(qqq) "Prohibited sign." Any sign, other than nonconforming sign, which does not comply with this chapter or is specifically restricted herein.

(rrr) "Project." A commercial or mixed-use center containing a combination of retail, office, and/or other uses located on a single parcel or multiple parcels. A project is included within a single plat, site plan, or planned development application.

(sss) "Project sign." A sign identifying a multi-tenant property.

(ttt) "Projecting sign." Any sign attached to a building wall extending laterally more than eighteen inches (18") from the face of such wall.

(uuu) "Public event banner." Any sign of lightweight fabric or similar material, except for national, state, municipal or official flags of any institution, that is mounted to a pole or building by a supporting frame at two (2) or more edges.

(vvv) "Raceway." A metal structure enclosing the electric components of a sign.

(www) "Real estate sign." A sign advertising real property for sale or for lease.

(xxx)  "Real estate information tube/box." A box or tube attached to one end of the temporary real estate sign for the purpose of holding a brochure whose information relates to the subject property. The dimensions of the box shall be a maximum ten inches by fourteen inches by three inches (14" x 3"), and the tube shall be a maximum twelve inch by three inch (12" x 3") diameter. The box and the tube shall be black or white in color, or translucent. Advertising on the exterior of the box or tube shall be prohibited.

(yyy)  "Real estate window signs." A sign located inside a window offered for sale, rent, or lease for the purpose of announcing such.

(zzz)  "Residential sign." Any sign located in a district zoned for residential uses that contains no commercial message.

(aaaa) "Reverse channel letter sign." A sign composed of channel letters which have face and sides, but no back and are pegged out from a background surface (wall).  When the light source inside the letter is lit, it produces a halo-effect around the letter.

(bbbb) "Right-of-way (ROW)." The proposed right-of-way as indicated on the official city major street plan and/or as set forth in the city subdivision ordinance.

(cccc) "Roof line." The highest horizontal point of the wall visible to the public, excluding any architectural feature which extends above such apparent horizontal roof line if such feature is fully enclosed and considered an integral part of the occupied space such as an atrium or high ceiling.

(dddd) "Roof sign." A sign erected wholly or partially above the roofline.

(eeee) "Rotating sign." Any sign or portion of a sign that moves in a revolving or similar manner.

(ffff)  "Seasonal or special occasion sign." A sign that is not permanently attached and is limited to a specific activity or in the celebration of holidays or other special events for a specified period of time.

(gggg) "Setback." A line running parallel to the front, side and rear property lines that establish the minimum distance the principal building and related appurtenances including parking, signage, and accessory buildings, must be from each respective property line measured in feet.

(hhhh) "Shopping center." A building or group of buildings, either connected or free-standing, under unified or multiple ownership of land parcels, that is designed and has been approved by the City of Lakeland as a shopping center with common parking, pedestrian movement, common ingress and egress, and used or intended to be used primarily for the retail sale of goods and services to the public.

(iiii)  "Shopping center sign." A ground mounted sign that may contain the name of the shopping center and/or individual tenants.

(jjjj)   "Sign." Any device, fixture, placard or structure that uses any color, form, graphic, illumination, symbol or writing to advertise, announce the purpose of, or identify the purpose of a person or entity, directs attention to a product, service, place, activity, person, institution, business or solicitation, including any permanently installed or situated merchandise, which is exposed to the view of potential clients or customers and/or the general public, and is located on public or private property, inside or outside of buildings, or to communicate information of any kind to the public, except the following:

(i)      Merchandise temporarily displayed in a show window available for sale on the premises and that does not include flashing, neon, or colored lights;

(ii)     Decorative devices or emblems as may be displayed on a residential mailbox.

(kkkk) "Sign plan." A plan prepared to scale conforming to submittal requirements contained in this chapter that depict construction details for all types of signage proposed for installation on a parcel.

(llll)   "Sign structure." Any structure that supports or has supported or is capable of supporting a sign, including decorative cover.

(mmmm) "Site." A lot, tract or parcel of land considered as one (1) land-unit for purposes of this chapter. For a single-family residence, the site shall be the subdivided lot on which it is located.  For multifamily projects, the site shall be all land occupied by the buildings in the project and adjoining such property and under common ownership with it.  For vacant land, the site shall be all of the adjoining vacant land under single ownership.  For single-occupancy, non-residential properties, the site shall be the subdivided lot that is occupied.  For multiple-occupancy properties, the site shall be all land included under the original "site plan" or "subdivision plan" approved by the City of Lakeland.

(nnnn) "Site plan." A scaled graphic schematic of a development site indicating the location of buildings, walkways, signage, lighting, parking, drainage facilities, topography and landscaping, as they are to appear upon the completion of development.  Site plans may be required to contain such other information as may be deemed necessary by the design review commission to insure proper development of the site.

(oooo) "Site triangle (or horizontal sight distance)." The horizontal and vertical areas at the intersections of streets and/or driveways which must remain unobstructed in order to ensure that drivers can see traffic and pedestrians around the corner of the intersection, entrance or driveway.

(pppp) "Snipe sign." Any sign that is affixed by any means to trees, utility poles, fences or other objects, where the message appearing thereon is not applicable to the present use of the premises upon which the sign is located.

(qqqq) "Street frontage." The distance for which a lot line adjoins a public or private street from one lot line intersecting said street to the furthest lot line intersecting the same street.

(rrrr)  "Subdivision entrance sign." A sign that gives the name of a residential or non-residential subdivision or multifamily development.

(ssss) "Suspended sign." A sign that is suspended from and supported by the underside of a horizontal plane surface.

(tttt)  "Tag sign." Secondary signs that are descriptive of goods and services available on the premises such as "Deli/Bakery" and "Open 24 Hours."

(uuuu) "Temporary sign." Any sign that used only temporarily and sign is not permanent mounted, and that is allowed only for a designated time period.

(vvvv) "Traffic sign." A sign indicating federal, state, or municipal regulations for vehicular or pedestrian movement.

(wwww) "Translucent." The property of a material to allow the passage of some light through it without being transparent.

(xxxx) "Two-sided sign or two sign faces." Any sign constructed on a single set of supports with messages visible on either side, or a "V" type sign with a common support in the center of the "V."

(yyyy) "Use." The purpose for which a building, lot, sign or other structure is arranged, intended, designed, occupied or maintained.

(zzzz) "Wall, exterior." A vertical, structural component of a building which encloses habitable or usable space; a parapet extending not more than twelve inches (12") above a flat roof shall be considered part of the exterior wall for purposes of determining signage.

(aaaaa) "Wall sign." Any sign painted on or attached to and extending not more than twelve inches (12") inches from an exterior wall in a parallel manner.

(bbbbb) "Windblown device." Any banner, spinner, streamer, propeller, disc, moored blimp, gas balloon or flag (which is not of local, state, federal, corporate, nonprofit or religious origin) that is designed to inform or attract attention, whether or not such device carries a message, all or part of which is set in motion by wind, mechanical, electrical or any other means.

(ccccc) "Window sign." Any sign that is applied to the inside or outside of glassed areas of a building or within one foot (1') of the window.

(2)   Interpretations. Words and phrases used in this chapter shall have the meanings set forth in this article.  Words and phrases not defined in this chapter, but defined elsewhere in the city code shall be given the meanings set forth there.  Principles for computing sign area and sign height are given in the next section.  All words and phrases shall be given their common, ordinary meanings, unless the context clearly requires otherwise.  Section headings or captions are for reference purposes only and shall not be used in the

interpretation of this chapter. Illustrations included in the code shall be used in interpreting the relevant provisions, but where the text conflicts with an illustration the text shall control.

(3) Computations. (a) Area computation of individual signs: The area of a sign comprised of individual letters or elements attached to a building wall is determined by calculating the area of the smallest geometric figure (e.g. square, rectangle, circle, polygon, etc.) that can be drawn around the letters and/or elements.

Signs consisting of individual letters and/or elements will be measured as one (1) sign when the distance between the letters and/or elements is less than the largest dimension of the largest sign letter.

Figure 1: Area Computation of Sign of Individual Signs

(b) Area computation of multi-faced signs: Where the sign faces of a double-faced sign are parallel, only one (1) display face shall be measured in computing sign area. If the two (2) faces of a double-faced sign are of unequal area, the area of the sign shall be the area of the larger face. In all other cases, the areas of all faces of a multi-faced sign shall be added together to compute the area of the sign. Sign area of multi-faced signs is calculated based on the principle that all sign elements that can be seen at one (1) time or from one (1) vantage point should be considered in measuring that side of the sign.

Figure 2: Area Computation of Multi-Faced Signs

(c) Sign height computation: The height of a sign shall be computed as the distance from the base of the sign at normal grade to the top of the highest attached component of the sign. Normal grade shall be construed to be the newly established grade after construction, exclusive of any filling, berming, mounding or excavating solely for the purpose of locating the sign. In cases where the normal grade is below grade at street level, sign heights shall be computed on the assumption that the elevation of the normal grade at the base of the sign is equal to the elevation of the nearest point of the crown of a public or private street.

Figure 3: Sign Height Computation

(d) Building frontage: Building frontage shall mean the horizontal length of a building on the side with its principal entrance. If that side is a straight wall, then the building frontage shall be the length of the wall. If the side is not a straight wall, the building frontage shall be the horizontal distance from the corner at one (1) end of the side of the building with the principal entrance to the other corner on the same side of the building; where that side of the building is concave, then the measurement shall be made in a straight line from corner to project in front of the front corners, then the measurement shall be made as the shortest distance between two (2) lines projected from the two (2) front corners of the building, with such lines parallel to each other and as close as practicable to perpendicular to the front of the building.

Figure 4: Building Frontage Measurements

(1989 Code, § 4-202, as amended by Ord. #192, Dec. 1996, and Ord. #193, Dec. 1996, replaced by Ord. #03-41, June 2003, amended by Ord. #04-59, March 2004,

Ord. #10-145, March 2010, and Ord. # 12-177, Aug. 2012, and replaced by Ord. #16-245, Oct. 2016)

**14-403. Signs exempt from regulations.** The following signs shall be exempt from regulations under this chapter:

(1) Any official or public notice or warning required by a valid and applicable federal, state or local law, regulation or ordinance, by a public utility company or by order of a court of competent jurisdiction;

(2) Traffic signs on private property, such as Stop, Yield and similar signs, which meet Department of Transportation and Manual on Uniform Traffic Control Devices standards and contain no commercial message;

(3) Government signs for the control and direction of traffic and other regulatory purposes;

(4) Historic markers recognized by local, state and/or federal authorities;

(5) Memorial plaques, cornerstones, historical tables and the like;

(6) Address signs denoting the numerical address designation of the premises on which the sign is placed not to exceed seventy-two (72) square inches in surface area.

(7) Any sign inside a building, not attached to a window or door, that is not visible from off the site on which it is located;

(8) Decals, numerals, names, addresses, hours of operation, credit information, etc., attached to a door or window and all of which occupy a total surface area not to exceed three (3) square feet; provided, however, street numbers and addresses shall not be included in calculating the total surface area;

(9) Any sign inside an athletic field or other enclosed outdoor space, where the sign is not legible from more than three feet (3') beyond the lot line of the site on which it is located;

(10) Hand carried signs;

(11) Signs affixed to vehicles and trailers used in the normal transport of goods or persons where the sign is incidental and accessory to the primary use of the vehicle or trailer.

(12) Works of art with no commercial message; and

(13) Special event signs for community events sponsored in whole or part by the City of Lakeland.

(14) Incidental signs on the interior of a property not generally readable from off the property.

(15) Window signs not exceeding twenty-five percent (25%) up to a maximum of six (6) square feet of the transparent portion of a commercial building facade. (1989 Code, § 4-203, as replaced by Ord. #03-41, June 2003, amended by Ord. #04-59, March 2004, and replaced by Ord. #16-245, Oct. 2016)

**14-404. Permitted signs: location, size and number.** Conditions.

(1) Building marker. Building marker signs shall be allowed provided that:

(a) Such signs shall not exceed three (3) square feet in sign area;

(b) Such signs shall contain no logo or commercial message;

(c) Such signs shall be made of permanent material, such as bronze or masonry, and be permanently affixed to the building wall; and

(d) Such signs shall not exceed one on any single building.

(2) Changeable copy sign. Changeable copy signs shall be allowed only at schools, public performing arts and recreation facilities, libraries, theater, and places of worship, provided that:

(a) Only one (1) double-faced ground mounted sign is permitted on any parcel occupied by a school, public performing arts and recreation facility, library or place of worship;

(b) The sign must contain a black background with white letters of sufficient size to be viewed from the public right-of-way;

(c) Such signs shall not exceed seventy-two inches (72") in height measured from finished grade;

(d) Such signs shall not exceed thirty-two (32) square feet in sign area per side;

(e) Such signs shall be set back a minimum of twenty feet (20') from the edge of the public street right-of-way;

(f) Such signs shall be oriented to the middle of the front property line unless in conflict with an entrance but, in no case shall be placed within fifteen feet (15') of a side property line oriented perpendicular to the front property line

(g) The sign shall not be internally illuminated but, may be externally illuminated using a single white light source mounted on the ground with appropriate shields to minimize glare;

(h) The sign shall be placed upon a masonry base a minimum of eighteen inches (18") in height measured from finished grade;

(i) The base surrounding the sign shall be landscaped with a combination of evergreen plantings and seasonal colors and such landscape areas shall be irrigated;

(j) For a single-occupant school, performing arts and recreation facility, library, or place of worship, only one (1) changeable copy sign shall be permitted and shall only be permitted in lieu of the principal ground sign for the facility;

(k) For a single-occupant school, performing arts and recreation facility, or place of worship that installs a changeable copy sign, no other wall sign or principal ground sign shall be permitted on the premises unless otherwise provided in this chapter;

(l)     A service station may use up to one-half (1/2) of the area of its principal ground sign or one-half (1/2) of the area of any wall sign for changeable copy displaying current fuel prices; and,

(m)     A theater shall be permitted to have one (1) poster box for each theater viewing room within the theater, subject to total sign area limits applicable to all wall signs, provided that:

(i)     Lighting shall be backlighted or internally illuminated;

(ii)     Such boxes shall not exceed thirty-six by fifty-four inches (36" x 54") each in area;

(iii)     The top of such boxes shall not be more than eight feet (8') above the ground; and

(iv)     Such boxes shall be permanently mounted to a wall.

(3)     Construction sign.  Construction signs shall be allowed provided that:

(a)     For non-residential, institutional or multifamily residential buildings, in the same location and subject to the same size and other conditions applicable to principal ground sign.  Such sign shall be removed no later than the date of the issuance of the certificate of occupancy for the premises or any part thereof.

(b)     For new single-family residences, a single sign of not more than thirty-six inches (36") in height measured from finished grade and four (4) square feet in sign area shall be permitted. Such sign shall be removed upon issuance of a final inspection and/or certificate of occupancy.

(c)     In single-family residential districts, including planned unit developments allowing single-family residences, a single construction ground sign shall be permitted as an accessory use to a subdivision real estate sales office, as long as such office is permitted in the zoning ordinance and actually used.  Such sign shall not exceed sixteen (16) square feet in sign area and forty-eight inches (48") in height measured from finished grade.

(d)     Construction signs shall not be permitted on existing single-family residences, except if providing directional or safety related information placed on the single-family residential site, subject to the conditions applicable to "residential sign," including the prohibition of commercial messages, a height limit of forty-eight inches (48") measured at finished grade and an area limit of four (4) square feet per side.

(4)     Directory sign.  Directory ground-mounted signs not visible from the public right-of-way shall be allowed where a particular building or structure includes more than six (6) tenants and a minimum gross floor area of one hundred thousand (100,000) square feet, provided that:

(a)     Directory signs in shopping centers may be located near entrances to parking areas, but not less than one hundred feet (100') from

any public right-of-way, and at principal intersections within the site, where such intersections are not less than one hundred feet (100') from any public right-of-way.

(b) Such signs shall not exceed sixteen (16) square feet in area and forty-eight inches (48") in height measured from finished grade, subject to the total sign area requirements for ground signs allowed for the development.

(c) Such signs may contain logos or business names with arrows or other directional information but, shall not contain any commercial message.

(d) Such sign shall not be separately illuminated.

(5) Flag and flag pole. Flags and flagpoles shall be allowed, provided that:

(a) Sites not showing flags and flagpoles on site plans. On a non-residential or multi-family residential site not showing flags on an approved site plan, there shall be no more than three (3) flagpoles and two (2) flags per pole. Poles for such flags shall be located on the principal building wall on the site or within twenty feet (20') of the main building entrance. No flag shall bear a commercial message;

(b) Sites showing flags and flagpoles on site plans and sign plan. Flags may be included on a site plan and located as shown on that plan, provided that:

(i) Flagpoles shall be limited to three (3) per principal building or multi-family residential complex;

(ii) No flag shall bear a commercial message; and

(iii) Flagpoles shall be not less than fifty feet (50') from a public or private street right-of-way;

(c) Flags on single-family residential lots. There shall be not more than one (1) flagpole and two (2) flags per pole on any single-family residential lot. No flag shall bear a commercial message. No sign on such lot may bear a commercial message;

(d) Flag size - all sites. No flag shall exceed five feet by eight feet (5' x 8') in size; and

(e) Flagpole height - all sites. No flagpole shall exceed twenty-five feet (25') in height measured from finished grade.

(6) Identification sign. Identification signs shall be allowed provided that:

(a) Such signs shall be limited to one (1) per principal building entrance;

(b) Such signs shall not exceed three (3) square feet in sign area;

(c) Such signs shall contain no logo or commercial message; and,

(d) Such signs shall be affixed to a building wall.

(7) Incidental sign. Incidental signs shall be allowed provided that they contain no commercial message or logo and do not exceed one (1) square foot in area placed a minimum of ten feet (10') from the front property line, except that signs providing notice that cars parked illegally may be towed may comply with provisions of applicable state and federal law where such provisions may require that such notice be placed on larger sign placards. Incidental ground signs shall not exceed twenty-four inches (24") in height measured from finished grade.

(8) Menu board. Menu boards shall be allowed only as an accessory use to a restaurant permitted to have a drive-thru window under the zoning ordinance provided that:

(a) Such sign shall not exceed forty (40) square feet in sign area and seventy-two inches (72") in height measured from finished grade;

(b) Such sign shall not be legible or visible from the public right-of-way;

(c) The color of such sign shall be neutral or earth tone and or have similar material treatments as the principal structure;

(d) Such sign shall have placed around the back side evergreen shrubbery and trees sufficient to screen the sign from public view along the right-of-way;

(e) Such sign may have changeable copy (manual and/or electronic); and

(f) Such sign may be internally or directly illuminated.

(9) Model home:

(a) Such signs shall be limited to one (1) on any single-family parcel;

(b) Such sign shall not exceed seventy-two inches (72") in height measured from finished grade including a decorative cap;

(c) The allowable sign area shall be sixteen (16) square feet and the sign shall not exceed seventy-two inches (72") in height measured from finished grade;

(d) The sign may be double-sided and shall be attached to two (2) separate decorative posts white in color located not more than forty-eight (48") apart on center;

(e) Such sign shall not contain a commercial message;

(f) The base of the sign shall be planted with evergreen shrubbery and seasonal colors in an area equivalent to the total sign area.

Figure 5: Model Home Sign

(10) Political sign. Political signs shall be allowed provided that:

(a) Such signs shall be limited to not more than one (1) per candidate or issue on any single occupied parcel except polling places on election day where signage may be placed in accordance with election commission guidelines for signage at polling places;

(b) Such signs shall be located on private property, with permission of the property owner;

(c) Such signs shall not be placed closer than fifteen feet (15') from the edge of pavement or five feet (5') behind a sidewalk, whichever is greater;

(d) Such signs shall not be erected or placed in such a manner that they interfere with, obstruct, or confuse or mislead vehicular or pedestrian traffic;

(e) No such sign shall be erected or displayed earlier than thirty (30) days before the election including early voting to which it relates, nor later than three (3) days following such election;

(f) Such signs shall not be located in the public right-of-way or on other public property or on any public utility pole or tree, except within specified proximity of polling places on election day, under the rules established by the Shelby County Board of Election;

(g) No signs will be allowed at polling places earlier than one (1) day before an election or early voting period and must be removed not later than one (1) day after said election or early voting period. For signs placed at polling places no permit or bond will be required, but requirements of all other sections of this chapter shall apply;

(h) Such signs shall not exceed five (5) square feet in area per side and forty-eight inches (48") in height;

(i) Such signs erected or maintained not in accordance with the provisions of this subsection shall be the responsibility of the owner of the property upon which the sign is located, shall be deemed a public nuisance, and may be abated, without notice, by such property owner, the

candidate, or person advocating the vote described in the sign, or the code enforcement official or his/her designee;

(11) Principal ground sign. Principal ground signs shall be allowed, provided that:

(a) Such signs shall not exceed seventy-two inches (72") in height measured from finished grade;

(b) Such signs shall not exceed thirty-two (32) square feet in sign area per side;

(c) Such signs shall be set back a minimum of ten feet (10') from the edge of the public street right-of-way;

(d) Such signs shall be oriented to the middle of the front property line unless in conflict with an entrance but, in no case shall be placed within fifteen feet (15') of a side property line oriented perpendicular to the front property line;

(e) The base of the sign shall be landscaped with evergreen and deciduous shrubbery and seasonal colors on each side of the sign in an area equivalent to the total sign area of each face of the sign. All landscaping shall be irrigated.

Figure 6: Principal Ground Sign

(f) Both sides of the two (2) side ground sign shall be identical in design and content;

(g) The sign shall be placed upon a masonry base a minimum of eighteen inches (18") in height measured from finished grade;

(h) A sign placed in a residential district shall not be internally illuminated. The sign may be illuminated using backlighted lettering or reverse channel lettering creating a halo-effect or direct lighting from a ground-mounted light fixture not to exceed one hundred (100) watts screened from public view with evergreen plant materials;

(i) For a single-occupant property, only one (1) principal ground sign shall be permitted unless otherwise provided in this chapter;

(j) For a multi-occupant project, there shall be only one (1) ground sign for the entire project plus one (1) additional principal ground sign for street frontage adjacent to a corner side yard on a secondary street, provided that the frontage on that street is at least one hundred fifty feet (150') in length and that an actual entrance to the project is permitted and exists prior to installation of the sign and the secondary principal ground sign conforms to the area, height and location requirements of this chapter for a principal ground sign;

(12) Real estate sign, except single-family residential. Real estate signs shall be allowed provided that:

(a) On single-family residential lots, one (1) residential sign shall be permitted as more fully described in item (13) below.

(b) On multifamily residential projects and non-residential developments (i.e., commercial, office, industrial), one (1) real estate sign shall be permitted, provided that:

(i) Such sign shall not exceed 16 square feet per side in area and seventy-two inches (72") in height measured from finished grade;

(ii) There shall be not more than (1) real estate sign on any site except where the parcel has more than one thousand (1,000) linear feet of road frontage whereby one (1) additional sign may be placed a minimum distance of five hundred feet (500') from the other real estate sign;

(iii) Such sign shall not be posted in public rights-of-way or on any private common area;

(iv) Such signs shall be set back from the front property line a minimum of twenty feet (20');

(v) Such signs shall carry no commercial message other than information on the lease or sale of the premises on which the sign is displayed; and

(vi) Such signs shall not advertise or identify the conducting of a permitted non-residential use.

(13) Residential real estate sign, single-family residential. Residential signs shall be allowed provided that:

(a) Such signs shall not exceed nine (9) square feet per side in area and forty-eight inches (48") in height measured from finished grade;

(b) There shall be not more than one (1) residential sign on any site containing only one (1) dwelling unit;

(c) Such signs shall not be posted in public rights-of-way or on any private common area;

(d) Such signs shall be setback from the front property line facing the public right-of-way a minimum of fifteen feet (15');

(e) Such signs shall carry no commercial message other than information on the lease or sale of the premises on which the sign is displayed; and,

(f) Such signs shall not advertise or identify the conducting of a permitted home occupation in a residential district.

(14) Subdivision entry sign. Ground-mounted signs integrated into the entrance treatment (i.e., entrance wall) with the name of the subdivision or planned unit development may be allowed on one (1) or both sides of each principal entrance. Subdivision entry signs shall be located on private property and shall not obstruct any public right-of-way or easement. Where located at the side of the road on private property, there may be one (1) sign located on one (1) side of the entrance road or on both sides of the entrance road at each principal entrance to the subdivision or planned unit development, provided that:

(a) Such signs shall not exceed thirty-two (32) square feet in sign area per entry sign;

(b) Such sign shall not exceed seventy-two inches (72") in height measured from finished grade, unless integrated into a wall or column, in which case it shall not exceed the height of the wall or column; and

(c) Such sign shall contain no commercial message.

Figure 7: Subdivision Entrance Sign

(15) Temporary signs. Signs for temporary uses, special events or the opening of businesses, as expressly permitted under this chapter, provided that:

(a) Such signs shall not be located on public property:

(i) Such sign, if a ground-mounted sign, shall be placed a minimum of ten feet (10') from the front property line and shall not be placed in such a manner as to obstruct visibility;

(ii) Sign permits shall be limited to duration of thirty (30) days or, for a temporary use or for the period of time stated on the temporary use permit. Permitted duration shall not to exceed thirty (30) days in a calendar year;

(iii) No more than six (6) temporary sign permit shall be issued within a calendar year for the same business in the same location;

(iv)     Sign permits for new businesses shall be issued only upon the initial opening of a business for a period that shall end not later than thirty (30) days after issuance of the first business license for that business in that location.  New business temporary signs do not count towards the annual permit allotment specified in item (iii) above;

(v)     Temporary signs, when installed as a wall-mounted sign, shall be attached to and parallel with a wall of the building on which wall signs are permitted and shall not exceed thirty-two (32) square feet of surface area;

(vi)     Such signs may be made of cloth or canvas and are not subject to the construction and installation requirements otherwise applicable in this chapter;

(vii)     Where a temporary use permit specifically authorizes the use of the temporary ground sign, such sign, except feather flags, shall not exceed forty-eight (48") inches in height measured from finished grade. Feather flags shall not exceed eight feet (8') in height measured from finished grade.  All temporary ground signs shall not exceed thirty-two (32) square feet in sign area per side;

(viii)     Temporary signs shall not require the review and approval of the design review commission prior to issuance of a sign permit by the City of Lakeland;

(ix)     Supporting structures for temporary signs shall be removed when no temporary sign is present.

(x)     For single occupancy buildings, temporary signs shall not be allowed if a permanent ground sign does not exist on the property.

(b)     Not-for-profit special events, such as those associated with a civic, philanthropic and educational purpose, shall be allowed a temporary sign, regardless of whether a temporary use permit is required and whether the use is specifically permitted under this chapter, provided that:

(i)     Only one (1) such sign shall be allowed per property per event;

(ii)     Such sign shall be located only on private property or on the public property where the event will be held;

(iii)     Such sign, if a ground sign, shall be limited to forty eight inches (48") in height measured from finish grade and thirty-two (32) square feet in sign area per side;

(iv)     Such sign, if attached to a wall, shall be limited to thirty-two (32) square feet in sign area and securely attached on all corners;

(v) Such sign shall be erected no sooner than thirty (30) days preceding the event and shall be removed no later than one (1) day following the conclusion of the event; and,

(vi) Temporary signs for non-profit special events shall not require the review and approval of the design review commission prior to issuance of a sign permit by the City of Lakeland.

(16) Wall Sign, nonresidential. Wall signs shall be allowed on nonresidential properties that are proportionate to the scale and massing of the building upon which the sign is attached, provided that:

(a) The total area of all wall signs on a building shall not exceed one (1) square foot in area for each linear foot of building frontage; provided, however, that in the case of a primary building or structure located more than one hundred feet (100') from the front property line the design review commission may allow an increase in the permitted sign area at a ratio equivalent to the total distance of the primary building from the front property line divided by one hundred (100) for each linear foot of building frontage not to exceed a maximum of one and one-half (1.5) square feet in area for each one (1) linear foot of building frontage unless otherwise restricted. For example, a building located one hundred thirty-eight feet (138') from the front property line may be permitted to have a ratio of 1.38 square feet of sign area for each linear foot of building frontage.

In the case of a single occupant building that is also permitted to have one or more principal ground signs, the total area of all wall signs on a building shall not exceed one-half (1/2) square foot in sign area for each linear foot of building frontage regardless of the distance from the building or structure to the front property line; provided, however, the design review commission may allow an increase in allowable sign area in consideration of scale and massing of front facade, not to exceed a maximum of one (1) square foot in sign area for each one (1) linear foot of building frontage.

(b) The total area of all wall signs on a particular wall or a section of wall shall not exceed the wall sign area as prescribed elsewhere in this chapter;

(c) Such signs shall be located only on principal buildings and shall not be placed on accessory buildings;

(d) No wall sign shall project above the highest point of the building wall on the same side of the building as the sign;



Figure 8:   Wall Sign, Non-Residential

   (e)   On a single occupancy building, all signage or message elements, except for poster boxes, logos, and wall signs on theaters on any single wall, shall be considered parts of the same sign and shall be measured as prescribed elsewhere in this chapter;

   (f)   A single-occupant building shall be limited to one (1) wall sign unless otherwise provided in this chapter;

   (g)   A single-occupant building shall be limited to one (1) wall sign installed facing a public right-of-way unless otherwise provided in this chapter;

   (h)   A single-occupant building located on a lot with multiple frontage upon a public right-of-way may be permitted to have one (1) wall sign installed facing each public right-of-way;

   (i)   On a multi-occupant building except for multi-tenant convenience centers as provided for in § 14-404(18)(d) of this chapter, each occupant with a primary outside entrance serving the general public may have one (1) wall sign.  Corner tenants with a separate outside entrance serving the general public as a point of ingress and egress that is on a different exterior wall from the primary entrance for which the tenant space is accessed may be allowed one (1) additional wall sign centered over the secondary entrance subject to review and approval by the design review commission;

   (j)   On a multi-occupancy building serving primarily office uses, there may be signs on only one (1) wall of the building; provided, however, that in the case of multiple occupancy building containing more than one hundred fifty thousand (150,000) square feet of gross floor area and more than seven (7) tenants facing upon a public right-of-way, tenants within the multiple occupancy building may be permitted subject to approval of the design review commission to have one (1) exterior wall sign not to exceed fifty (50) square feet of sign area to be installed on the exterior wall of the multiple occupancy building;

(k) Conditions above shall not apply to changeable copy signs for a convenience store vending gasoline products or a theater, which shall be subject to the requirements of (b), above;

(l) Multi-occupant buildings containing more than one (1) tenant wall sign shall have a sign policy that outlines the colors, font, illumination, size and location of all wall-mounted signs. Wall signage should complement the principal ground sign.

(17) Wall sign, residential/institutional:

(a) Single-family residential units (either attached or detached) including permitted professional home occupations in residential zoning districts or planned unit developments designated for such use shall be permitted one (1) wall sign, provided that:

(i) Such sign shall not exceed two (2) square feet in sign area;

(ii) Such sign shall not be separately illuminated; and

(iii) Such sign shall not contain any commercial message.

(b) Institutional uses located in residential zoning districts and planned unit developments designated for such use, shall be permitted one (1) wall sign per public entrance, provided that:

(i) Such sign shall not exceed three (3) square feet in sign area; and,

(ii) Each sign may be illuminated only by direct external illumination.

(18) Gasoline trade signs. Petroleum product pumps and dispensers that are within view of the public right-of-way shall be permitted to display only that information required by law along with brand name and type of product being dispensed. No other advertising shall be displayed on the pumps, temporary or permanent.

(a) Principal ground sign. Premises that dispense retail bulk petroleum products by pump shall be allowed to display the changeable copy pricing of such products within a single principal ground sign or wall sign. The principal ground sign may also contain the name and/or logo of the principal tenant; provided, however, said principal ground sign or wall sign shall conform to the design requirements contained in Table 2 of this chapter (see § 14-404).

(b) Canopy sign. When an enclosed principal structure exists, all canopy signs shall be calculated and deducted from the total allowable wall sign area. In the absence of an enclosed principal structure, for the purposes of this subsection, canopy signage may be allowed in addition to the permitted principle ground sign. With the exception of the measurable area for placement of the canopy sign, no internally illuminated or back lighting of the outside canopy area or canopy roofline shall be permitted. Only one (1) canopy sign not exceeding a total sign

area of ten (10) square feet shall be permitted on one (1) canopy facade regardless of the number of streets the property fronts.

(c)     Gasoline pump identification sign.  For the purpose of identifying the brand of gasoline, each pump shall be allowed one (1) sign not to exceed one (1) square foot mounted on the pump facade.  No other commercial message shall be displayed.

(d)     Multiple-tenant convenience centers.  For the purpose of identifying multiple tenants within a convenience center, the principal ground sign or wall sign may be divided equally among those tenants occupying the convenience center; provided, however, said principal ground sign shall conform to the design requirements contained in Table 2 of this chapter.



Figure 9: Multi-tenant Convenience Store Sign

(19)   Subdivision development sign:

(a)     Such signs shall be limited to one (1) located within one hundred feet (100') of the primary entrance to the subdivision provided the sign must be located on property located within the subdivision.

(b)     Such sign shall not exceed seventy-two inches (72") in height measured from finished grade including a decorative cap.

(c)     The allowable sign area shall be twenty-four (24) square feet and the sign shall not exceed seventy-two inches (72") in height measured from finished grade.

(d)     The sign may be double-sided and shall be attached to two (2) separate decorative posts white in color located not more than forty-eight inches (48") apart on center.

(e)     Such sign shall not contain a commercial message.

(f)     The base of the sign shall be planted with evergreen shrubbery and seasonal colors in an area equivalent to the total sign area.

(g)     The sign shall be removed upon development of ninety percent (90%) of available lots in the subdivision.

Figure 10: Subdivision Development Sign

(20) Temporary residential yard signs. Signs shall be permitted, provided that such signs do not exceed five (5) square feet in surface area and 48 inches in height measured from finished grade. Signs shall be set back from the public right-of-way a minimum of fifteen feet (15').

(21) Street numbers. All occupied buildings and/or structures shall have prominently displayed on the front façade near the primary entrance or upon the principal ground sign, the street number assigned to the building and/or structure so as to be readily identified by emergency response personnel. If mounted to a wall, street number signs shall not be calculated as part of the total allowable sign area for a wall sign.

(22) Suspended sign (planned commercial). Suspended signs shall be allowed under canopies provided that:

(a) Such sign shall not exceed one (1) per building or tenant entrance;

(b) Such signs shall not exceed three (3) square feet in sign area;

(c) Such signs shall not be separately illuminated; and,

(d) Such signs shall contain only the two (2) pieces of information excluding the street number or suite number of the occupant served by the entrance.

(23) Shopping center signs:

(a) Qualifying sites - shopping center signs may be permitted on commercial sites that meet all of the following criteria:

(i) The property upon which the sign would be located is zoned C-2.

(ii) The commercial project is located directly adjacent to Canada Road, Highway 64, or Highway 70.

(iii) The project contains at least twenty thousand (20,000) square feet of leasable area.

(iv) The project contains at least eight (8) tenant spaces.

(b) Standards. If a property qualifies for a shopping center sign, the following standards shall apply:

(i)      A maximum of one (1) shopping center sign shall be allowed per street frontage and shall be located only on an arterial road (Canada Road, Highway 64, or Highway 70).

(ii)     The maximum total sign area shall be one hundred fifty (150) square feet

(iii)    The maximum size of the directory space shall be one hundred twenty (120) square feet.

(iv)     The maximum height of the sign shall not exceed fifteen feet (15').

(v)      The maximum width of the sign face shall be ten feet (10').

(vi)     The maximum individual tenant space on the sign shall be fifteen (15) square feet.

(vii)    The minimum letter height allowed for tenant identification on the sign shall be ten inches (10").

(viii)   The minimum setback from right-of-way is ten feet (10').

(ix)     No shopping center sign shall be located within five hundred feet (500') of another shopping center sign.

(x)      The shopping center sign shall include the street address of the center, or the address range if more than one (1) address is included in the project.

(xi)     The sign shall be placed upon a brick or stone base a minimum of eighteen inches (18') in height measured from finished grade.

(xii)    The base of the sign shall be landscaped with evergreen and deciduous shrubbery and seasonal colors on each side of the sign in at least an area equivalent to the total sign area of each face of the sign.

(xiii)   No sign within six hundred feet (600') of any residential district shall be illuminated between the hours of midnight and 6:00 A.M. unless the sign is visibly obstructed from the residential district. (1989 Code, § 4-204, as amended by Ord. #192, Dec 1996, replaced by Ord. #03-41, June 2003, and amended by Ord. #04-59, March 2004, Ord. #07-108, Aug. 2007, Ord. #07-109, Aug. 2007, Ord. #12-177, Aug. 2012, and replaced by Ord. #16-245, Oct. 2016)

**14-405.  Prohibited signs and devices.** All signs not express permitted under this chapter or exempt from regulation as provided for in this chapter are prohibited.  Such signs include, but are not limited to:

(1)      Signs which are of a size, location, movement, content, coloring, or manner or illumination which may be confused with or construed as a traffic control device or which hide from view any traffic or street sign or signal;

(2)     Signs which contain or are an imitation of an official traffic sign or signal or contain the words "Stop," "Go Slow," "Caution," "Yield," "Danger," "Warning" or similar words;

(3)     Signs which show pictures of human figures, animals or food, and signs which contain characters, cartoons or statements of an obscene, indecent or immoral character which would offend public morals or decency;

(4)     Signs which are of a size, location, movement, content, coloring, or manner or illumination which may be confused with or construed as a traffic control device or which hide from view any traffic or street sign or signal;

(5)     Signs which purport to be, or are an imitation of, or resemble an official traffic sign or signal;

(6)     Changeable copy signs (manual and automatic), except for civic, institutional and schools.  Any changeable copy sign (manual) that does not have a locked, vandal-proof access cover;

(7)     Canopies with backlighting shall not be allowed;

(8)     Any internally illuminated sign, unless permitted in a commercial district;

(9)     Beacons;

(10)    Rotating signs;

(11)    Snipe signs, or off-premise signs attached to utility poles, trees, or any like freestanding structure;

(12)    Windblown devices;

(13)    Flashing signs;

(14)    Open channel letter signs;

(15)    Projecting signs;

(16)    Canopy signs;

(17)    Marquee signs;

(18)    Tag signs;

(19)    Portable signs;

(20)    Double-faced, "V"-type back-to-back signs;

(21)    Pole signs;

(22)    Project signs;

(23)    Inflatable signs;

(24)    Signs painted on or attached to balloons and other such devices, whether hot air or cold air or gas filed;

(25)    Animated signs;

(26)    Signs which emit audible sound, odor or visible matter;

(27)    Off-premise signs;

(28)    Any commercial sign located in a residential district not otherwise provided for in this chapter;

(29)    Strips or strings of lights outlining property lines, sales areas, roof lines, doors, window, wall edges, or other architectural elements of a building, provided, however, this prohibition shall not apply generally to holiday decorations and lighting;

(30) Neon and other similar type signs located in such a manner as to attract public attention from outside the building that:

(a) Contain a message clearly intended for public recognition outside the buildings such as "drive thru" and other similar messages; or

(b) Are legible from the public right-of-way or adjacent property; provided, however, an illuminated sign containing the word "Open" may be displayed in the front window of a tenant space provided such sign does not exceed four (4) square feet in sign area and must be turned off after business hours or when the tenant space is not being occupied;

(31) Signs attached to, suspended from or painted on any vehicle which is regularly parked on any street or private property when one of the purposes of so locating such vehicle is to display, demonstrate, and advertise or attract the attention of the public:

(a) It is not a violation of this section merely to have a common logo of business sign attached to, suspended from, or painted on a company vehicle regularly engaged in the business of the owner, and;

(b) When appropriate authorities determine that a vehicle is being regularly parked in a manner that violates this chapter, the city will issue a single notice of violation to the owner of the vehicle, to remove said vehicle from the premises. Failure to remove said vehicle might result in further legal action including the removal of said vehicle by the city.

(32) Any sign attached to an accessory structure, except an incidental sign, if such sign is legible from the public right-of-way or from an adjoining property;

(33) Signs which are structurally unsound or which are rendered structurally sound by guy wires or unapproved facing or bracing;

(34) Abandoned, neglected or dilapidated signs;

(35) Any other attention-attracting device, except for those conforming to the dimensional, design, lighting and other standards applicable to a sign in the same location;

(36) Any sign that obstructs or substantially interferes with any window, door, fire escape, stairway, ladder, or opening intended to provide light, air, ingress, or egress to any building;

(37) Ground signs exceeding thirty-two (32) square feet in copy area and/or signs and sign structures in excess of seventy-two inches (72") in height unless otherwise provided for in this chapter;

(38) Signs in any area designated as an undisturbed buffer pursuant to a federal, state or local law, pursuant to a condition of approval for a subdivision, planned development or site plan;

(39) Signs which advertise an activity illegal under federal laws, the laws of the State of Tennessee, or any laws of Shelby County or the City of Lakeland; and

(40)     Any sign that exhibits statements, words or pictures of an obscene nature.

(41)     Signs not expressly permitted in this chapter are prohibited. (1989 Code, § 4-205, as replaced by Ord. #03-41, June 2003, amended by Ord. #04-59, March 2004, and replaced by Ord. #16-245, Oct. 2016)

**14-406.  Design and construction standards.** (1) Construction standards.  All signs shall be designed, constructed and maintained in accordance with the following standards:

(a)     All signs shall comply with applicable provisions of local, state and federal building codes including seismic design standards and wind load design specifications.

(b)     Electrical signs that have internal wiring or lighting equipment, and external lighting equipment that directs light on signs, shall not be erected or installed until an electrical permit has been obtained from the city or authority having jurisdiction.  All such signs and equipment shall bear the seal of approval of an electrical testing laboratory that is nationally recognized as having the facilities for testing and requires proper installation in accordance with the National Electrical Code.  All wiring to electrical signs or to freestanding equipment that lights the sign shall be installed underground.

(c)     Except for permitted banners, flags, temporary signs and window signs conforming in all respects with the requirements of this chapter, all signs shall be constructed of permanent materials and shall be attached to the ground, a building or another structure by direct attachment to the wall, frame or structure.

(d)     All ground-mounted signage shall include landscaping around the entire base of the sign structure.  Landscaping shall consist of multiple rows of evergreen and deciduous plant materials and seasonal colors that add visual interest to the sign.  All landscaping shall be irrigated.  All plant materials shall be properly maintained including the immediate removal and replacement of any dead or diseased plant materials.

(2)     Maintenance standards.  All signs shall be maintained in good structural condition, in compliance with all building and electrical codes, and in conformance with this chapter. specifically:

(a)     A sign shall have no more than twenty percent (20%) of its surface area covered with disfigured, cracked, ripped or peeling paint, poster paper or other material for a period of more than thirty (30) days.

(b)     A sign shall not stand with bent or broken sign facing, with broken supports, with loose appendages or struts, or more than fifteen degrees (15°) from vertical for a period of more than ten (10) days.

(c)     A sign shall not have weeds, trees, vines, or other vegetation growing upon it, or obscuring the view of the sign from the public

right-of-way from which it is to be viewed, for a period of more than fifteen (15) days.

(d) An internally illuminated sign shall be allowed to stand with only partial illumination for a period of no more than fifteen (15) days.

(e) Flags shall not be faded, tattered or torn.

(f) All landscaping installed around the base of a sign shall be maintained whereby any dead plant materials are replaced with the same plant material in a size and spread comparable to other plant materials installed around the base of the sign at the time the replacement plant materials are being installed.

(3) Signs not to create traffic hazard. (a) Clear sight triangle. All entrance signs and freestanding signs located near the corners of an intersection shall be located outside of the clear sight triangle. Such triangle shall be measured at a distance of thirty five feet (35') running parallel along each leg of the road or driveway pavement surface and connecting them to form a triangle area. This area shall be free of any permanent or temporary signs that may inhibit clear sight visibility for motorists and/or pedestrians.

(b) Other hazards. No signs shall be erected, and there shall be no lighting of signs or premises, in such a manner or in such location as to obstruct the view of, or be confused with, any authorized traffic signal, notice or control device.

(c) Removal. Any such signs or light sources shall be removed at the direction of the city. If not removed by owners or occupants of the property within ten (10) days of notice, the city shall cause the signs to be otherwise removed, and the cost of removal including all incidental administrative costs shall become a lien against the property until satisfied.

(4) Colors. Signs that are internally illuminated shall not use more than three (3) colors, plus a background color, unless specified in an approved sign plan. The background color shall be non-illuminated. Signs externally illuminated may upon approval of the design review commission have up to five (5) colors excluding the background color. For panel signs, the background color shall mean the panel itself. For channel letters, the background color shall mean the returns. If the portion of the building wall behind a wall sign is painted a different color than the remainder of the wall, then such portion of the wall shall be counted as a background color. Trim colors shall be counted as background colors.

(5) Display of logos and trademarks, general. Logos and trademarks may be included on signs (except identification, residential and incidental signs) without separate restriction, provided that such logos and trademarks are consistent with the approved color scheme shown on the approved sign plan.

(6) Display of registered trademarks. A federally registered trademark which is registered in colors inconsistent with the applicable sign plan be

displayed in whole or part on a sign in its registered form and color(s), provided that it may only occupy up to twenty-five percent (25%) of the permitted area of the sign as permitted by the design review commission, without regard to the color limitations otherwise applicable to the sign; placement on the sign shall be in accordance with any applicable provisions of the approved sign plan and as may be required by the design review commission.

(7) Lighting. Sign illumination shall only be achieved through the following standards:

(a) A white, steady, stationary light of reasonable intensity that is directed solely at the sign. The light source shall be shielded from adjacent buildings and streets, and shall not be of sufficient brightness to cause glare or other nuisances to adjacent land uses.

(b) Internal illumination shall provide steady, stationary lighting through translucent materials. The use of translucent backgrounds is not permitted. Backgrounds shall be opaque and not permit the transmission of light through the sign face material. Illumination of a logo or trademark may be permitted provided translucent backgrounds are not utilized.

(c) If the wall sign is internally illuminated or back lit by any means, the entire light area shall be included within the allowable signage calculation for the site.

(d) The light from any illuminated sign shall not be of an intensity or brightness that will interfere with the peace, comfort, convenience, and general welfare of residents or occupants of adjacent properties.

(e) No sign shall have blinking, flashing, or fluctuating lights or other illuminating devices that have a changing light intensity, brightness, or color.

(f) Exposed bulbs shall not be used on the exterior surface of any sign.

(g) Exposed neon shall not be allowed including use as an architectural detail element.

(h) All wall signs shall be either individual translucent letters and an individual logo or reverse channel letters and individual logo with a backlit light source.

(i) No color lights shall be used at any location or in any manner so as to be confused with or construed as traffic control devices.

(j) Neither direct nor reflected light from primary light sources shall create a hazard to operators of motor vehicles.

(k) All electrical service to ground mounted signs shall be placed underground. Electrical service to other signs including wall signs shall be concealed from public view.

(l)      A sign placed in a residential district shall not be internally illuminated.  The sign may be illuminated using back lighting or reverse channel letters which create a halo-effect or ground-mounted direct light fixture not to exceed one hundred (100) watts and properly screened from public view with evergreen plant materials.

(8)      Signs in public right-of-way. (a) Permanent signs.  Permanent signs shall be limited to:

(i)      Public signs erected by or on behalf of a governmental body to identify public property, convey public information and direct or regulate pedestrian or vehicular traffic;

(ii)      Bus stop signs erected by a public transit company;

(iii)      Informational signs of a public utility regarding its poles, lines, pipes or other facilities;

(iv)      Signs appurtenant to a use of public property permitted under a franchise or lease agreement with the city; and

(v)      Signs posted in association with municipal, county, state or federal authorities for crime prevention and public safety and health.

(b)      Temporary signs:

(i)      Legal notices erected by or on behalf of a governmental body;

(ii)      Emergency warning signs or devices erected by a governmental agency, a public utility company, or a contractor doing authorized or permitted work within the public right-of-way.

(c)      Subdivision and neighborhood identification signs. Ground-mounted signs integrated into entrance treatment with the name of the residential or non-residential subdivision or planned unit development may be located on one or both sides of each principal roadway entrance into the development provided that:

(i)      Roadside. One (1) sign located on one side of the entrance road or on both sides of the entrance road at each principal entrance to the subdivision or planned unit development, provided that:

(A)      Such sign shall not exceed thirty-two (32) square feet in area; and,

(B)      Such sign shall not exceed seventy-two (72) inches in height, unless such sign is integrated into a wall or column, in which case such sign shall not exceed the height of the wall or column; and,

(C)      Such sign shall not contain a commercial message.

(d)      Other signs in public right-of-way. Any other sign placed in the public right-of-way in violation of this chapter shall be deemed a public nuisance and may be seized by the enforcement official or other

representative of the city, and the person owning or placing the sign may be charged both with a violation of this chapter and with the cost of removing and disposing of the sign. (1989 Code, § 4-206, as replaced by Ord. #03-41, June 2003, amended by Ord. #04-59, March 2004, and replaced by Ord. #16-245, Oct. 2016)

**14-407. Interstate and Highway 64 Corridor signs.** Interstate signage. The following signs shall be permitted on a parcel that is zoned C2, general commercial and adjoins the right-of-way of Interstate 40:

(1) The monument-style interstate sign shall contain a solid base and shall be solid monument-style or a minimum of two (2) architecturally detailed columns of similar material to the base of the sign as approved by the design review commission. No exposed posts or poles shall be permitted. The materials should match and/or compliment the materials, colors, and textures of the principal structure on the subject parcel.

(2) The monument-style interstate sign shall be placed in the middle third of the frontage directly abutting Interstate 40 unless otherwise authorized by the design review commission to be placed on a property not facing the Interstate.

(3) The height shall not exceed thirty-five feet (35') measured from the finished grade to the uppermost element of the sign structure.

(4) The maximum sign area per sign face shall not exceed one hundred (100) square feet.

(5) The sign face shall be limited to three (3) colors excluding the background color if internally illuminated. The design review commission may allow the sign face to exceed three (3) colors excluding the background color if non-internally illuminated not to exceed a maximum of five (5) colors excluding background color.

(6) The sign may be internally illuminated provided the background color shall be opaque and not be permitted to transmit light through the material.

(7) The sign shall be limited to two (2) pieces of information. Both sign faces shall contain the same pieces of information.

(8) Multiple-tenant occupancies shall not be permitted to have multiple-tenant signage (i.e., the principal tenant or the shopping center shall be the only tenant permitted to have a sign even if a multiple tenant occupancy exists).

(9) The sign shall be positioned in the yard facing the right-of-way of Interstate 40 and shall be no closer than fifty feet (50') from the property line abutting the Interstate right-of-way.

(10) The base surrounding the sign shall be landscaped an area equal to the total sign area and shall consist of a combination of evergreen and deciduous plant materials including trees and shrubs. All landscaping shall be irrigated. Any dead or diseased plant materials shall be replaced immediately.

(1989 Code, § 4-207, as amended by Ord. #193, Dec. 1996, and replaced by Ord. #03-41, June 2003, and Ord. #16-245, Oct. 2016)

**14-408.  Administration and penalties.** (1) Scope of authority of design review commission.  The design review commission shall not have the authority to alter or amend this chapter nor to approve a sign not in conformity herewith except as provided in § 14-410 of this chapter and is directed to cooperate with the code enforcement official in the enforcement of same, including but not limited to, the following functions:

(a)     The design review commission, upon approving a sign, shall forward the application to the code enforcement official with approval noted thereon.

(b)     The design review commission shall identify signs that it believes to be illegal, variance, and/or non-conforming signs to the code enforcement official for enforcement.

(c)     The design review commission may take other action within its authority to insure safety, eliminate hazards, and eliminate encroachment upon public streets and property and encroachment upon adjoining land or users.

(d)     The design review commission, while it may not approve signs in violation of this chapter, has the specific and general authority to refuse approval of signs, otherwise in compliance with this chapter, which because of unsafe location, unsafe construction, aesthetic deficiency, insufficient structure and/or encroachment upon surrounding property, violate the spirit of this chapter, which is dedicated to the safety and public welfare of all citizens and businesses in the City of Lakeland.

(e)     The design review commission shall not review:

(i)     Applications and related documents for temporary signs; or,

(ii)     Individual signs that are a part of a previously approved site plan; or

(iii)     Wall signs that are in compliance with all aspects of the sign ordinance.

(2)     Authorization to enforce sign ordinance.  The code enforcement official is hereby authorized and directed to enforce all of the provisions of this chapter. Upon presentation of proper credentials, the code enforcement official, or his duly authorized representative, shall be permitted by the owner or occupant to enter at reasonable times, any building, structure or premises in the city of Lakeland to perform any duty imposed upon him by this chapter.

(3)     Appeal. (a)     Appeal from decision of the code enforcement official:

(i)     Any applicant aggrieved by any decision or order of the Code enforcement official may appeal, within a period not to exceed ten (10) days from said action, to the design review commission by serving written notice to the city recorder who, in

turn shall immediately transmit the notice to the design review commission which shall meet to hear said appeal within thirty (30) days thereafter.

(ii) If the design review commission should fail to hear the appeal within thirty (30) days, the appeal shall be referred directly to the board of commissioners.

(iii) The code enforcement official shall take no further action on the matter pending the design review commission's decision, except from unsafe signs that present an immediate and serious danger to the public, as provided elsewhere in this chapter.

(b) Appeal from decision of design and review commission:

(i) The decision of the design review commission may be appealed directly to the board of commissioners upon written notice of appeal to the board within five (5) days of said action.

(ii) The appeal shall be heard at a scheduled meeting of the board of commissioners.

(iii) The board of commissioners may accept, reject or modify the action of the design and review commission.

(iv) Any action on an appeal from the design review commission shall require a minimum of four (4) affirmative votes of the board of commissioners and in the absence thereof, the action of the design review commission shall become final and binding.

(4) Penalties. Any person, firm or corporation violating any of the provisions of this chapter shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined not more than the maximum allowable fine under state law, each day's continuance of a violation constituting a separate offense. The owner of any sign, building, premises, or part thereof, where a sign in violation of this chapter shall be placed, or shall exist, and any person who may have assisted in the commission of any such violation, shall be guilty as an accessory of the offense. (1989 Code, § 4-208, as replaced by Ord. #03-41, June 2003, amended by Ord. #04-59, March 2004, and replaced by Ord. #16-245, Oct. 2016)

**14-409. Permits and fees.** (1) Permits required for signs. (a) All permanent and temporary signs allowed under this chapter, including existing signs, shall require a permit unless provided otherwise in this chapter.

(b) No sign shall be placed, constructed, erected, altered or relocated on a site without a permit, except as otherwise provided herein. Required electrical permits shall be obtained at the same time the sign permit is obtained by the applicant.

(c) With the exception of signs that comply with a sign plan contained within an approved planned unit development (provided such

plan was approved prior to month, date, year), no sign permit of any kind shall be issued for an existing or proposed sign unless such sign is consistent with:

(i) Any sign plan approved and in effect for the property; and,

(ii) The conditions of this chapter.

(d) No permit shall be issued for a permanent sign requiring a sign permit until the application has received the review and approval of the design review commission as provided for in this chapter.

(e) Any sign standard not included in a sign plan will be controlled by the sign ordinance.

(2) Application requirements. (a) An application for a sign permit may be filed only by the owner of the property on which the sign is to be erected, or by an agent, lessee, or contract purchaser specifically authorized by the owner to file such application. Where an agent, lessee, or contract purchaser files the application, the agent, lessee, or contract purchaser shall provide the city with written documentation that the owner of the property has authorized the filing of the application.

(b) An application for a sign permit shall be filed with the City of Lakeland on a form prescribed by the city, along with the fee for such application as contained in Appendix "A" of the City Code of Lakeland, Tennessee.

(c) Each application for a sign permit shall contain information required on the application form, and such other information regarding the proposed sign as the city and/or design review commission may deem necessary in order to determine whether the proposed sign(s) complies with the applicable requirements of this chapter and other applicable ordinances of the city.

(d) The city shall determine whether the application is complete. If the city determines that the application is not complete, then it shall notify the applicant of any deficiencies and shall take no further steps to process the application until the applicant remedies the deficiencies.

(3) Fees. The permit fee for each sign allowed under the requirements of this chapter shall be as prescribed in Appendix "A" of the City Code of Lakeland, Tennessee.

(4) Plan submittal required. A sign plan is required for all residential subdivisions, multifamily and townhome developments, planned unit developments, non-residential subdivisions, non-residential developments, and all multi-building or multi-occupant non-residential developments before any signs for such development may be erected on the property. All owners, tenants, subtenants and purchasers of individual units within the development shall comply with the sign plan approved by the City of Lakeland.

(5) Sign plan elements. The sign plan shall consist of five (5) distinct design elements that shall govern all signs within the development: location, materials, size, color and illumination. The sign plan shall include details, specifications, dimensions, and plans showing the proposed locations of sign and how such locations conform to the requirements of this chapter. Material samples proposed for use on sign shall be included with submittal of plan documents. A full-color rendered site plan and elevation drawing shall be included with the submittal of plan documents. The sign plan shall also show the computations of the maximum total sign area permitted for the site.

(6) Plan review procedure. A sign plan shall be submitted for review and approval by the design review commission. Prior to consideration of a sign plan by the design review commission, the applicant shall meet with city staff to review the sign elements relative to applicable provisions of this chapter. city staff shall provide a written report to the design review commission outlining their findings for consideration by the commission during the review of the sign plan. The design review commission shall review the sign plan in accordance with § 14-408(1) of this chapter.

(7) Plan review criteria. A Sign plan for a residential or non-residential subdivision, planned unit development, non-residential structure (single occupant, multi-building or multi-occupant), and other projects proposing the installation of signage requiring review and approval by the design review commission and issuance of a sign permit, shall not be approved until and unless the city finds that:

(a) The sign plan provides that signs of a similar type and function within the development will have a consistent color scheme, architectural style, and material construction; and

(b) The sign plan provides for signs are context sensitive and fit the massing, scale, design theme, architectural style of the buildings and are generally consistent with the provisions contained in the remainder of this chapter. The DRC may approve sign plan elements that vary from the general requirements of the sign ordinance if the applicant can demonstrate how the varied standards are contextually appropriate and would enhance the overall project. Any sign standard not provided in the sign plan shall be controlled by the sign ordinance.

(8) Amendment to approved sign plan. An approved sign plan may be amended by filing a new sign plan with city:

(a) The application may be filed only by the owner of the land affected by the proposed change; or an agent, lessee or contract purchaser specifically authorized by the owner to file such application. Before filing the application, all landowners affected by the proposed change must give written authorization.

(b) Any new or amended sign plan (including those for planned unit developments) shall include a schedule for bringing into conformance

within ninety (90) days all signs not conforming to the proposed plan. This shall apply to all properties governed by the sign plan.

(9)     Effect of approval of sign plan.  After approval of a sign plan, or an amended sign plan, no sign shall be erected, placed, painted, or maintained, except in accordance with such plan, and such plan may be enforced in the same way as any provision of this chapter.

(10)     Lapse of sign permit.  A sign permit shall lapse automatically if the business license for the premises lapses or is revoked or not renewed.  A sign permit shall also lapse if the business is discontinued for a period of ninety (90) days or more.

(11)     Permits for temporary signs.  Temporary signs on private property shall be allowed only in accordance with the provisions of § 14-404(15) of this chapter and only upon issuance of a temporary sign permit, which shall be subject to the following terms:

(a)     A temporary sign permit shall allow the use of a temporary sign for a specified period.

(b)     Temporary signs shall not require the review and approval by the design review commission prior to issuance of a temporary sign permit.

(12)     Removal of signs upon discontinuance of use.  Whenever the use of a building or premises by a specific business or other establishment is discontinued by the owner or occupant for a period of ninety (90) days, the sign permits for all signs pertaining to that business or establishment that were installed by the occupant or owner shall be deemed to have lapsed, and the signs shall be removed at the expense of the occupant and/or owner, as well as all signs and related structural members which do not conform to the standards of this chapter.  The sign plan approved by the city, if applicable, shall remain in effect provided it does not conflict with the requirements of this chapter. (1989 Code, § 4-209, as amended by Ord. #192, Dec. 1996, replaced by Ord. #03-41, June 2003, amended by Ord. #04-59, March 2004, and replaced by Ord. #16-245, Oct. 2016)

**14-410.  Variances.** (1) Purpose.  Where a literal application of the terms of this chapter, due to special circumstances, would result in an unusual hardship in an individual case, the design review commission may grant a variance to the number of colors, use of logos and trademarks, location, orientation, illumination, and other related design elements for permitted signs as specifically provided for in various sections of this chapter and pursuant to procedures set forth in city code, where all the following conditions exist:

(a)     Exceptional conditions pertaining to the property where the sign is to be located as a result of its size, shape or topography, which are not applicable generally to other lands or structures in the area.

(b)     The applicant would be deprived of rights that are commonly enjoyed by others similarly situated.

(c) Granting the variance would not confer on the applicant any significant privileges that are denied to others similarly situated.

(d) The exceptional circumstances are not the result of action by the applicant.

(e) The requested variance is the minimum variance necessary to allow the applicant to enjoy the rights commonly enjoyed by others similar situated.

(f) Granting of the variance would not violate more than one (1) standard of this chapter.

(g) Granting of the variance would not result in allowing a sign that interferes with road or highway visibility or obstruct or otherwise interfere with the safe and orderly movement of vehicular and pedestrian traffic.

(2) Variance allowed. A request for variance from the sign ordinance shall be submitted to the design review commission through the City of Lakeland. Final review of the variance shall be based upon the criteria enumerated in § 14-410(1) of this chapter. No variance shall be granted to the height or setback requirement in excess of ten percent (10%) of the prescribed standards in this article. The design review commission may allow variances to dimensional requirements for wall sign area (not the method of computation) that permit an increase above the maximum sign area provided there is suitable wall surface and building massing upon which to place a larger wall sign. (1989 Code, § 4-210, as amended by Ord. #192, Dec. 1996, replaced by Ord. #03-41, June 2003, amended by Ord. #04-59, March 2004, and replaced by Ord. #16-245, Oct. 2016)

**14-411. Inspection, removal and safety.** (1) Repair and/or replacement of signs. It shall be the obligation of the code enforcement official to maintain routine inspections upon all signs in the City of Lakeland, independently and/or upon the referral of the design review commission. The code enforcement official will perform routine inspections to insure all signs are reasonably maintained, promptly repaired, remain in compliance with this chapter and still exhort the business of the occupant. In the event that the code enforcement official determines that a sign is deficient as above recited, he shall cause to be delivered a formal written notice to the owner and/or occupant directing the correction of the deficiency within ten (10) days. Upon failure to properly correct the deficiency of said notice within the time allotted, the sign shall be rendered an illegal sign subject to the enforcement provisions as hereinbefore provided.

(2) Annual inspection required. (a) The City of Lakeland shall inspect once annually on or about the anniversary date of this chapter signs properly permitted by this chapter; provided, however, single-family subdivision entrance signs are exempt from the annual inspection requirement.

(b) All signs and components thereof shall be kept in good repair and in safe, neat, clean and attractive condition.

(3) Removal of illegal signs required. All illegal signs shall be removed within sixty (60) days from the effective date of this chapter.

(4) Notice to remove illegal sign. In addition to the other rights and privileges created hereby, the code enforcement official, upon determining that a sign, sign structure, or appurtenance thereto, is in violation of the chapter, may in addition to other penalties, deliver notice to the owner and/or occupant to remove the illegal sign within ten (10) days. The code enforcement official may also cause to be issued summons by the clerk of any court having jurisdiction over said violation, citing the violator to appeal and answer the charge of violation before said court, which finding may be appealed as any other conviction of an ordinance violation to the circuit court.

(5) Removal of sign. (a) Temporary signs erected or maintained in violation of this chapter shall be removed by the code enforcement official or his designee without notice.

(b) The code enforcement official or his designee shall remove any sign immediately and without notice if the sign presents an immediate threat to the safety of the public.

(c) Any sign removal shall be at the expense of the property owner.

(6) Removal of abandoned signs. All signs that no longer correctly direct or exhort any person, advertise a bona fide business in progress, lessor, owner, project or activity conducted or product available shall be removed within thirty (30) days from the cessation of said activity.

(7) Removal of unsafe structures. Upon notice by the code enforcement official to the owner or occupant of property upon which an illegal sign, an unsafe sign, unsafe sign structure or unsafe appurtenance thereto, is located, the said owner or occupant, within twenty-four (24) hours, shall remove same, or in the alternative, with the leave of the city manager, the code enforcement official or his designee may remove same or provide for its immediate removal, the cost of said removal to be borne by the owner and/or occupant.

(8) Provisions of federal and state law expected. No provision of this chapter shall contravene by term or application any existing or later enacted statute or regulation of the federal or state governments, and in the event of said conflict, the provisions of the state and/or federal regulations shall control, and signs permitted by said statute may be erected in size, dimensions, set-back and design at the minimum requirements of said state and/or federal law or regulation, and subject to the review and approval of the design and review commission and upon reference to the city attorney upon his certification of the law to the design and review commission. (as added by Ord. #03-41, June 2003, and replaced by Ord. #16-245, Oct. 2016)

**14-412.  Nonconforming signs.**  It is the policy of the City of Lakeland to encourage that all signs within the city be brought into compliance with the terms and requirements of this chapter.

(1)     Nonconforming signs adversely affect public health, safety and welfare.  The city finds that non-conforming signs may adversely affect the public health, safety and welfare.  Such signs adversely affect the aesthetic characteristics of the city and may adversely affect public safety due to visual impact of said signs on motorists and the structural characteristics of said signs. Accordingly, the following registration requirements are found to be necessary in order to minimize these possible adverse effects through annual inspections and maintenance and allow the city to remain cognizant of the locations and maintenance of said signs.

(2)     Inspection of nonconforming signs.  The city may inspect existing signs in the city from time to time to determine if such signs conform to the provisions of this chapter.

(3)     Discontinuance of nonconforming signs.  Any nonconforming sign, which is not used or leased for a continuous period of ninety (90) days, shall not be reused for sign purposes unless and until it fully conforms to the terms and requirements of this chapter.

(4)     Removal of non-conforming signs. All non-conforming signs provided the non-conformity has been documented as hereinbefore provided shall be removed within the earliest applicable time period or occurrence as specified below:

(a)     Change in use.  When the use of a property changes (including but not limited to the redevelopment of the site or a change in use, the signs on that property must be brought into compliance with the requirements of this chapter.

(b)     Abandonment.  Any sign related to a use or business that ceases to exist or operate for a continuous period of ninety (90) days shall be considered nonconforming and shall not be reused for sign purposes unless and until it is in full conformity with the provisions of this chapter, subject to issuance of a new sign permit.

(c)     Alterations to nonconforming signs.  No alterations to a nonconforming sign or sign structure shall be permitted except minor repairs and maintenance.   Any structural or other substantial maintenance or improvement to a nonconforming sign (except painting or refinishing the surface of the existing sign face or sign structure so as to maintain proper appearance) shall be deemed an abandonment of the nonconforming status, shall render any prior permit void, and shall result in the reclassification of such sign as an illegal sign.

(5)     Alteration, expansion, moving.  No nonconforming sign shall be changed or altered in any manner which would increase the degree of its nonconformity, be expanded, altered to prolong its useful life, or removed in whole or part to any other location where it would be nonconforming.

(6) Damage or destruction. In the event that any nonconforming sign is damaged or destroyed by any means, to the extent of more than fifty percent (50%) of the fair market value of such sign immediately prior to such damage or destruction, such sign shall not be restored unless it shall thereafter, conform to this chapter.

(7) Maintenance and repair of nonconforming signs. No structural repairs, change in shape, size or design, shall be permitted except to make a nonconforming sign comply with all requirements of this chapter.

(8) Other sign permits on premises. (a) For single occupant properties, the issuance of a sign permit for a new or replacement sign shall be subject to the condition that all nonconforming signs on that property shall be removed or brought into compliance as part of the work of installing the new or replacement sign.

(b) For multi-occupant properties, the issuance of a sign permit for a new or replacement sign for any individual occupant shall be subject to the condition that all nonconforming signs for that occupant shall be removed or brought into compliance as part of the work of installing the new or replaced sign.

(c) This section shall not apply to the issuance of a permit for a temporary sign.

(9) Required removal. Where an amendment to a previously approved development plan is proposed, approval of such plan shall be contingent upon removal of all nonconforming signs on the site. For example, if an existing retail establishment proposed a building addition or parking expansion, then any nonconforming signs on the property must be brought into compliance as a condition of approval of the amended site plan.

(10) Replacement of nonconforming sign. Another nonconforming sign may not replace a nonconforming sign. (as added by Ord. #03-41, June 2003, amended by Ord. #04-59, March 2004, and replaced by Ord. #16-245, Oct. 2016)

**14-413. Severability.** The provisions of this chapter are severable. If any provision of this chapter or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, such invalidity shall not affect other provisions or applications of this chapter that can be given effect without the invalid provision or application. (as added by Ord. #16-245, Oct. 2016)

## CHAPTER 5

## MOBILE HOME PARKS[1]

**SECTION**

14-501. Jurisdiction.
14-502. Definitions.
14-503. Permits.
14-504. Fees.
14-505. Inspection services.
14-506. Application procedure.
14-507. Development site.
14-508. Site improvements.
14-509. Transportation system.
14-510. Utilities.
14-511. Mobile home site.
14-512. Service facilities.
14-513. Miscellaneous requirements.
14-514. Enforcement.
14-515. Amendment.
14-516. Penalties.

**14-501. Jurisdiction**. The regulations established within this chapter shall govern all mobile home parks within the city. Any owner of land within this area wishing to develop a mobile home park shall submit to the procedures outlined in this chapter and shall make those improvements necessary to comply with the minimum standards of this chapter. (1989 Code, § 8-501)

**14-502. Definitions**. Except as specifically defined herein, all words used in this chapter have their customary dictionary definitions where not inconsistent with the context. The term "shall" is mandatory. When not inconsistent with the context, words used in the singular number include the plural. Words used in the present tense include the future. For the purpose of this chapter certain words or terms are defined as follows:

(1) "Approved." Means acceptable to the appropriate authority having jurisdiction.

(2) "Building code." Unless otherwise designated, this term shall mean the Standard Building Code and its amendments.

---

[1]Municipal code reference
Building, utility and housing codes: title 12.

(3)     "Building inspector."  The person appointed by the city board of commissioners having jurisdiction over the city for the enforcement of the building code and other local developmental regulations, including this chapter.

(4)     "Common area." Any area or space designed for joint use tenants occupying mobile home developments.

(5)     "Developer." The person, firm, or corporation having a proprietary interest in a mobile home park for the purpose of preceding under this chapter.

(6)     "Diagonal tie." Any tie down designated to resist horizontal forces and which does not deviate less than 30 degrees from a vertical direction.

(7)     "Electric feeder."  That part of the electric distribution system between the transformer and the electrical connections of a mobile home.

(8)     "Ground anchor." Any device at a mobile home stand designed for the purpose of securing a mobile home to the ground.

(9)     "Health officer."  The director of the county or district health department having jurisdiction over the community health in the city, or his duly authorized representative.

(10)     "Internal street." In a privately owned mobile home park, this term shall mean a private street owned, constructed, and maintained by the developer which provides access to all spaces and facilities for common use by park occupants.

(11)     "Mobile home (trailer)."  A detached single-family dwelling unit with any or all of the following characteristics:

      (a)     Designed for long-term occupancy, and containing sleeping accommodations, a flush toilet, a tub or shower bath and kitchen facilities, with plumbing and electrical connections provided for attachment to outside systems.

      (b)     Designed to be transported after fabrication on its own wheels, or on a flatbed or other trailer or detachable wheels.

      (c)     Arriving at the site where it is to be occupied as a complete dwelling including major appliances and furniture, and ready for occupancy except for minor and incidental unpacking and assembly operations, locations of foundation supports, connection to utilities and the like.

(12)     "Mobile home lot." A parcel of land rented for the exclusive use of the occupants of a single mobile home.

(13)     "Mobile home park."  A parcel of land within the city under single ownership which has been improved for the placement of two (2) or more mobile homes for non-transient use.

(14)     "Mobile home stand." That part of land subdivided into lots, each lot individually owned to utilize as the site for placement of a single mobile home and its facilities.

(15)     "Occupied area." The total of all of the lot area covered by a mobile home and its accessory buildings on a lot or space.

(16) "Plat." A map or plan of an area indicating the location and boundaries of individual properties.

(17) "Service buildings." A structure housing a toilet, laundry facilities, office, or storage space.

(18) "Sewer connection." Consists of all pipes and fittings from the drain outlet of the mobile home to the inlet of the sewerage disposal system.

(19) "Site plan." This shall be the document, the contents of which are outlined within this chapter representative of the physical design of the mobile home park.

(20) "Subdivision regulations." This term shall refer to the subdivision regulations adopted by and in force within the city.

(21) "Tie down." Any device designed for the purpose of attaching a mobile home to ground anchors.

(22) "Travel trailer." A vehicular portable structure designed as a temporary dwelling for travel, recreational, and vacation uses, which:

(a) Is identified on the unit by the manufacturer as a travel trailer;

(b) Is not more than eight (8) feet in body width;

(c) Is of any weight provided its body length does not exceed 29 feet; or

(d) Is of any length provided its gross weight, factory equipped for the road, does not exceed 4,500 pounds.

(23) "Water connection." Consists of all pipes and fittings from the water inlet pipe of the mobile home to the outlet of the water distribution system.

(24) "Yards." That area on the mobile home lot or space between all lot or space lines and the sides of the mobile home and its attachments.

(25) "Zoning ordinance." This term shall mean the zoning ordinance adopted by and in force within the city. (1989 Code, § 8-502)

**14-503. Permits**. The following requirements for permits shall apply to any mobile home park within the city. The purpose of these permits shall be to provide contents to assure compliance with this chapter and other existing chapters; the public welfare demanding such.

(1) No place or site within the city shall be established by any person, group of persons and/or corporation as a mobile home park unless a valid permit has been issued by the city manager/recorder in the name of such persons, group of persons, and/or corporation for that specific mobile home park.

(2) It shall be unlawful for any person or persons to maintain or operate, within the city, any existing mobile home park unless such person or persons first obtain a permit therefor. Mobile home parks in existence as of the effective date of this chapter shall be required to obtain a mobile home park permit. Pre-existing mobile home parks which cannot comply with the

requirements regarding mobile home parks shall be considered as a non-conforming use.

(3)     Every person holding a mobile home park permit shall give notice in writing to the building inspector within twenty-four (24) hours after having sold, transferred, given away, or otherwise disposed of interest in and/or control of any mobile home park.  Such notice shall include the name and address of the person succeeding to the ownership of control of such mobile home park for the purpose of transferring the permit.

(4)     No mobile home park in the city shall operate without the appropriate city and county business permits or licenses.

(5)     It shall be unlawful to construct any building including accessory buildings, to move or alter any building, or locate a mobile home or any lot or space until the building inspector has issued a building permit for such.

(6)     Any permit issued "shall become" void six (6) months from the date of issuance unless substantial efforts have been made by the date to exercise that power permissible by the permit.

(7)     Any use, arrangement, or construction at variance with those originally authorized plans submitted as a basis for any permit shall be deemed a violation of this chapter and void the permit.

(8)     In accordance with Tennessee State Law, a permit for the installation of the mandatory mobile home anchoring system is required and obtainable from the appropriate state inspector.

(9)     No mobile home shall be used, placed, stored or serviced by utilities within the city or within any mobile home park in the city unless there is posted near the door of said mobile home a valid Tennessee State License or a HUD inspection sticker.

(10)    The building inspector is authorized to issue, suspend, or revoke permits in accordance with the provisions of this chapter.  (1989 Code, § 8-503)

**14-504.  Fees**.  In order to assure a more cost effective system for the provision of inspection services, permit fees are hereby established as follows:

(1)     Mobile home park permit fee.  An annual mobile home inspection fee shall be required for all mobile home parks within the city.  This fee for the mobile home park permit shall be collected by the county building inspector.

(2)     Business permit (license) fees.  Appropriate city and county fees are required for business permits and licenses and shall be obtained prior to the construction of any mobile home park within the city.

(3)     Electrical inspection fee.  An electrical inspection fee is required and shall be levied in accordance with Tennessee statutes for inspection services recommended.

(4)     Anchoring fee.  The state anchoring system inspection fee as required by Tennessee statutes shall be levied in accordance with said statutes.

(5) Tennessee license fee. A state license fee for mobile homes is required by Tennessee statutes and shall be levied in accordance with said statutes. (1989 Code, § 8-504)

**14-505. Inspection services**. The county building inspector and county health officer and all other authorized inspectors are hereby authorized and directed to make inspections within the city for the purpose of safeguarding the health and safety of the occupants of mobile home parks and of the general public. These representatives on behalf of the city shall have the authority to enter at reasonable times upon any private or public property for the purpose of inspections and investigations related to the performance of their duties concerning the enforcement of this chapter and other related regulations. Specifically, their inspections shall include but not be limited to the following duties:

(1) Building inspector. Upon inspection of a mobile home park or a mobile home by the building inspector, the following actions shall be undertaken for compliance with this chapter and other related regulations of the city which apply:

(a) Sections 14-507 through 14-513 of this chapter concerning the minimum standards acceptable for the development and operation of a designated mobile home park.

(b) Appendix "H" of the Standard Building Code outlining minimum mobile home standards.

(c) A review shall be conducted of all necessary permits for not only the park but also individual mobile homes with all violations reported by the building inspector to the appropriate authority.

(d) A visual review of the general health and safety conditions with any possible violations noted and reported by the building inspector to the appropriate authority.

(2) County health officer. The State Department of Health shall make inspections of the water system, sewage disposal system, and solid waste disposal facilities in accordance with Tennessee Code Annotated, §§ 68-24-101 and 68-24-120, and other state regulations.

(3) Electrical inspector. The electrical inspector shall make inspections in accordance with those powers designated by the appropriate state regulations.

(4) Anchorage inspector. The anchorage inspector shall make inspections of the mobile home anchorage and tie down facilities in accordance with Tennessee Code Annotated, § 68-45-105, and the State Fire Marshal's Office.

(5) The officials noted in the above subsection in the performance of their respective duties shall have the authority to inspect that register containing a record of all residents of a mobile home park.

(6)     It shall be the duty of the owners or occupants of mobile home parks and mobile homes or of the person in charge thereof to give the designated inspectors free access to such premises at reasonable times for the purpose of inspection.

(7)     It shall be the duty of every occupant of a mobile home park to give the owner thereof or his agent or employee access to any part of such mobile home park or its premises at reasonable times for the purpose of making alterations as are necessary to comply with this or other local regulations.

(8)     Upon inspection of any mobile home park in which conditions or practices exist in violation of this chapter or other related regulations, the building inspector shall give notice in writing to the person to whom the permit was issued that unless such conditions or practices are corrected within a six (6) month period, the  mobile home park shall be revoked and the operation of the mobile home park shall cease operation.  (1989 Code, § 8-505)

**14-506.  Application procedure**. (1)  The developer shall consult early and informally with the planning commission and the city engineer for advice and assistance before the preparation of the site plan and the formal application for approval in order to become familiar with all regulations and area plans.

(2)     Applications for a mobile home park shall be filed with the municipal planning commission for review and recommendation accompanied by a complete set of site, design and construction plans as required or prescribed by separate zoning and subdivision ordinances.  Said plans shall conform to all zoning and/or subdivision regulations or requirements.

(3)     Within sixty (60) days after submission of the site plan, the planning commission will review it and recommend approval or disapproval, or approval subject to modification.  If disapproved, reasons for such shall be stated in writing.

(4)     The planning commission recommendation shall be forwarded to the city commission for final approval, provided that, where modifications have been required of the applicant which are to appear on the site plan, such changes, as recommended by the planning commission, shall have been made. (1989 Code, § 8-506)

**14-507.  Development site**. (1)  The development site shall be suitable for residential use.  It shall not be subject to hazards such as insect or rodent infestation, objectionable smoke, noxious odors, unusual noise, or the probability of flooding or erosion.  The soil, ground water level, drainage, and topography shall not create hazards to the property or to the health and safety of occupants.

(2)     The development site for a mobile home park shall comprise an area of not less than ten (10) acres.  All sites shall consist of a single plat so dimensioned and related as to facilitate efficient design and management.

(3) Essential community facilities and services for residential development shall be reasonably accessible to the development site or provisions shall be made to assure that such facilities and services will be provided.

(4) Direct vehicular access to the development site shall be provided by an abutting improved public street of at least a "Collector" classification (as shown on the city's major street plan). (1989 Code, § 8-507)

**14-508. Site improvements**. (1) Site improvements shall be harmoniously and efficiently developed in relation to topography and the shape of the site. Full attention should be paid to use, appearance, and livability. Site improvements shall be fitted to the terrain with a minimum disturbance of the land. Existing trees, rock formations, and other natural site features should be preserved to the extent practical.

(2) When necessary, grading shall be utilized to preserve desirable site features through the diversion of surface water away from mobile home stands, the prevention of standing water and excess soil saturation, and the disposal of water from each mobile home space or lot. In no cases, however, shall grading be permitted to direct excessive surface water flow onto adjacent property.

(3) In the case of fill work at the development site, all fill material shall be uniform in texture and free from debris. Fill material shall be applied in uniform layers, raked and compacted to minimize settlement.

(4) Specific areas for the collection and disposal of surface and subsurface water shall be provided to protect the mobile home and provide safe use of other improvements. Surface water shall be directed toward existing off-site drainage facilities located in public right-of-ways. Internal drainage facilities shall be of adequate size, design, and construction and assured of permanent maintenance through easements or other means.

The planning commission upon advice from technical staff such as the city engineer or planning staff may require other drainage measures such as intersectional drains, drop inlets, bridges, etc., as deemed necessary.

(5) Exposed ground surfaces in all parts of every development site shall be either paved, covered with stone or other solid material, or protected with a vegetative growth that is capable of preventing soil erosion and of eliminating objectionable dust.

(6) A thirty (30) foot wide evergreen buffer strip consisting of at least two rows of trees, shrubs, or hedges (as approved by the Design Review Commission) which will grow to a minimum height of ten (10) feet and be spaced not less than ten (10) feet apart shall be planted along all boundaries of the mobile home park, not including any public road right of ways.

(7) The provision of designated open space and recreation areas is encouraged to the extent necessary to meet the anticipated needs of the occupants. A centralized location is preferable for convenience and efficient maintenance. (1989 Code, § 8-508)

**14-509.  Transportation system**.  (1)  All mobile home parks shall be provided with safe and convenient vehicular access from abutting public streets or roads to each mobile home lot and other important park facilities.  Access shall be designed to minimize congestion and hazards at the entrance or exit and allow free movement of traffic.

(2)     The street system shall be designed to recognize existing easements, utility lines, etc., which must be preserved and to permit connection of existing facilities where necessary for the proper functioning of the drainage and utility systems.  Streets shall also be adapted to the topography, have suitable alignment for traffic safety, and have satisfactory surface and ground water drainage.

(3)     All streets either public or internal (private) shall be a minimum of twenty-two (22) feet in width to accommodate anticipated traffic.  Designated collector streets shall be of a width established by the planning commission.

(4)     Before any proposed street may be constructed, the area must first be inspected by the city engineer who will at that time review the size of culvert necessary to prevent future drainage problems.  The developer will be responsible for the provision of the specified culvert and installation of the culvert in the manner as is indicated by the city engineer.

(5)     Surfaced streets are required, and all streets shall meet the technical specification for base and asphaltic concrete paving as required in the Lakeland Standard Construction specifications.

(6)     All streets located within a mobile home park shall be illuminated with lighting units consisting of 400 watt mercury vapor lamps at intervals of 100 feet approximately 30 feet from the ground.

(7)     Off-street parking areas shall be provided in all mobile home parks for the use of the occupants and guests without interference with the normal movement of traffic.  All parking spaces shall be located so access can be gained only from internal streets of the mobile home park.  Specific parking facility requirements are detailed in § 14-511(2).

(8)     All mobile home parks shall be provided with safe and convenient pedestrian access between mobile homes and park facilities.  A common walk system is recommended for those areas in which pedestrian traffic is concentrated in a large development.  (1989 Code, § 8-509)

**14-510.  Utilities**.  (1) Water supply.  An adequate supply of safe water under adequate pressure shall be provided in each mobile home park.  Where a public supply of water is satisfactory quantity, quality, and pressure is available, connection shall be to this system and used exclusively.

(a)     The bacteriological and chemical quality of the water shall be acceptable to the Shelby County Health Officer in accordance with minimum requirements for the State of Tennessee.

(b)     The source of water supply shall be capable of supplying a minimum volume of 250 gallons of water per day per mobile home with

pressure of not less than twenty (20) pounds residential pressure per square inch under normal operating conditions at each mobile home. The individual size of the feeder water lines shall be a minimum of 6" or more as required by the city engineer.

(c) The water system must be adequate to provide 500 gallons per minute fire flow and maintain a 20 psi residential pressure. All fire hydrants shall be located at no distances beyond 400 feet.

(d) The water supply system shall be connected by pipes to all mobile homes and other facilities requiring water in such a manner that neither underground nor surface contamination will reach the water from any source. All water piping, fixtures, and other equipment shall be constructed and maintained in accordance with the Standard Plumbing Code and Tennessee State Health regulations. Written approval from the Tennessee Department of Health shall be required for all water line extensions.

(e) In the case of all developments, the fire hydrants shall be the 3 way type as specified by city standards.

(2) Sewage disposal. An adequate and safe sewerage disposal system shall be provided in all mobile home parks for conveying and disposing of all sewage. Mobile home parks must connect to an approved public or private sewage disposal system. In no case will a septic tank system or package treatment plant be approved. In addition, the sewage disposal system shall meet the following general requirements:

(a) The sewage disposal system shall be approved in writing by the Tennessee State Health Department and subject to maintenance inspections.

(b) All sewer lines shall be located in trenches of sufficient depth to prevent breakage from traffic or other movements and constructed in such a manner as to have water tight joints. Sewer lines shall be separated from the water supply system and be constructed and maintained in accordance with the Standard Plumbing Code and Tennessee State Health Regulations.

(c) All sewer lines shall be at a grade which will insure a velocity of two feet per second when flowing full and designed for a minimum volume flow of 250 gallons of sewage per day per mobile home.

(3) Electrical distribution. Every mobile home park shall contain an electrical wiring system consisting of wiring, fixtures, and equipment installed and maintained in accordance with the applicable code and regulations governing electrical distribution systems. The electrical distribution system shall also meet the following general requirements.

(a) Main primary lines not located underground shall be suspended at least eighteen (18) feet above the ground. There shall be a minimum horizontal clearance of three (3) feet between overhead wiring and any mobile home or other structure.

(b) All direct buried cables shall be without splices or taps between junction boxes and protected by ridged conduit at all points of entry or exit from the ground. Such cables shall be located no less than eighteen (18) inches below the ground surface and located in a separate trench not less than one (1) foot radial distance from water, sewer, gas, and other piping.

(c) Demand factors for feeder and service lines shall be calculated in accordance with the Standard Building Code to determine the appropriate line sizes.

(4) Gas supply. Natural gas and liquified petroleum gas systems equipment and installations within a mobile home park shall be designed and constructed in accordance with the applicable codes and regulations. The natural gas supply system shall meet the following general requirements:

(a) Underground piping shall be buried at a sufficient depth to protect it from physical damage as outlined in the Standard Gas Code. No piping shall be installed underground beneath a mobile home or other structure.

(b) All gas regulators, meters, valves and other exposed equipment shall be protected from physical damage by vehicles or other causes.

(c) A readily accessible and identified emergency shut-off valve controlling the flow of gas to the entire internal gas piping system of a mobile home park shall be installed near to the point of connection to the service piping.

(d) Demand factors for use in calculating gas piping systems shall be in accordance with the Standard Gas Code.

(5) Oil supply. Oil supply systems equipment and installations within a mobile home park shall be designed in accordance with the applicable codes and regulations. Oil may be supplied by either an outside underground tank, an outside above ground tank or a centralized oil distribution system designed and installed in accordance with accepted engineering practices which comply with national codes.

(6) Garbage disposal. The storage, collection, and disposal of refuse in a mobile home park shall be so conducted as to create no health hazards, rodent harborage, insect breeding areas, accident or fire hazards, or air pollution. A commercial dumpster system shall be utilized exclusively for solid waste disposal. In addition, the refuse disposal system shall meet the following general requirements:

(a) All refuse shall be stored in fly tight, water tight, and rodent proof containers, which shall be located not more than 150 feet from any mobile home space or lot. These containers shall be located not more than 150 feet from any mobile home space or lot. These containers shall be located on concrete dumpster pads designed to prevent or minimize spillage and container deterioration.

(b)     A sufficient number of containers of adequate capacity in accordance with city approval shall be provided to properly store all refuse.  The refuse within these containers shall be collected and disposed of on at least a weekly basis in the approved manner.  (1989 Code, § 8-510)

**14-511.  Mobile home site**.  (1)  Every mobile home site shall meet the minimum requirements set forth in this section for the development of individual sites.  These criteria are for the purpose of assuring privacy, adequate natural light and air, and convenient access and circulation around each mobile home.  The minimum number of sites completed and ready for occupancy before the first occupancy shall be fifty (50) percent of the total sites planned.

(2)     Within mobile home parks - Each mobile home space shall be adequate for the type of facility occupying the same. Mobile homes shall be parked on each space so that there will be at least twenty-eight (28) feet of open space between mobile homes or any attachment such as a garage or porch, and at least thirty (30) feet end to end spacing between trailers and any building or structure, twenty (20) feet between any trailer and property line and fifty (50) feet from the right-of-way of any public street or highway.  In addition, each mobile home space shall contain:

(a)     A minimum lot area of four thousand (4,000) square feet.

(b)     A minimum depth with end parking of an automobile equal to the length of the mobile home plus thirty (30) feet.

(c)     A minimum depth with side or street parking equal to the length of the mobile home plus fifteen (15) feet; and

(d)     A minimum width of at least forty (40) feet and a minimum depth of at least seventy-five (75) feet with the limits of each mobile home space being clearly marked by permanent ground stakes.

(3)     Each mobile home space shall have an area designated as a mobile home stand or pad which meets all the setback requirements and affords practical access for the placement and removal of a mobile home.   It is recommended that these stands consist of runways (24" wide) running vertical to the mobile home and spaced, at a minimum, every eight (8) feet for the length of the mobile home.  The stand shall contain piers to serve as load-bearing supports for the mobile home.  These piers shall meet the following construction requirements or the Standard Building Code, whichever is the most restrictive:

(a)     Piers less than forty (40) inches in height shall be constructed of open or closed cell, eight (8) inch by eight (8) inch by sixteen (16) inch concrete blocks (with open cells vertically placed upon the footer).  Single-stacked block piers shall be installed with sixteen (16) inch dimension perpendicular to the main (I-beam) frame. The piers shall be covered with a two (2) inch by eight (8) inch by sixteen (16) inch wood or concrete cap.

(b)     Piers between forty (40) and eighty (80) inches in height and all corner piers over three blocks high shall be double blocked with blocks interlocked and capped with a four (4) inch by sixteen (16) inch wood or concrete cap.

(4)     All mobile homes shall be secured to the site through an anchorage system consisting of over the top tie downs to restrict overturning and frame tie downs to restrict the unit from being pushed from its piers.  These tie downs shall meet the anchorage requirements specified by Tennessee State Statutes and the Standard Building Code for installation and inspection requirements.

(5)     An individual water connection shall be provided at each site with at least a 3/4 inch connecting water riser pipe. This pipe shall extend in a vertical position at least four (4) inches above ground level at the appropriate location. Adequate provisions shall be made to prevent the freezing of service lines, valves, and riser pipe.  The riser pipe shall be capped when the site is unoccupied.  At each site a shut off valve located below the frost line shall be provided near the water riser.

(6)     Each site shall be provided with at least four (4) inch corrosive resistant sewer riser pipe.  This pipe shall extend in a vertical position at least four (4) inches above the ground level at the appropriate location.  This service pipe shall consist of water tight joints and slope at least one-fourth (1/4) inch per foot to a collector line.  Provisions shall be made to plug the drain when the site is unoccupied. All sewer lines shall be laid in trenches separated at least ten (10) feet horizontally from any drinking water supply line.

(7)     Electrical service drops from feeder distribution lines shall be provided, installed, and maintained in accordance with the National Electrical Code and Tennessee Department of Insurance and Banking Regulations Number 15, entitled "Regulations Relating".  A weather-proof over-current protection device and disconnecting means shall be provided for each site.  All exposed non-current carrying metal parts of the mobile home shall be properly grounded.

(8)     Each site provided with natural or liquified petroleum shall have an approved manual shut off valve installed upstream of the gas outlet. Underground piping shall be at a sufficient depth to be protected from physical damage and shall not be installed beneath a mobile home stand unless it is installed in an approved gas tight conduit.  Liquified petroleum gas or oil containers shall be securely but not permanently fastened to prevent accidental over-turning.  No containers shall be stored within or beneath any mobile home. All gas or oil systems shall be installed and maintained in accordance with the applicable codes and regulations governing such systems.

(9)     Off-street parking spaces shall be provided in sufficient number to meet the needs of the occupants and their guests.  Such facilities shall be provided at the rate of at least three (3) spaces per mobile home.  The size of the individual parking space shall consist of a minimum width of not less than ten

(10) feet and a length of not less than twenty-two (22) feet.  Each space shall be constructed of either a hot mix or concrete hard surface.

If necessary, driveways with a minimum of eight (8) feet in width shall be provided to the spaces.  These shall be of the same construction as the spaces and shall have a flare entrance for safe and convenient ingress and egress.  All mobile home stands shall be connected to the parking spaces and the driveway by some type of individual hard surfaced walk system.

(10)   It is recommended that provision be made for external storage facilities at each site.  These facilities should be designed in a manner that would enhance the appearance of the development.  Any such facility shall be confined within the exterior boundaries of the site and meet the applicable setbacks for such a facility.  (1989 Code, § 8-511)

**14-512.  Service facilities**.  (1) The requirements of this section shall apply to permanent service facilities including, but not limited to management offices, laundry facilities, sanitary facilities.  Such facilities are required for developments for the convenience of the occupants.  All recreational open space shall consist of a minimum area of not less than 100 square feet per space.

(2)   Every permanent service facility shall be designed, constructed, and located in accordance with the applicable codes and regulations of the city.  These also include the building, electrical, gas, and plumbing codes of the county. Each structure shall meet the same minimum setback requirements as outlined in this chapter for mobile home stands or pads with greater setback recommendations.   Parking requirements for such facilities shall be as determined by the planning commission.  (1989 Code, § 8-512)

**14-513.  Miscellaneous requirements**.  (1) The development shall be maintained free of insect and rodent harborage and infestation.  Where the potential for insect, and rodent infestation exists, extermination methods which conform to the requirements of the health authority shall be utilized to control such.

(2)   The growth of brush, weeds, and grass in open areas shall be controlled and maintained to prevent heavy undergrowth of any description. Special emphasis shall be on the prevention of the growth of ragweed, poison ivy, poison oak, poison sage, and other noxious weeds considered to be detrimental to health.

(3)   Care shall be taken to control dry brush, litter, rubbish and other such flammable materials which might communicate fire between mobile homes and other structures.

(4)   A mobile home shall not be occupied for dwelling purposes unless it is properly installed on a  mobile home stand and connected to all utilities. The park management shall supervise such installations.

(5)   No mobile home shall be admitted to a mobile home park unless it can be demonstrated that it meets the requirements of the Mobile Home

Manufacturers Association Mobile Home Standards for Plumbing, Heating, and Electrical Systems or any state administered code insuring equal or better systems. Mobile homes manufactured prior to 1976 shall be exempt from this requirement.

(6) No dogs, cats, or other domestic animals shall be permitted unrestrictive freedom within the limits of a mobile home park. Any kennels or pens for such animals shall be maintained in a sanitary condition at all times.

(7) Pre-existing mobile home parks shall comply with all state regulations applicable thereto which were in force prior to the establishment of this mobile home park resolution. Expansion of these mobile home parks shall be limited to twenty-five (25) percent of their size as of September 2, 1982. Further expansion shall only occur after compliance with the requirements of this chapter.

(8) Every mobile home park within the city shall be operated with adequate supervision to assure the park, its facilities and equipment are maintained in good repair and operated in a clean and sanitary condition at all times.

No travel trailers shall be placed on a mobile home stand or connected to utilities either in a mobile home park for occupancy as a dwelling unit. (1989 Code, § 8-513)

**14-514. Enforcement**. (1) It shall be the duty of the building inspector to enforce the provisions of this chapter and the duty of those inspectors specifically mentioned in § 14-505 of this chapter to enforce those regulations under their jurisdiction as those regulations apply to this chapter.

(2) The developer or the person to whom a permit for a mobile home park is issued shall be the sole individual responsible for compliance with this chapter and the other related regulations. Actions toward the enforcement of this chapter and all other related regulations shall be directed toward the person to whom the mobile home park permit is issued. (1989 Code, § 8-514)

**14-515. Amendment**. (1) Whenever the public necessity, convenience or general welfare justifies such action, the board of commissioners may amend or supplement this chapter. Any person may petition the board of commissioners for an amendment or amendments to this chapter.

(2) Any proposed amendment or supplement shall be first submitted to the planning commission for its recommendation to the board of commissioners. (1989 Code, § 8-515)

**14-516. Penalties**. (1) Any person or corporation who violates the provisions of this chapter or the rules and regulations adopted pursuant thereto, or fails to perform the reasonable requirement specified by the building inspector or other inspectors with jurisdiction after receipt of thirty (30) days written notice of such requirements, shall be fined according to the general

penalty provisions of this code of ordinances and each day shall constitute a separate offense, subsequent to the receipt of said thirty (30) days.

(2) In any case any structure is erected, constructed, reconstructed, repaired, converted, or maintained, or any structure or land is used in violation of this chapter, the building inspector or any other appropriate authority, or any adjacent or neighboring property owner who would be damaged by such violation, in addition to other remedies may institute injunction, mandamus, or other appropriate action or proceeding to prevent the occupancy of such structure or land. (1989 Code, § 8-516)

## CHAPTER 6

## MODEL HOMES

**SECTION**
14-601. Title and purpose.
14-602. Definition.
14-603. Permit required.
14-604. Not to become a nuisance.
14-605. Violations and fines.
14-606. Use of model homes.

**14-601. Title and purpose**. The purpose of this chapter is to protect the health, safety and welfare of the citizens of Lakeland by controlling the type, number, location, etc. of model homes within a subdivision development; to prevent disruption of life of residents within a subdivision development; and to enhance the quality of the environment. (Ord. #183, May 1996)

**14-602. Definitions**. For the purpose of this chapter, the following terms, phrases, words, and their derivation shall have the meaning given herein:

"Model home." A residential structure that: may or may not be furnished; may or may not have displays of building materials such as carpets, wallpaper, paint colors or layouts of subdivision plans or different home plans for the subdivision wherein the model home is located; and that may be staffed with sales agents or real estate brokers to show, assist and contract with a potential purchaser. (Ord. #183, May 1996)

**14-603. Permit required**. Except as otherwise provided in this chapter, it shall be unlawful for any person to erect, construct, enlarge, move or convert any model home in the city, or cause the same to be done, without first obtaining a model home permit as required by this chapter.

(1) One (1) model home for each may be permitted in a subdivision or planned residential development with a maximum of three (3) model homes per subdivision development allowed regardless of the number of phases, sections or builders.

(2) All applications for a model home permit must be reviewed by the city manager or his designate and shall be accompanied by such information as may be required to assure compliance with all appropriate laws and regulations of the city including but not limited to:

(a) Name, address and phone number of owner.

(b) Name, address and phone number of applicant.

(c) Name, address and phone number of owner of the premises where the model home is to be located.

(d) Intended use of the model home.

(e) Clear and legible site plan.

(f) Hours of operation, provided that said hours shall not be earlier than 9:00 A.M. and not later than 7:00 P.M.

(g) Number of employees or sales agents to work in the model home, provided that not more than two (2) employees or sales agents work in each model home during hours of operation regardless of the number of models per subdivision.

(3) A non-refundable permit fee will be required per model home to be submitted at the time of application. This fee shall be an amount resolved by the board of commissioners.

(4) The permit shall be issued for a one (1) year period and may be extended until all lots have been sold in the phase or section where the model home is located, however, such extensions shall not exceed two (2) successive one hundred eighty (180) day periods. The permit extension fee shall be an amount resolved by the board of commissioners. (Ord. #183, May 1996, modified)

**14-604. <u>Not to become a nuisance</u>**. (1) Pedestrian and vehicular traffic shall be controlled by the permit holder, at no expense to the City of Lakeland, by traffic devices, no parking signs, security or traffic management personnel, etc.

(2) Pedestrian and vehicular traffic shall be controlled wherein other residents will not be disturbed and it will not become a nuisance.

(3) If more than 50% of the residents in a 2,000 foot radius of any model home is adversely affected, then it shall be considered a violation of permit.

(4) No music, public address systems, signs or fences in violation of current Lakeland ordinances shall be allowed in or on the model homes. All other ordinances and/or requirements of the City of Lakeland, Tennessee must be adhered to. (Ord. #183, May 1996)

**14-605. <u>Violations and fines</u>**. (1) Any violation not corrected within five (5) working days from the date of written notice by the city manager or his designate shall be considered a breach of permit.

(2) A fine of fifty dollars ($50) per day per violation shall be assessed without recourse on the part of the permit holder.

(3) Said model home shall be closed until all violations are corrected and approved by the city manager. (Ord. #183, May 1996)

**14-606. <u>Use of model home</u>**. The model home shall not be used for the sale of construction materials, interior or exterior, to include paint, wallpaper, carpets, etc. but only displays for the purpose of comparison and selection. (Ord. #183, May 1996)

## CHAPTER 7

## FENCES AND WALLS

**SECTION**

14-701. Title and purpose.
14-702. Definitions.
14-703. General requirements.
14-704. Double frontage lots.
14-705. Multi-family, commercial institutional or subdivision developments.
14-706. Conflict with other provisions.
14-707. Nonconforming fences.
14-708. Appeals.
14-709. Enforcements.
14-710. Acceptable fencing, wall and landscape screening examples.

**14-701. Title and purpose**. The purpose of this chapter is to establish regulations to enhance the quality of life, health, safety, welfare, aesthetics and general environment of the city by regulating the erection of fences and/or walls and establishing landscaping and maintenance standards therefore. (1989 Code, § 4-401)

**14-702. Definitions**. In addition to those definitions contained in Article II of the Lakeland Zoning Ordinance which may relate to this chapter and for purposes of this chapter, the following additional terms, phrases, words and their derivation shall have the meaning given herein:

(1) "Abandoned fences." A fence which no longer is being maintained or kept in good state of repair, maintenance or upkeep within the parameters established by this chapter.

(2) "Dog run." An enclosed, fenced area within the perimeters of a yard or legal tract of land wherein three (3) or less dogs or cats or any combination of three (3) or less animals are kept, whether by the owner of the animals or by other persons, with or without compensation.

(3) "Double frontage lot." A lot having frontage on two (2) non-intersecting streets as distinguished from a corner lot.

(4) "Illegal fence." Any fence which is prohibited by this chapter, or a non-conforming fence.

(5) "Kennel." A place where four (4) or more cats or dogs or any combination of four (4) such animals are kept, whether by the owners of the animals or by other persons, with or without compensation.

(6) "Non-conforming fence." Any fence which was lawfully erected and maintained prior to such time as it came within purview of this code and any amendments thereto, and which fails to conform to all applicable regulations

and restrictions in this code, or a non-conforming fence for which a special permit has been issued.

(7) "Off-premise fence (off-site fence)." Any fence not physically located within the confines of an established lot or legal tract of land.

(8) "Person." Any individual, firm, co-partnership, corporation, company, association, trustee, receiver, assignee or other similar representative thereof.

(9) "Setback lines." The line nearest the street and across a lot establishing the minimum open space to be provided between buildings and specified structures and street or property lines.

(10) "Temporary fence." Any fence which is by reason of construction or purpose intended to be displayed for a short period of time. Unless specifically stated elsewhere in this chapter, a period of three (3) months is the maximum time limit for temporary fence usage. Temporary construction site fences may exceed the three (3) month time frame, but will be removed prior to final site plan and/or final construction inspection approval.

(11) "Tether run." A tethered line to which an animal is restrained within a yard or legal tract of land. (1989 Code, § 4-402)

**14-703. <u>General requirements</u>.** The following general criteria will apply:

(1) The maximum height of any fence or wall shall be six (6) feet except:

(a) Tennis court fencing may be a maximum of ten (10) feet in height.

(b) All other athletic field fencing shall be subject to approval of the design review commission on an individual basis in accordance with accepted conventions for the sport involved.

(c) Fences and/or walls in Commercial (C-1 & C-2), Industrial (M-1), Multiple-Family (M-R) or Forestry, Agricultural and Residential (FAR) districts may exceed six (6) feet in height when specifically approved by the design review commission.

(d) On lots where steep slopes exist at property lines, fences may exceed six (6) feet to a height that would not exceed six (6) feet above the existing yard or house grade. Any such fence height above ten (10) feet must be justified and approved by the design review commission and may require special. (See § 14-710 for examples.)

All proposals for fences or walls in excess of six (6) feet in height must be submitted to the design review commission for approval and must be accompanied by appropriate documentation justifying such additional height.

(2) Solid fences and walls over thirty (30) inches in height are not permitted within the required front yards or lots as specified in the zoning ordinance with the following exceptions:

      (a)     On double frontage lots.

      (b)     Periodic posts, decorative columns, lighting fixtures or other decorative detail may exceed the thirty (30) inch height limit.

      (c)     Front yard fences in FAR districts wherein animals are maintained may be a maximum height of forty-eight (48) inches in height.

      (d)     Width parameters for front yard requirements in FAR districts may be varied and will be reviewed by the design review commission on a case by case basis for approval.  Applicants for such fencing shall submit design documentation adequate for review by the commission.

      Heights in excess of forty-eight (48) inches in FAR districts front yards may be approved by the design review commission upon the merits presented in each case.

      (3)     No solid fence or wall over thirty (30) inches in height shall be placed within twenty-five (25) feet of any street corner, the corner being defined as the intersection of the right-of-way lines of the two (2) streets.

      (4)     All perimeter fencing or walls shall provide aesthetic values for off-site public viewing.  The exterior surfaces and street sides of all fences shall be the finished side.

      (5)     Materials for fences or walls to be constructed in residential front yards may be split wooden rails, wrought iron, masonry and/or aluminum or durable wood pickets of two (2) inches or less in width, placed at a minimum of six (6) inches on center (including those with brick or store columns).  In addition to the foregoing, front yard fences or walls in FAR districts may be constructed of woven wire, barbed wire, masonry, durable wood (or combinations of masonry and durable woods) that do not substantially impede visibility.  All others are subject to the approval of the design review commission. Specifically prohibited in front yard fencing or walls are the following materials:

      (a)     Exposed plain cinder or concrete blocks.

      (b)     Metal mesh fencing (FAR districts excepted).

      (c)     Barbed wire (FAR districts excepted).

      (d)     Single wire fencing (FAR districts excepted).

      (e)     Razor Wire.

      (6)     Solid fences and walls in excess of thirty (30) inches in height which are substantially opaque and serve as visual barriers are not permitted within twenty-five (25) feet of the water's edge on residential lots abutting a lake.  No landscaping of any variety or type will be allowed on these fences or walls that will exceed a height of thirty (30) inches.  Applications for fences in excess of thirty (30) inches for these areas must reflect an approved material that does not substantially impede viability and will be subject to approval by the design review commission.

      (7)     No fence or wall constructed of barbs, spikes, razor wire, glass, broken glass and the like and electrical fence, any of which are reasonably calculated to do bodily harm, shall be permitted in any of the yards except:

(a)     Forestry, Agricultural & Residential (FAR) districts may erect barbed wire and single wire electrical fencing for agricultural uses only.

(b)     Commercial (C-1 & C-2) and light industrial (M-1) districts may erect PVC, chromate or vinyl clad barbed wires strands atop approved security fencing upon approval of the design review commission.

(8)     Solid fences and walls in all districts which are substantially opaque and serve as visual barriers shall be composed of masonry, durable woods, or combination of masonry and durable woods.

(9)     Earth tone colors of PVC, chromate or vinyl coated chain link fabric fencing, terminal posts, line posts and rails are also acceptable for side and rear yard fencing in all districts.  The use of plain galvanized chain link fence fabric, posts or rails for side or rear yard fencing is specifically prohibited for use in all zoning districts except FAR.

(10)     No fence shall impede or divert the flow of water through any drainage way unless, by adequate investigation by the city engineer, it can be determined that such fence will not adversely impact any property owner and will contribute to an improvement in the overall drainage system.

(11)     It is the responsibility of the property owner to have located and marked all existing public utilities prior to erection of any fence or wall.  No fence or wall shall block access to any fire hydrant, utility equipment or any above-ground pad-mounted electrical transformer installed and maintained in accordance with the rules and regulations of Memphis Light, Gas and Water (MLG&W) and the ordinances, rules and regulations of the city, from the street right-of-way so as to provide fifteen (15) feet clear access to the transformer doors for operation and maintenance at all times.

(12)     Swimming pools four (4) feet deep at any point must have a minimum four (4) foot fence surrounding the yard or pool area.  Gates must be self-latching with latches placed four (4) feet above the ground or otherwise made inaccessible from the outside to small children.

(13)     All dog runs, tether runs and/or kennels shall be screened from public view by an appropriate planting screen.

(14)     Fencing in all districts shall at all times be maintained and kept in good repair by the lot owner including maintenance and upkeep of all grass, weeds and noxious growths ensuring such growths do not exceed heights of nine (9) inches, except in FAR districts wherein this height requirement may exceed the nine (9) inch limit.  All such cuttings, clippings and other debris are not to be allowed to accumulate and shall not be left adjacent to the property lines.

(15)     Any fences which do not conform to the provisions of this ordinance shall be regarded as non-conforming fences.  The locations, size, material and other structural characteristics of such non-conforming fences shall be governed by these provisions.  Maintenance standards and requirements imposed upon such non-conforming   fences pursuant to previous ordinances and regulations applicable prior to the passage of this chapter may be continued until replaced

but will be repaired and maintained up to standards established by this chapter provided they are not determined to be an imminent threat to the safety or health of the community. If the owner of the lot or legal tract on which said non-conforming fences exists fails to so maintain or repair said non-conforming fences to these standards within one (1) year of the passage of this code, the city manager or city engineer shall cause said non-conforming fence to be removed with the costs and expenses to be assessed against the lot owner as a special assessment as provided in § 14-709 of this code. (1989 Code, § 4-403)

**14-704. Double frontage lots**. Due to the exceptional nature of double frontage lots, fences with frontage on a street to which access to such lot is not permitted will be subject to § 14-702 and the following provisions:

(1) Such fences shall not be constructed of untreated or non-durable wood, plastic, chain link, or wire.

(2) An appropriate planting screen such as that shown in § 14-710 may be required. Such planting screen shall be in place within six (6) months from the time the fence permit is issued.

(3) Only solid fences similar in design to those shown in § 14-710 shall be allowed, and then only when the following requirements are met:

(a) Within any one hundred (100) foot section of a wooden fence, no more than fifty (50) percent or fifty (50) feet of the fence shall be on the property line or any line parallel thereto. (See § 14-710 for examples.)

(b) The remaining fifty (50) percent or more of the one hundred (100) foot section of a wooden fence must be set back from six (6) feet to fifteen (15) feet with evergreen planting inserted to break up a stockade appearance. (See § 14-710 for examples.)

(c) The entire wooden fence may be built fifteen (15) feet or more from the property line with evergreen screening to break up a continuous appearance effect. (See § 14-710 for examples.)

Set back and/or screening requirements outlined above for solid wooden fences will not be required for those wooden fences using brick or other approved masonry columns at lot property lines and at intervals of no less than fifty (50) feet between said property lines. (See § 14-710 for examples.)

(d) Solid brick or other masonry fencing approved by the design review commission shall be decorative in appearance with columnar designs placed at each lot property line and at no more than every fifty (50) feet intervals between said property line columns.

(e) Gates may be required by the design review commission enabling each property owner access for maintenance and upkeep of adjacent street right-of-ways.

Such gates shall be self-locking from the property owner's side of the fence only. Said locking devices shall be no lower than forty-eight (48) inches from the ground level to provide child safe characteristics.

(4) Maintenance and landscaping double frontage lot fencing.

(a) Fence material; condition. All fences on double frontage lots shall comply with the provisions contained herein. In addition thereto, all such fences erected on double frontage lots shall be of such material as to be resistant to disease and decay or shall be treated with substances to prevent such disease or decay. All such fences shall at all times be maintained and kept in good repair by the lot owner of such double frontage lot.

(b) Grass, shrubs, trees; condition; height of grass. All shrubs, trees and other landscaping located between the curb line or paved edge of the roadway and the fence on such double frontage lots and all grass or planted surfaces shall be maintained at all times by the lot owner of such double frontage lot. All grass, weeds, and noxious growths shall be mowed, cut or clipped, as frequently as necessary to insure that weeds, grass, and noxious growths do not exceed a height of nine (9) inches. Cuttings and clippings and other debris shall not be allowed to accumulate and shall not be left adjacent to the property lines.

(c) Maintenance of shrubbery. All trees, shrubs, grasses, and other landscaping as required herein, on double frontage lots shall be properly maintained to remain in a healthy growth state, and any dead growth shall be removed and replaced by such trees, shrubs, grasses and other landscaping as complies with the code and which is substantially identical with such previous landscaping material or with other landscaping material as approved by the design review commission.

(d) Non-conforming fences and landscaping. Any fences or landscaping on double frontage lots which do not conform to the provisions of this chapter, shall be regarded as non-conforming fences and landscaping. The location, size, material, and other structural characteristics of such nonconforming fences and landscaping shall be governed by the provisions of § 14-702. The maintenance standards and requirements imposed on such non-conforming fences and landscaping pursuant to previous ordinances applicable prior to the passage of this code may be continued for a period of one (1) year from the passage of this code, provided such non-conforming fences and landscaping are not determined to be an imminent threat to the safety or health of the community. Any non-conforming fences or landscaping which are found to contain maintenance deficiencies in violation of this section shall be brought into compliance within one (1) year from the passage of this code. If the owner of the lot on which said non-conforming fences or landscaping exists fails to correct said maintenance deficiencies within one (1) year from the passage of this code, the city manager or city engineer shall cause such maintenance and corrective action to be taken with the costs and expenses to be assessed against the lot owner as a

special assessment as provided in the foregoing sections of this code. (1989 Code, § 4-404)

**14-705.  Multi-family, commercial, institutional or subdivision developments**.  Fences  proposed for multi-family, commercial, institutional or subdivision developments must satisfy the requirements of the design review commission and the intent of this chapter.  Developers will be required through subdivision covenants or project development contracts to address fencing requirements as well as to erect certain fences for buffering purposes.  (1989 Code, § 4-405)

**14-706.  Conflict with other provisions**.  (1)  This chapter is not intended to interfere with, abrogate or annul any other ordinance, rule or regulation, statute or other provision of law.  Where any provision of this chapter imposes restrictions different from those imposed by any other provision of this chapter, or by any other ordinance, rule or regulation of the provision of law, whichever provisions are more restrictive or impose higher standards shall control.

(2)     This chapter is not intended to abrogate any easement, covenant, or any other private agreement or restriction, provided that where the provisions of this chapter are more restrictive or impose higher standards or regulations than such easement, covenant, or other private agreement or restrictions, the requirements of this chapter shall govern. (1989 Code, § 4-406)

**14-707.  Nonconforming fences**.  Any fence erected lawfully prior to September 7, 1989 may be maintained in its present condition.  However, no fence may be substantially altered except in conformity with the provisions of this chapter.  This chapter shall not be construed as abating any action now pending under, or by virtue of, prior existing regulations, or as discontinuing, abating, modifying or altering any penalty accruing or about to accrue, or as affecting the liability of any person, or as waiving any right of the city under any section or provision existing on September 7, 1989, or as vacating or annulling any rights obtained by any person by lawful action of the city except as shall be expressly provided for in this chapter.  (1989 Code, § 4-407)

**14-708.  Appeals**. (1) Any person aggrieved by a decision or order of the building official may appeal, within a period not to exceed ten (10) days from said action, to the Lakeland Design Review Commission (LDRC) by serving written notice with the city manager or city recorder who, in turn, shall immediately transmit the notice to said commission which shall appeal at a regular or special meeting within forty-five (45) days thereof.  Should the deign review commission fail to hear the appeal within said forty-five (45) days, the appeal shall be referred directly to the Lakeland Board of Appeals.  The building

official shall take no further action on the matter pending the design review commission's decision.

(2) The decision of the LDRC may be appealed directly to the Lakeland Board of Appeals upon written notice of appeal to the board within five (5) days of said action. This appeal shall be heard at a meeting as prescribed by the board of appeals bylaws. The board may accept, reject or modify the action of the LDRC and shall require a minimum of three (3) affirmative votes of the board and in the absence thereof, the action of the LDRC shall become final and binding. (1989 Code, § 4-408)

**14-709. Enforcement**. (1) Enforcing officer. It shall be the duty of the city manager or city engineer to administer and enforce the provisions of this chapter. The city manager or city engineer shall have the power to make inspections necessary to carry out his duties.

(2) Permits. It shall be unlawful to commence the erection of a fence within the corporate limits of the City of Lakeland until the city manager or city engineer has issued a permit for such work.

(a) Exceptions. Permits will not be required for fences in FAR districts except for front yard and double frontage lot fencing as addressed in §§ 14-703 and 14-704.

(b) Applications. Applications for fence permits will be available at city hall. A non-refundable fee of thirty dollars ($30.00) must accompany each application.

(c) In applying to the city manager or city engineer for a fence permit, the applicant shall submit a dimensional sketch or scale plan indicating the shape, size, height, and location on the lot of any fence to be erected, altered, or moved and of any other buildings on the lot and all drainage from, onto, or through the lot. Applicants for fence permits in FAR districts shall provide additional presentation in documentation submission requirements to allow adequate review for approval for front yard width determination being requested under the foregoing provisions of § 14-703(2)(d). If the proposed fence complies with the provisions of this chapter and other ordinances of the city, the city manager or city engineer shall issue a permit for such activity. If the application is refused, the city manager or city engineer shall state the refusal and cause in writing.

(3) Violation. Any person violating any provisions of this chapter shall be deemed guilty of a misdemeanor, and upon conviction shall be punished as provided herein. Each day's continuance of a violation shall be considered a separate offense. The owner of any premises, or part thereof, where anything in violation of this chapter shall be placed, or shall exist, any person who may have knowingly assisted in the commission of any such violation, shall be guilty of a separate offense. Persons in violation of this chapter may also be subject to injunctive proceedings.

(4) Penalty. Any person, firm or corporation violating any provision of this code shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not more than fifty dollars ($50.00). Each day's continuance of a violation shall be considered a separate offense. The owner of any premises or a part thereof, where anything in violation of this ordinance be placed, or shall exist, and any person, firm or corporation who may have knowingly assisted in the commission of any such violation or shall have permitted such violation to occur shall be guilty of a separate offense. Persons in violation of this ordinance shall also be subject to injunctive proceedings to enforce compliance therewith.

(5) Notice of alleged violation; assessment against lot owner if convicted. In addition to the penalty set forth in this code, upon the failure of any lot owner to maintain such fences and landscaping as required by this chapter, upon ten (10) days written notice from the city manager or city engineer to the last known address of such lot owner, the city manager or city engineer is authorized and directed to have such maintenance or repairs performed with the cost and expenses thereof to be assessed as provided in this section. Such notice shall be served personally to the lot owner or may be posted on the lot or may be mailed by registered or certified mail. Such maintenance may be performed by city forces or by retention of services from a private contractor to perform on the city's behalf in accordance with the city's contracting and purchasing procedures. All costs and expenses, including inspections and other expenses, incurred by the city pursuant to this section, but not less than the minimum amount established by the administration for such maintenance shall be assessed against the lot. It shall be the duty of the appropriate city and/or county official or his designee to collect, as a special tax, the amount so assessed at the time that city and/or county taxes are levied against properties on which such maintenance work was performed. Such special tax shall constitute a special assessment against such offending lot and shall be collected as general taxes levied by the city and/or county.

(6) Severability. If any section of provision or this ordinance be declared by a court of competent jurisdiction to be invalid, such decision shall not affect the validity of the ordnance as a whole or any part thereof, other than the part so declared to be invalid. (1989 Code, § 4-409)

**14-710. Acceptable fencing, wall and landscape screening examples.**

PLATE.

(1) Typical Fence Setback.
(2) FAR District Front Yard Setbacks.
(3) Acceptable Standards.
(4) Double Frontage Lots, Planting Screen.

(1989 Code, § 4-410)

14-710(1). Typical fence setbacks.

CORNER VISIBILITY TRIANGLE
FENCE SETBACK ON STREET FRONTAGES OTHER THAN ENTRANCE AND REAR
FENCES ON DOUBLE FRONTAGE. LOTS SHALL BE AS ESTABLISHED BY SECTION 4-404. OF THIS CHAPTER
MINIMUM BUILDING SETBACK LINES
FRONT YARDS
PLATE 1

14-710(2). FAR district front yard setbacks.

* Setbacks in Farm, Agriculture, or Residential (FAR) districts to correspond with property lines on dedicated street/road Right-of-Ways. Should records not reflect dedications, setbacks shall be determined from street/road center lines to the required distances at the designated street/road as described by Article III, A-5, LAKELAND SUBDIVISION REGULATIONS.

Plate 2

14-710(3). Acceptable standards.





Plate 3A
Note: 6' Fence Height is determined by measuring height above house grade or existing yard whichever is lower and the top of fence boards used in constructio
6' Fence Height measured from Grade
Brick Column
Floor Line
Grade of House
This portion is not a full 6' high due to slope of ground at this point.
Typical Concrete Footing
All designs for fences over 6' in height shall be submitted to the Design Review Commission for approval, designs must be accompanied by appropriate documentation justifying additional height.

Plate 3B
6' Fence Height Measured from House Grade or Existing Yard Level (Whichever is Lower)
Extended Fence Height Allowed Due To Slope of Yard.
Floor Line
House Grade
Property Line

On lots where steep slopes exist at property lines, fences may exceed six (6) feet to a height that would not exceed six (6) feet above the existing yard or house grade, whichever is lower.



Plate 3C
Brick or Concrete Cap (Typical)
1"x6" Wood Slat Fence (Typical)
4"x4" Brace Post at 6' oc Max Spacing
Brick/Wood Column
2"x4" Slat Wood Reinforcing (Use 2 or 3 as needed)
Ground Line
depth as Reqd
8"min
Concrete around Brace Post as needed
2'x2' Conc. Footing w/ Reinf. Rods (Typ)
6' oc max
TYPICAL FENCE CROSS-SECTION w/ details
No Scale
Plate 3D
TYPICAL VINYL COATED FENCE SECTION
No Scale
Height determined by use and established regulations
Vinyl Coated Cap
Top Rail
Tie Wire as needed
Vinyl Coated Wire Mesh. gauge per specifications
ALL POSTS TO BE VINYL COATED
2" or 3" Corner Post per specs
Top Rail
1" Line Post w/ rail holder cap vinyl coated
Ties/Buckel per std specs or as reqd
Toe Line (heavy gauge)
Spacing on all Line Posts to be determined and shown on individual plans and specifications
Concrete Base for Posts Extra amount for Gate/Corner Posts

**14-710(4). Double frontage lots, planting screen.**





FENCES
TYPE "A"
SHADE TREE
SHRUBS
SECTION
PLANTING SCREEN A - FOR DOUBLE FRONTAGE LOTS
SHEET 1 OF 2
PLATE 4A
Wood Fence
Easement
Street
PLANTING SCREEN A - FOR DOUBLE FRONTAGE LOTS
SHEET 2 OF 2
PLATE 4A



FENCES
TYPE "A" (SHADE) TREES (2"-2-1/2" cal.)
PIN OAK
SCARLET OAK
MAGNOLIA
TYPE "B" (SHADE) TREES (2"-2-1/2" cal.)
RED MAPLE
LARGE SHRUBS (Minimum 36" High)
SMALL SHRUBS (Minimum 18" High)
TYPE "C" (FLOWERING) TREES (8'-0' High)
CRAPEMYRTLE
WASHINGTON HAWTHORNE
GOLDENRAIN TREE
RED BUD
JAPANESE CHERRY
CRABAPPLE
PLANTING SCREEN C - FOR DOUBLE FRONTAGE LOTS
SHEET 1 OF 2
PLATE 4B
21
22
23
24
Shade Tree TYPE "A"
1/2 of Lot
6 ft High Wood Fence
Shade Tree TYPE "B"
Sidewalk
Easement
Flowering Tree TYPE "C"
Brick Column
Street
Small Shrubs (3ft o.c.)
Large Shrubs (3ft o.c.)
NOTE: Shade Trees shall be planted 50' o.c. Shade Trees may be Deleted where Existing Trees have been Saved
PLANTING SCREEN C - FOR DOUBLE FRONTAGE LOTS
SHEET 2 OF 2
PLATE 4B

CODE
TYPE "A"
SHADE TREE ( 2"-2 1/2" cal )
SCARLET OAK
MAGNOLIA
TYPE "A" SHRUBS ( Minimum 36" High )
GOLDEN EUONYMUS
PYRACANTHA
TYPE "B" SHRUBS ( 2' High )
MANHATTAN EUONYMUS
PFITZER JUNIPER
SECTION
PLANTING SCREEN D - FOR DOUBLE FRONTAGE LOTS
CITY OF
SHEET 1 OF 2
PLATE 4C
21
22
23
24
TYPE "A" Shrub ( 5 ft. o.c. )
TYPE "B" Shrub ( 4 ft o.c. )
10'
6'
Sidewalk
Easement
Typical Shade Trees
6 ft High Wood Fence
Street
NOTE: Shade Trees may be Deleted where Existing Trees have been Saved
PLANTING SCREEN D - FOR DOUBLE FRONTAGE LOTS
CITY OF
SHEET 2 OF 2
PLATE 4C

TYPE "A" SHADE TREE (2"-2 1/2" cal.)
PIN OAK
SCARLET OAK
TULIP TREE
BALD CYPRESS
MAGNOLIA
TYPE "C" TREE ( 8'-10' High )
WASHINGTON HAWTHORNE
RED
JAPANESE CHERRY
CRABAPPLE
SHRUBS ( 3' High Minimum )
WAX LEAF LIGUSTRUM
RED LEAF PHOTINIA
SECTION

PLANTING SCREEN E - FOR DOUBLE FRONTAGE LOTS
CITY OF
SHEET 1 OF 2

PLATE 4D

21
22
23
24
TYPE "A" TREE
TYPE "B" TREE
Typ Under Tree Planting
9 SHRUBS ( 3 ft o.c.)
Wood Fence (6' High)
1/2 of Lot
15'
15'
Sidewalk
Easement
Street

PLANTING SCREEN E - FOR DOUBLE FRONTAGE LOTS

CITY OF

SHEET 2 OF 2

PLATE 4D

TYPE "A" SHADE TREE ( 2"-2 1/2" cal. )
WILLOW OAK
PIN OAK
SCARLET OAK
TULIP TREE
BALD CYPRESS
MAGNOLIA
TYPE "B" TREE ( 8'-10' High )
CREPE MYRTLE
WASHINGTON HAWTHORNE
GOLDENRAIN TREE
REDBUD
JAPANESE CHERRY
CRABAPPLE
SHRUBS ( Minimum 36" High )
PYRACANTHA
ELAEAGNUS
SECTION
PLANTING SCREEN F - FOR DOUBLE FRONTAGE LOTS
CITY OF
PLATE 4E
CURVILINEAR
OBLIQUE
21
22
23
24
TYPE "B" Tree
TYPE "A" Shade Tree
Shrub
Sidewalk
Easement
TYPE "B" Tree
Street
PLANTING SCREEN F - FOR DOUBLE FRONTAGE LOTS
CITY OF
SHEET 2 OF 2
PLATE 4E





FENCES
TYPE "A"
SHADE TREE ( 2"-2 1/2" cal. )
SCARLET OAK
TULIP TREE
TYPE "A" SHRUB ( Minimum 36" High )
BURFORD HOLLY
GOLDEN EUONYMUS
GOLD SPOT EUONYMUS
TYPE "B" SHRUB ( Minimum 36" High )
RED LEAF PHOTINIA
WAX LEAF LIGUSTRUM
SECTION
PLANTING SCREEN G - FOR DOUBLE FRONTAGE LOTS
CITY OF
SHEET 1 OF 2
PLATE 4F
21
22
23
24
Shade Tree
1/2 of Lot
Street
PLANTING SCREEN G - FOR DOUBLE FRONTAGE LOTS
CITY OF
SHEET 2 OF 2
PLATE 4F

## CHAPTER 8

## EROSION AND SEDIMENT CONTROL

**SECTION**
14-801. Erosion and sediment control,
14-802. Document to provide guidance.
14-803. Approval required.

**14-801. Erosion and sediment control**. To regulate erosion and sediment control on land disturbance or construction sites and to promote clean water in all waters including waters of the state, storm sewers and drainage structures hereby adopts the following: Tennessee Erosion and Sediment Control Handbook, A Guide for Protection of State Waters through the use of Best Management Practices during Land Disturbing Activities, distributed by Tennessee Department of Environment and Conservation, Second Edition March 2002 and any future amendments to same. (as added by Ord. #02-20, Dec. 2002)

**14-802. Document to provide guidance**. This document shall be used by the engineer to develop an erosion control plan for any land disturbance and/or construction activity. Furthermore, the contractor shall use this document as guidance in methods and materials in the installation and construction of erosion control measures as shown on the approved plan set for land disturbance and/or construction activity. (as added by Ord. #02-20, Dec. 2002)

**14-803. Approval required**. Any land disturbance activity, except as exempted by subdivision or zoning regulations, must be approved by the municipal planning commission through submittal of an application. Plans that detail the activity and erosion control measures must be stamped and sealed by a professional engineer. Approval of the plan must also be obtained by signature of the city engineer on the plan and appropriate city official on the land disturbance permit. All other required permits must be obtained from other federal, state and local governments. Copies of approvals from other agencies shall be provided to the City of Lakeland to assure compliance. (as added by Ord. #02-20, Dec. 2002)

# CHAPTER 9

## LANDSCAPING AND SCREENING REQUIREMENTS

**SECTION**

14-901. Intent.
14-902. Applicability.
14-903. General design parameter.
14-904. Tree preservation and protection requirements.
14-905. Landscape islands for existing trees.
14-906. Landscape restrictions - sight triangle standards.
14-907. Parking lot landscaping requirements.
14-908. Building facade and foundation landscaping requirements.
14-909. Slope plantings.
14-910. Removal of debris.
14-911. Plant materials.
14-912. Plant size requirements.
14-913. Installation.
14-914. Time landscaping required.
14-915. Landscape and irrigation plan requirements.
14-916. Maintenance requirements for landscaping and irrigation.
14-917. Buffering requirements.
14-918. Berms.
14-919. Median landscaping.
14-920. Common open spaces - planned developments.
14-921. Irrigation system requirements.
14-922. Mixed use developments.

**14-901. Intent**. The intent of this chapter is to foster aesthetically pleasing developments which will protect and preserve the appearance, character, health, safety and welfare of the community. Specifically, these regulations are intended to increase the compatibility of adjacent uses requiring a buffer or screen between uses, to minimize the harmful impact of noise, dust, debris, motor vehicle headlight glare, or other artificial light intrusions, and other objectionable activities or impacts conducted or created by an adjoining or nearby land use. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-902. Applicability**. (1) All new development, excluding agricultural use and the individual development of single-family or two-family detached dwelling units, shall comply with the landscape and screening requirements. All development located within office, commercial and industrial zoning classifications as well as non-residential uses in residential districts shall be subject to the landscape and screening requirements.

(2) Any parking lot constructed as a result of the expansion of an existing development shall comply with the landscape and screening requirements.

(3) Expansion of all existing development which, after the passage of the ordinance comprising this chapter, exceeds twenty-five percent (25%) of the existing gross square footage or any change in use which results in the property becoming a higher impact use as indicated by an increase in average daily trip generation (ADTs) per day, shall comply with the following:

(a) The site shall be modified to provide at least fifty percent (50%) of the amount of landscaping which would be required for a comparable new development; provided, however, that in the case of an existing site that already has landscaping in excess of the fifty percent (50%) required for a new development no additional landscaping may be required by the design review commission. If it is not feasible to meet the quantity or placement requirements, the required landscaping may be modified with the approval of the design review commission including the introduction of larger plant specimens as a means of compensating for the lack of required landscaping.

(b) Any change in use which results in a higher impact shall require buffers and screening measures as set forth in the landscape and screening requirements. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-903. <u>General design parameters</u>.** (1) The following general design parameters shall be considered in designing landscaping areas:

(a) Landscape design and species shall be used to create visual continuity throughout the development. Landscape coordination shall occur among all phases of the development.

(b) Landscape areas should be combined to form large clusters at highly visible locations such as landscape courts, plazas or common areas.

(c) Landscape design should create variety, interest and view corridors for visibility.

(d) A variety of different species (including both deciduous and evergreen species) shall be incorporated into the site design to provide visual interest, as well as disease and pest resistance. A minimum of twenty percent (20%) of the plantings shall be evergreen/coniferous species.

(e) Required landscape plantings shall be coordinated with the location of utilities, driveways, and traffic clearance zones. Landscape plantings shall be located an adequate distance away from utility lines and easements to avoid damage when such lines are repaired or replaced.

(2) All landscape areas shall be irrigated. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-904.  Tree preservation and protection requirements**. (1) Tree preservation.  Site plans and plats shall be designed to preserve existing trees and vegetation to the greatest extent possible and shall seek to incorporate existing stands of trees as well as individual trees. Sensitivity to the site grading, storm drainage, building location, public/private utility layouts and easements, and parking lot configurations shall be demonstrated by the developer to ensure tree and vegetation preservation. Particular attention shall be paid to the preservation of trees and their natural understory vegetation on steep or erodible slopes, riparian areas, wetlands, or other environmentally sensitive areas. The intent of these regulations is to recognize the need to alter the landscape during site development activities, while setting out standards necessary to ensure tree preservation and protection of environmentally sensitive areas to the greatest extent possible.

(2)     Tree survey.  The applicant shall submit a tree survey indicating the species, size, and location of trees within the subject site. Unless otherwise specified, the survey shall identify by common and scientific name and indicate by diameter in inches each tree twenty-four inches (24") or greater (or specimen tree), as measured at four and one-half feet (4.5') above the mean ground level, as well as other trees proposed for retention. The tree survey shall be prepared on a topographic survey of the site to establish the tree elevation at the trunk and shall clearly indicate the drip line of all specimen trees as well as all other trees to be retained on site and at the edge of the drip line for wooded areas. In accordance with the Lakeland Tree Management Ordinance, all other trees not proposed for retention shall be delineated on the survey as a stand and accompanied by a summary table describing species and size distributions. The city manager or their designee may grant an exception for trees or wooded areas that will not be removed or impacted by site development operations.

(3)     Trees preserved - plan review determination.  The applicant shall prepare and present a tree management plan and statement of intent at time the site plan application is submitted for consideration by the planning commission. The plan shall indicate the location and massing of wooded areas, areas with dense shrubbery, and isolated individual mature hardwood trees and designate which areas or trees are to be preserved and which are to be removed. The plan shall also identify the location of all site improvements, buildings, general utility locations including easements, and preliminary site grading. The tree preservation statement shall indicate which trees and wooded areas are to be protected and the measures proposed to protect them during the construction process. The planning commission shall have the authority to review and evaluate the information contained in the management plan and to require additional protection measures where deemed appropriate to improve preservation of existing tree cover.

(4)     Protection of existing trees. (a)  Existing trees and their root protection zones that arc to be saved shall be protected from all construction activities, including earthwork operations, movement and

storage of equipment and vehicles and placement of construction materials and debris. Erosion protection measures may be required to prevent siltation of the tree preservation areas during construction. Protection zones shall be established by the city manager or his/her designee to ensure trees and their root zones are adequately protected and are not damaged during site development operations.

(b) Every effort shall be made to locate utility easements away from tree preservation areas. However, utility easements may be located adjacent to tree preservation areas as long as adequate clearance and protection is provided for the tree preservation easement. When infrastructure systems must cross tree preservation areas, every effort including consideration of the use of directional boring rather than trenching shall be made to minimize tree removal in such areas. If the removal of trees within these areas is determined to be excessive, the city manager or his/her designee may require the developer to replace such trees or pay into a tree preservation fund.

(c) To ensure protection of tree preservation areas, protection zones shall be delineated on the site development plans. During construction, such protection zones shall be delineated on the property using standard orange barricade fencing or comparable fencing material approved by the city forester. Such fencing shall be four feet (4') in height and supported by metal channel posts spaced at a maximum of ten feet (10') on center. Such fencing shall be placed around all trees or wooded areas to be protected and shall remain erected and secure throughout all construction phases. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-905. <u>Landscape islands for existing trees</u>**. (1) The planning commission and design review commission may approve variations to the landscape island requirements to preserve existing trees in interior parking areas. For existing trees, the minimum width of a landscape planter island shall be as follows:

| | |
|---|---|
| 6-inch caliper or less | 9-foot minimum width |
| 6-inch to 12-inch caliper | 15-foot minimum width |
| More than 12-inch caliper | 20-foot minimum width |



**Figure 9-1. Streetscape Landscaping Plate**

(as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-906.** **<u>Landscape restrictions - sight triangle standards</u>**. (1) A sight triangle is that area located at the intersection of two (2) public streets or a public street and private driveway through which an unobstructed view of approaching traffic is necessary for motorists and pedestrians. Except as permitted in this section, no landscaping or vegetation, or fence, structure, or object shall be included in a sight triangle in a landscape plan, nor shall any such landscaping or object be planted, erected or maintained within a sight triangle. A sight triangle shall be as defined in Table 9-1 and Figure 9-2 below.



**Figure 9-2. Minimum Required Site Triangle**

The distance "D" shall measure twenty feet (20') and fifteen feet (15') from the edge of the nearest travel lane for a public street and private driveway. respectively. The distance "L" shall be measured from the centerline of the minor approach to a point at the edge of the nearest travel lane. The distance "R" shall be measured from the centerline of the minor street to a point on the centerline of the major street approach.

**Table 9-1.**
**Minimum Required Sight Distance for Different Posted Speed Limits**

| Posted Speed Limit [(1)] | Minimum Sight Distance (Left and Right) |
|---|---|
| 25 mph | 200 feet |
| 30 mph | 250 feet |
| 35 mph | 325 feet |
| 40 mph | 400 feet |
| 45 mph | 475 feet |
| 50 mph | 550 feet |
| 55 mph | 650 feet |

(1) Posted speed limit on the major approach. Except at a signalized intersection, the speed limit of the approach from which the sight distance is being measured is ignored.

(2)     Sight triangles shall be measured from the minor leg of the intersection of two (2) public streets where the minor approach shall be defined as that approach whose right-of-way is controlled by a stop sign and whose major approach is uncontrolled. At a signalized intersection of two (2) public streets, sight triangles shall be measured for all approaches. For an intersection of a public street and private driveway, the sight distance is only measured from the private driveway.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-907.   Parking lot landscaping requirements**.  To reduce the visual impact of parking lots, landscaping areas and/or architectural features that complement the overall design and character of the development will be integrated into the development.

(1)     The number of trees required in the internal planting areas in parking lots shall be dependent upon the location of the parking lot in relation to the building, public right-of-way and adjoining land uses. The following minimum tree planting requirements shall apply to parking lots:

(a)     Where the parking lot is located between the building and the public right-of-way, one (1) shade tree for every five (5) parking spaces shall be provided (1:5).

(b)     Where the parking lot is located to the side of the building and partially abuts the public right-of-way, one (1) shade tree for every seven (7) parking spaces shall be provided (1:7).

(c)     Where the parking lot is located behind the building and is not visible from the public right-of-way, one (1) shade tree for every ten (10) parking spaces shall be provided (1:10).

(d)     Each shade tree planted shall be a minimum of three inch (3") caliper at time of planting.

(2)     Parking lots that abut the public right-of-way shall be screened with one or a combination of the following treatments:

(a)     Low walls made of masonry, stone, or other similar material and not exceeding a maximum height of three feet (3').

(b)     Raised planter walls planted with a minimum of eighty percent (80%) evergreen shrubs planted in an intertwined planting pattern using plant materials that are a minimum of twenty-four inches (24") in height and spread at time of planting for a minimum overall height including planter of thirty inches (30") at time of planting.

(c)     Landscape plantings consisting of eighty percent (80%) evergreen shrubs planted in an intertwined planting pattern using plant materials that are a minimum of thirty inches (30") in height and spread at the time of planting and interspersed with deciduous and coniferous trees and groundcovers.

(3)     One (1) deciduous shade tree or two (2) ornamental trees along with a minimum of eight (8) durable evergreen and deciduous shrubs,

groundcover, mulch and irrigation shall be provided for every parking landscape island.

(4) Landscape aisles and strips shall include medium to large deciduous trees a minimum of one (1) tree every thirty (30) linear feet, in addition to other parking lot landscaping requirements. All landscape aisles and strips shall be irrigated.

(5) Primary landscape materials shall be trees which provide shade or are capable of providing shade at maturity. Ornamental trees, evergreen trees, shrubbery, hedges and other planting materials may be used to compliment the landscaping, but shall not be the sole means of landscaping. Effective use of earth berms and existing topography is also encouraged as a component of the landscape plan.

(6) The perimeter of parking areas along side and rear property lines not abutting a public right-of-way shall be landscaped using a combination of evergreen and deciduous plant materials. All perimeter landscape areas shall be irrigated.

(7) Groundcover plants shall be planted in a number as appropriate by species to provide fifty percent (50%) surface coverage.

(8) Seeding and sodding shall be provided for total coverage within the first growing season. Sod shall be used where necessary to provide coverage and soil stabilization.

(9) Stormwater detention and retention basins and ponds shall be landscaped. Landscaping materials shall include a combination of deciduous shade and ornamental trees, coniferous trees, and evergreen and deciduous shrubbery, hedges and groundcovers. Any areas not covered with tree or shrubbery materials shall be seeded and/or sodded to minimize sedimentation within the detention and retention basins and ponds. Depending upon design, stormwater detention and retention basis landscape may require irrigation.

(10) Walls and raised planters shall not exceed a maximum height of three feet (3'), unless all of the following are provided:

(a) Screen treatment does not create a traffic or safety hazard or obstruct visibility.

(b) Portion of treatment that is above three feet (3') in height is a minimum of seventy-five percent (75%) transparent (i.e., wrought iron fencing, trellis).

(c) Portion of wall/landscape treatment that is above three feet (3') in height provides added visual interest, detail, and character suitable to the character of the development.

(d) The raised planter shall be irrigated.

(11) Where walls are provided, landscape planting areas shall be a minimum of five feet (5') in width and shall be located adjacent to the public right-of-way.

(12)    Chain link fencing shall not be permitted to be used to screen or enclose parking along a public right-of-way. In addition, the use of razor ribbon or barbed wire shall be prohibited.

(13)    Landscape islands shall be protected by curbs a minimum of six inches (6") in height. All parking lot islands shall be excavated completely of all building and paving materials to a minimum depth of twenty-four inches (24") and backfilled with a medium textured planting mix prior to landscape materials being planted.

(14)    Trees shall be required throughout the life of the development. If any trees within a parking lot or periphery die, become diseased, or are removed for any reason, they shall be replaced at the expense of the owner.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-908.  Building facade and foundation landscaping requirements**.  (1)  Non-residential developments shall include the following building facade and foundation landscaping standards, unless deviations from these standards are otherwise approved by the design review commission as part of the landscape plan approval process:

(a)    Landscaping and planting areas shall be placed to provide a buffer between the parking lot or drives and building walls or pedestrian circulation. Landscape areas may be placed adjacent to the building wall or adjacent to the curb to coordinate with building overhangs and canopies, if applicable. A variety of shrubs, ornamental trees and/or shade trees are encouraged. Any trees used should accommodate pedestrian circulation.

(b)    Along any building facade or foundation that fronts upon a public right-of-way or a parking lot provided for the building, landscape areas shall be provided equivalent to a minimum of fifty percent (50%) of each building facade or foundation. The landscape area may be a continuous area or comprised of several areas. Building facades along service areas are excluded but, shall be screened according to applicable screening requirements of such areas.

(c)    Each landscape area shall be planted with shrubbery a minimum of thirty (30") inches in height at time of planting that is of a species capable of reaching thirty-six (36") inches in height above the adjacent parking area or drive, covering a minimum of seventy-five percent (75%) of the length of the landscape area. A mixture of evergreen and deciduous shrubs shall be used to maintain seasonal interest. Ornamental trees (where appropriate), or shade trees should be included in the landscape design to further buffer the building facade from the drives and parking lot areas. In areas where pedestrian circulation is anticipated, trees with a branching habit conducive to walking under shall be used. For example, pin oaks are not acceptable in these areas due to their descending branch habit. Consideration should also be given to

the presence of thorns, fruit, or other features that will affect pedestrian circulation. Appropriate plant species should be installed so that mature tree limbs can be maintained at a minimum eight foot (8') clearance from ground level and so that shrubs do not exceed thirty-six inches (36") in height for areas where it is important to maintain visibility for security and safety purposes.

(d)     Planting areas shall have a minimum width of either six feet (6') or the equivalent of twenty percent (20%) of the building facade height as measured from finished grade to the top of the wall or parapet, whichever is greater.

(e)     Building facade and foundation areas shall be irrigated. Bubbler or drip irrigation systems are encouraged in order to reduce water consumption and overspray onto pedestrian circulation areas.

(f)     Landscape areas shall generally not be placed beneath overhangs and canopies.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-909.  Slope plantings**.  Landscaping of all cuts and fills and/or terraces shall be sufficient to prevent erosion, and all roadway slopes steeper than one foot (1') vertically to three feet (3') horizontally shall be planted with groundcover appropriate for the purposes and soil conditions, water availability and surrounding environment.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-910.  Removal of debris**. (1) All stumps and other tree parts, litter, brush, weeds, excess or scrap building materials or other debris shall be completely removed from the site prior to issuance of a certificate of completion by the city.

(2)     No tree stumps, or portions of tree trunks or limbs shall be buried anywhere in the development.

(3)     All dead and dying trees, standing or fallen, shall be completely removed from the site upon notification by the city. If trees or limbs are reduced to chips, they may be used as mulch in landscape areas, subject to approval by the city.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-911.  Plant materials**. (1)  Quality standard.  All plant material shall be of No. 1 grade, free from plant disease, of typical growth for the species, have a healthy, normal root system, rounded branch pattern, and shall be installed in conformance to the code of standards set forth in the most recent edition of The American Standard for Nursery Stock (ANSI Z60.1), as published by the American Association of Nurserymen.

(2)     There shall be a minimum of one (1) shade tree for every three (3) understory trees planted. There shall be no more than forty percent (40%) from

one (1) genus unless otherwise approved by the city manager or his/her designee.

(3) Recommended plants. A list of recommended plants within each plant material type is included in Table 9-2. The applicant may propose plants other than those listed if the plant is appropriate for the intended use or the applicant maintains a plant care program sufficient to properly care for the proposed plant material. Plant materials shall be appropriate for the region and local soil conditions and shall be planted in accordance with good horticultural practice. Plants selected should require only low maintenance and should be temperature and drought tolerant.

**Table 9-2.**
**Recommended Native and Non-Native Landscape Species**

| Native Overstory Trees | |
|---|---|
| **Botanic name** | **Common name** |
| *Acer rubrum* | Red maple |
| *Acer saccharum* | Sugar maple |
| *Betula nigra* | River birch |
| *Carya spp.* | Mockernut, Bitternut, Pignut, Shagbark hickory |
| *Carya illinoensis* | Pecan |
| *Diospyros virginiana* | Common persimmon |

| Non-native Overstory Trees | |
|---|---|
| **Botanic name** | **Common name** |
| *Acer platanoides* | Norway maple; (locally appropriate cultivars) |
| *Aesculus x carnea* | Red horsechestnut |
| *Cedrus atlantica 'Glauca'* | Atlantic cedar (Blue atlas) |
| *Cedrus deodara* | Deodar cedar |
| *Cercidiphyllum japonicum* | Katsuratree |
| *Corylus spp.* | Filbert |

| | |
|---|---|
| *Fagus grandifolia* | American beech |
| *Fraxinus americana* | White ash |
| *Fraxinus pennsylvanica* | Green ash |
| *Gymnocladus dioicus* | Kentucky coffeetree |
| *Ilex Americana* | American holly |
| *Juniperus virginiana* | Eastern redcedar |
| *Liquidambar styraciflua* | Sweetgum |
| *Liriodendron tulipifera* | Yellow-poplar |
| *Magnolia acuminata* | Cucumbertree |
| *Magnolia grandiflora* | Southern magnolia |
| *Magnolia virginiana* | Sweetbay magnolia |
| *Nyssa sylvatica* | Blackgum |
| *Pinus echinata* | Shortleaf pine |
| *Pinus taeda* | Loblolly pine |
| *Platanus occidentalis* | Sycamore |
| *Prunus serotina* | Black cherry |
| *Quercus spp.* locally appropriate species | Oak – white, scarlet, southern red, shingle, overcup, swamp chestnut, chinkapin, water, nuttall, willow, northern red, shumard, post, and black oak. |
| *Sassafras albidum* | Sassafras |
| *Taxodium distichum* | Baldcypress |
| *Thuja occidentalis* | Arborvitae/Northern white-cedar |
| *Tilia Americana* | Basswood |
| *Tsuga canadensis* | Eastern hemlock |
| *Ulmus* hybrids | hybrid Elm |
| | |

| | |
|---|---|
| *Cryptomeria japonica* | Japanese-Cedar |
| *Ginkgo biloba* | Ginkgo (male only) |
| *Metasequoia glyptostroboides* | Dawn redwood |
| *Pinus nigra* | Austrian pine |
| *Pinus sylvestris* | Scots pine |
| *Platanus x acerifolia* | London planetree 'bloodgood' |
| *Pseudolarix x kaempferi* | Golden larch? |
| *Quercus acutissima* | Sawtooth oak |
| *Sophora japonica* | Japanese pagodatree (single leader) |
| *Tilia cordata* | Littleleaf linden |
| *Tilia tomentosa* | Silver linden |
| *Ulmus parvifolia* | Chinese elm |
| *Zelkova serrata* | Japanese zelkova |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Native Understory Trees**

| Botanic name | Common name |
|---|---|
| *Aesculus pavia* | Red Buckeye |
| *Amelanchier spp.* | Serviceberry (appropriate species/ cultivars) |
| *Asiminia triloba* | Pawpaw |
| *Bumelia lanuginosa* | Chittamwood |
| *Carpinus caroliniana* | American hornbeam |
| *Cercis canadensis* | Eastern redbud |
| *Chionanthus virginicus* | Fringetree |
| *Cladrastis lutea* | Yellowwood |
| *Cornus florida* | Flowering dogwood |
| *Cotinus obovatus* | American smoketree |
| *Crataegus spp.* | Hawthorn species (locally appropriate) |

**Non-native Understory Trees**

| Botanic name | Common name |
|---|---|
| *Acer buergeranum* | Trident maple |
| *Acer ginnala* | Amur maple (appropriate cultivars) |
| *Acer griseum* | Paperbark maple |
| *Acer palmatum* | Japanese maple |
| *Castanea mollisima* | Chinese chestnut |
| *Chionanthus retusus* | Chinese fringetree |
| *Cornus kousa* | Chinese dogwood |
| *Cotinus coggygria* | Smoketree |
| *Hammamelis mollis* | Chinese with-hazel |
| *Ilex x 'Nellie R. Stevens'* | 'Nellie R. Stevens' Holly |
| *Kolreuteria paniculata* | Goldenraintree |

| | |
|---|---|
| *Halesia Carolina* | Carolina silverbell |
| *Hammamelis virginiana* | Witch-hazel |
| *Ilex x attenuata 'Fosteri'* | Foster's Holly |
| *Ilex x attenuata 'Savannah'* | Savannah Holly |
| *Ilex decidua* | Possumhaw |
| *Magnolia x soulangiana* | Saucer magnolia |
| *Malus spp.* | Crabapple (locally appropriate cultivars) |
| *Ostrya virginiana* | American hophornbeam |
| *Oxydendrum arboretum* | Sourwood |
| *Prunus americana* | American plum |
| *Rhamnus caroliniana* | Carolina buckthorn |
| *Rhus glabra* | Smooth sumac |
| *Rhus typhina* | Staghorn sumac |
| *Styrax obassia* | Fragrant snowbell |
| *Viburnum rufidulum* | Rusty blackhaw |
| | |
| | |
| | |
| | |

| | |
|---|---|
| *Lagerstroemia indica* | Crape-Myrtle (locally appropriate hybrids and cultivars) |
| *Magnolia stellata* | Star magnolia |
| *Pistacia chinensis* | Chinese pistache |
| *Prunus spp.* | Cherry (Asian species; locally appropriate) |
| *Rhus chinensis* | Chinese sumac |
| *Styrax japonicus* | Japanese snowbell |
| *Viburnum spp.* | Asian viburnum (locally appropriate species) |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

(4) All plants shall equal or exceed the following measurements when planted. Plants larger than specified may be used, but use of such plants shall not decrease the size requirements of other proposed plants. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-912.** **Plant size requirements**. (1) Canopy and understory trees with single trunks shall be measured by caliper size one foot (1') above the ground line. Multi-trunk trees shall be measured by the number of trunks and caliper size one foot (1') above the ground line.

(2) An immediate landscape impact is desired within all landscape areas associated with residential, office, commercial and industrial developments including planned developments. To facilitate this, the following minimum plant size at the time of planting shall be required. Larger sizes are encouraged.

| Plant Material Type | Minimum Size |
|---|---|
| Deciduous Shade Tree | |
| Single Stem/Trunk | 3.0-inch caliper |
| Multi-trunk | 10-feet |
| Evergreen Tree | 8-feet |
| Understory Tree | 8-feet |
| Ornamental Tree | 1.5 to 2.0-inch caliper |
| Ornamental Tree (multi-trunk) | 3 or more trunks (1-inch each) |
| Shrubbery | |
| Deciduous | 30-inches (5 gallon min.) |
| Evergreen | 30-inches (5 gallon min.) |
| Groundcover | 6-inches |

(as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-913. Installation**. (1) All landscaping materials shall be installed in accordance with requirements set forth in the most recent edition of The American Standard for Nursery Stock (ANSI Z60.I), as published by the American Association of Nurserymen.

(2) Any landscape material that fails to meet the minimum requirements or standards of this ordinance at the time of installation shall be removed and replace with acceptable materials.

(3) Plant materials shall be placed intermittently against long expanses of building walls, fences, and other barriers to create a softening effect.

(4) Ground cover plants shall be planted in a number as appropriate by species to provide fifty percent (50%) surface coverage.

(5) Landscaping materials shall not obstruct the operation and maintenance of utilities. Landscaping or plant material may not interfere with the function, safety, and access to any public easement or right-of-way, or the flow of stormwater runoff.

(6) No large deciduous or evergreen trees shall be planted within five feet (5') on either side of a water, sewer or drainage line. Trees planted underneath overhead power lines shall be a species that does not, in this region, achieve a mature height that would reach or interfere with such lines, or as recommended by MLGW. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-914.  Time landscaping required**.  (1)  All required landscaping materials shall be in place prior to the time of issuance of the certificate of completion by the City of Lakeland.

(2)     In periods of adverse weather conditions, a temporary certificate of completion may be issued, subject to the posting of a cash escrow or irrevocable letter of credit in an amount equal to one and one-half (1 1/2) times the estimated cost of the landscaping, with said estimated cost to be certified by a licensed landscaping contractor.

(3)     The cash escrow or irrevocable letter of credit may be forfeited in the landscaping is not completed in accordance with approved landscape plans within six (6) months after the issuance of the temporary certificate of completion.

(4)     Forfeiture of any cash escrow or irrevocable letter of credit shall not relieve the owner of the responsibility to complete the required landscaping.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-915.  Landscape and irrigation plan requirements**.

(1)     Qualification to prepare plans.  Landscape plans submitted for consideration by the planning commission or design review commission shall be prepared by a registered landscape architect. Irrigation plans should be prepared by a licensed contractor or registered landscape architect.

(2)     Landscape plan requirements.  The following items shall be provided on the required landscape plan:

(a)     Sheet size twenty-four inches by thirty-six inches (24"x36").

(b)     Scale of one inch equals twenty feet (1"=20'), or as approved based on size of project.

(c)     North arrow, graphic and written scale.

(d)     Appropriate title.

(e)     Title block, including street address, legal description and date of preparation.

(f)     Name and address of owner.

(g)     Name, address and telephone number of person preparing plan.

(h)     Property line shown with dimensions.

(i)     Existing utilities (water, sewer, stormwater, gas, and electric) and related easements.

(j)     Location, diameter at breast height, and species of all existing trees to be preserved.

(k)     Calculations demonstrating compliance with the minimum density requirements of the Lakeland Tree Management Ordinance, if applicable.

(l)     Location, quantity, size and species of all proposed plant materials.

(m) Maintenance notation indicating maintenance responsibilities upon installation.

(n) Berms and other unique physiographic features.

(o) Visibility triangles for entrances and intersecting streets.

(p) Sealed and dated signature of landscape architect.

(q) Plant list.

(3) Irrigation plan requirements. The following items shall be provided on the required irrigation plan:

(a) Sheet size twenty-four inches by thirty-six inches (24"x36").

(b) Scale of one inch equals twenty feet (1"=20'), or as approved based on size of project.

(c) North arrow, graphic and written scale.

(d) Appropriate title.

(e) Title block, including street address, legal description and date of preparation.

(f) Name and address of owner.

(g) Name, address and telephone number of person preparing plan.

(h) Property line shown with dimensions.

(i) Existing utilities (water, sewer, stormwater, gas, electric) and related easements (all pipes shall be noted by size in inches).

(j) Proposed irrigation system (labeled by size).

(k) All sprinkler heads labeled as to type (key is acceptable).

(l) Backflow prevention device labeled with type and size.

(m) Location of water meter and connection to water service.

(n) Maintenance note indicating maintenance responsibility.

(o) Seal and dated signature of professional preparing plan. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-916. Maintenance requirements for landscaping and irrigation**. (1) Maintenance of landscaping. Maintenance includes all reasonable and regular irrigation, weeding, weed control, fertilizing, pruning as well as removal of tree wrap and staking per standard horticultural practices and the city code. Plant materials that show signs of insect infestation, diseases and/or damage shall be appropriately treated. Dead plant material will be replaced according to the approved landscape plan.

(2) Inspection authority. All landscaping and irrigation systems will be subject to periodic inspection by the city's code enforcement officer. Should landscaping not be installed, maintained and replaced as needed to comply with the approved plan, the owner and its agent(s) shall be considered in violation of the terms of the certificate of completion and this ordinance.

(3) The developer and subsequent owner shall be responsible for the perpetual maintenance of all landscaping materials and irrigation systems and

shall keep them in proper, neat and orderly appearance, free from weeds, refuse and debris at all times. This shall include mowing, edging, pruning, fertilizing, watering, weeding, and other such activities common to the maintenance of landscaping.

(4)    Landscaped areas shall be kept free of trash, litter, weeds and other material or plants not a part of the landscaping. All plant materials shall be maintained in a healthy and growing condition as is appropriate for the season of the year. All irrigation heads or lines that are broken and flow water shall be replaced or repaired immediately to prevent the waste of water.

(5)    The developer and subsequent owner shall be responsible for maintaining the landscaping on all adjacent rights-of-way as shown on an approved landscape plan or as existing if an approved landscape plan does not exist, unless a maintenance agreement is reached with another entity. The city, at its discretion, may add, remove, replace, or maintain landscaping within the right-of-way per city standards,

(6)    The developer may request city maintenance of primary greenways, or the city may approve an alternative maintenance plan. If no agreement is reached, maintenance of primary greenways shall be the responsibility of the developer and subsequent homeowners association. The following standards shall apply:

(a)    Installation of all landscaping and improvements in the greenway shall meet or exceed city standards.

(b)    The developer will maintain the improvements for at least one (1) year following construction acceptance by the city of such improvements, and thereafter until the city has granted final acceptance for maintenance for those improvements.

(7)    Plant replacement.  Should a plant or portion of the required landscaping die, the owner shall be responsible for replacing said plantings with a plant or plants that have similar characteristics and form. The developer and/or owner shall be responsible for replacing all plant materials which shows dead branching over seventy-five percent (75%) or more of the normal branching pattern and repair irrigation system for a period of one (1) year from the date of issuance of the certificate of completion by the City of Lakeland. Plant materials which die shall be replaced with plant material of similar variety and similar size. The owner shall make such necessary replacements within thirty (30) days of notification by the city.

(8)    Pruning.  Topping trees or the severe cutting of limbs to stubs larger than three inches (3") in diameter within the tree crown to such a degree as to remove the normal canopy is not proper maintenance to trees as required by this chapter. This maintenance requirement shall be subject to oversight by the city manager or his/her designee.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-917.  Buffering requirements**.    (1)    Function and materials. Buffering shall provide a year round visual screen in order to minimize adverse impacts. It may consist of fencing, evergreens, berms, mounds, or combinations thereof to achieve the same objectives.

(2)    When required.    Every development shall provide sufficient buffering when topographical or other barriers do not provide reasonable screening and when the planning commission determines that there is a need:

(a)    To shield neighboring properties from any adverse external effects of a development; or

(b)    To shield the development from negative impacts of adjacent uses such as streets or railroads. Buffers shall be measured from side and rear property lines, excluding driveways.

(3)    Amount of buffering required.    The following buffering requirements shall apply:

(a)    Where an office zoned development abuts a residential zoning district, a buffer strip twenty-five feet (25') in width shall be required. Where site conditions do not allow a natural buffer of twenty-five feet (25') in width, a solid privacy fence or wall may be substituted along with sufficient berms and evergreen and deciduous plantings, as determined by the planning commission and the design review commission.

(b)    Where a neighborhood commercial zoned development abuts a residential zoning district, a buffer strip twenty-five feet (25') in width shall be required. Where site conditions do not allow a natural buffer of twenty-five feet (25') in width, a solid privacy fence or wall may be substituted along with sufficient berms and evergreen and deciduous plantings, as determined by the planning commission and design review commission.

(c)    Where a general commercial zoned development abuts a residential zoning district, a buffer strip fifty feet (50') in width shall be required. Where site conditions do not allow a natural buffer of fifty feet (50') in width, a solid privacy fence or wall may be substituted along with sufficient berms and evergreen and deciduous plantings, as determined by the planning commission and design review commission.

(d)    Where an Industrial zoned development abuts a residential zoning district, a buffer strip one hundred feet (100') in width shall be required. Where site conditions do  not allow a natural buffer of one hundred feet (100') in width, a solid privacy fence or wall may be substituted along with sufficient berms and evergreen and deciduous plantings, as determined by the planning commission and design review commission.

(4)    Design.    Arrangement of plantings in buffers shall provide maximum protection to adjacent properties and avoid damage to existing plant materials. Possible arrangements include planting in parallel, serpentine, and

broken rows. If planted berms are used, the minimum top width shall be five feet (5') and the maximum side slope shall be 3:1. Examples of buffers are depicted in Figure 9-3 below.

**Figure 9-3.**
**Examples of Buffering Techniques Between Contrasting Land Uses**

(5) Planting specifications. Plant materials should be sufficiently large and planted in such a manner that a year-round screen at least ten feet (10') in height shall he produced within one (1) growing season. All plantings shall he installed according to accepted horticultural standards.

(6) Maintenance of buffers. Plantings shall be watered regularly and in a manner appropriate for the specific plant species through the first growing season, and dead and dying plants shall be removed upon notification by the city and shall be replaced by the property owner. No buildings, structures, storage of materials, storage of finished goods or merchandise, or parking shall be permitted within the buffer area. Buffer areas shall be maintained and kept free of all debris, rubbish, weeds, and tall grass. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-918. Berms**. (1) Whenever a berm is required as a landscape or buffer design element for screening parking and/or loading areas or other objectionable views, it shall be a minimum of one foot (1') in height.

(2) Berms shall have side slopes no steeper than 3:1. When possible, all berms shall be curvilinear rather than straight. Berms are not required to be continuous and are preferred to be broken periodically, but must cover a minimum of seventy-five percent (75%) of the length of the property line to be buffered or screened.

(3) A hedge of evergreen plants obtaining a mature height greater than three feet (3') may permit a reduction in the required height of the berm upon approval by the design review commission.

(4) When planting a hedge on top of a berm, the hedge shall be a minimum of two feet (2') in height and shall be planted in an intertwined planting pattern at the time of planting.

(5) Berms separating conflicting land uses shall include a variety of evergreen and deciduous plant materials (see Figure 9-4).

**Figure 9-4.**
**Example of Landscaped Berm**

(as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-919.  Median landscaping**.  (1)  Landscape islands within street cul-de-sacs, eye brows, loop lanes, or bulbouts will be required when appropriate to minimize the amount of asphalt and enhance the appearance of the streetscape. Islands will be landscaped with trees, shrubs and mulch, including irrigation commensurate with the size of the island.

(2)     When median landscaping is included as part of the project the developer and subsequent owners will be responsible for maintenance of such areas. The city, at its discretion, may add, remove, replace, or maintain landscaping within the right-of-way per city standards with any costs related to such work to be paid by the developer and/or subsequent owners of the development project.

(3)     If trees are utilized, planting should be clustered and requiring minimal maintenance at maturity.

(4)     If grasses are used in the median to supplement areas not covered with trees and shrubbery, the space devoted to grasses should be of sufficient width to accommodate mowing equipment.

(5)     Curbing should be surrounded.  No curbs surrounding medians shall be greater than six inches (6") unless required by the city engineer.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-920.  Common open spaces - planned developments**.

(1)     Common open space required in all subdivisions and planned developments shall be landscaped as follows unless otherwise permitted in these standards:

(a)     Common open space areas will have irrigated live ground cover over at least seventy-five percent (75%) of the area.

(b)     Common open space in single-family residential subdivisions or planned developments or portions of subdivisions and planned developments containing single-family dwellings will be landscaped at a ratio of at least one (1) tree and five (5) shrubs for every five thousand (5,000) square feet of lot area. Required perimeter buffer areas in all subdivisions and planned developments will be landscaped at a ratio of at least one (1) tree and five (5) shrubs for every forty (40) linear feet of buffer or as required by the buffer standards specified above.

(c)     Common open space for all other subdivisions and planned developments is subject to the landscaping requirements specified in this chapter.

(d)     At least fifty percent (50%) of the trees will be shade deciduous species and twenty-five percent (25%) of the trees will be coniferous species, where appropriate.

(e)     The developer shall have all landscaping improvements completed and in acceptable condition prior to the city's construction acceptance of public improvements and prior to turning the common open space area(s) over to the property owners association for maintenance.

(2) Stormwater detention/retention areas and other landscape areas. Detention/retention areas are generally not acceptable for dedication to the public for parkland dedication and/or maintenance. Buffalo grass or other approved dry-land seed mixtures is to be planted and maintained by the homeowners association. Detention areas to be considered for dedication to the city for use by the city as a recreational amenity shall be landscaped as follows:

(a) The perimeter of detention areas will be landscaped with plant groupings sensitive to the detention area design and will include at least one (1) tree and five (5) shrubs for every forty (40) linear feet of perimeter. At least fifty percent (50%) of the trees will be shade deciduous species and twenty-five percent (25%) of the trees will be coniferous species, where appropriate. The use of native plant species is encouraged.

(b) Grass or other comparable vegetation will be the primary ground cover. All areas within the floodplain, including, but not limited to, the detention area bottom, shall be planted with sod and irrigated if deemed necessary by the city with an underground irrigation system. Other areas may be seeded with dry-land grass if it is maintained free of weeds and irrigation is provided until the grass is fully established. Live plant material other than grass may be planted if it is suitable to the area and is maintained free of weeds and irrigation is provided.

(c) The landscape plan will indicate the 10-year and 100-year storm detention areas.

(d) The side slopes of the pond shall not exceed 6:1 slope.

(e) The bottom of the pond shall have a minimum of one to two percent (1% - 2%) slope to ensure proper drainage, eliminate mud bogs, flush siltation building and promote multiple use of the detention pond.

(j) A concrete slab near the outlet shall be installed and sized properly to reasonably accommodate siltation to ease maintenance. A minimum trickle channel shall be maintained and, if possible, shall be located on the perimeter of the pond to facilitate multiple use of the pond.

(3) Natural features including, but not limited to, unique physiographic features such as wetlands, stream channels, rock outcropping, significant stands of trees and other native vegetation, should be preserved as amenities and properly delineated on plan documentation and protected during the development process within a subdivision or planned development. Where practical, these areas should remain in their natural state and not be altered. Alteration of natural features including, but not limited to, the removal of vegetation and/or the installation of improvements such as the construction of a pathway or irrigation system should be reviewed and approved by the City of Lakeland prior to alteration. (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-921.  Irrigation system requirements**. (1) All required landscape areas shall have an automatic clock-activated irrigation system unless waived by the design review commission. Landscape areas without an irrigation system (when waived by the design review commission) and bearing live plant material will require temporary irrigation until the plants are established and a reliable water source sufficient to sustain plant life is provided.

(2)    Irrigation systems shall meet the following criteria:

(a)    An automatic controller shall activate the irrigation system.

(b)    The irrigation system shall provide sufficient coverage to all landscape areas.

(c)    The irrigation system shall not spray or irrigate impervious surfaces, including sidewalks, driveways, streets, and parking and loading areas.

(d)    All systems shall be equipped with a backflow prevention device.

(e)    All mechanical systems including controllers and backflow prevention devices shall be properly screened from public view.

(3)    Portions of irrigation systems may be comprised of temporary irrigation components to irrigate low maintenance are as if the design review commission determines that all of the following standards are met:

(a)    Plant selection, design, installation specifications and site conditions combine to create a micro-climate that will sustain the plant material in a healthy condition without regular irrigation after the plant establishment period.

(b)    All portions of the landscape area served by temporary irrigation will be within one hundred fifty feet (150') of an exterior water source to enable hand watering during extended dry periods.

(c)    The temporary irrigation will provide reliable automated irrigation for the plants during the establishment period.

(d)    The applicant has demonstrated the ability to provide ongoing long-term maintenance of landscape areas necessary to keep plant material healthy without irrigation.  (as added by Ord. #04-68, Sept. 2004 and replaced by Ord. #07-100, Feb. 2007)

**14-922.  Mixed use developments**.  To allow the desired mixing and integration of uses, streetscapes, and innovative design treatments for mixed use or traditional neighborhood design developments, these design guidelines may be waived, so long as the development is a planned development, and so long as the development complies with all prior approvals of the City of Lakeland. All waived portions of the guidelines must be specifically identified in writing and approved by the planning commission, otherwise the applicable design guidelines of this chapter shall apply.  (as added by Ord. #07-100, Feb. 2007)

# CHAPTER 10

## SITE LIGHTING REQUIREMENTS

**SECTION**

14-1001. Intent and purpose.
14-1002. Applicability.
14-1003. Definitions.
14-1004. Approval required.
14-1005. General requirements (all zoning classifications).
14-1006. Total outdoor light output.
14-1007. Height.
14-1008. Parking lot lighting.
14-1009. Minimum perimeter lighting requirements.
14-1010. Canopy lighting standards.
14-1011. Park and common space lighting requirements.
14-1012. Lighting plan requirements.
14-1013. Prohibited lighting.
14-1014. Exemptions.
14-1015. Mixed use developments.

**14-1001. Intent and purpose**. It is the intent of this chapter to encourage lighting practices and systems that will minimize light pollution, glare, light trespass; conserve energy and resources while maintaining night-time safety, utility, security and productivity; and curtail the degradation of the night time visual environment. The purpose of this section is to establish regulations to allow for outdoor illumination levels that are appropriate for the visual task, safety and security while minimizing the undesirable side effects of excessive illumination such as glare, sky glow and light pollution. Over time, it is the intent that this section will allow for reasonably uniform illumination levels in the community. It is also the purpose of this section to establish design criteria for outdoor lighting fixtures that will enhance the visual and aesthetic character of the City of Lakeland. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1002. Applicability**. (1) New uses. All proposed new land uses, developments, buildings, structures, or building additions of twenty-five percent (25%) or more in terms of additional dwelling units, gross floor area, seating capacity, or other units of measurement specified herein, either with a single addition or cumulative additions subsequent to the effective date of this chapter, shall meet the requirements of this chapter for the entire property. This includes additions which increase the total number of required parking spaces by twenty-five percent (25%) or more. For all building additions of less than

twenty-five percent (25%) cumulative, the applicant shall only have to meet the requirements of this chapter for any new outdoor lighting provided.

(2) Change in use/intensity. Except as provided in subsection (3) below, whenever the use of any existing building, structure, premises is changed to a new use, or the intensity of use is increased through the incorporation of additional dwelling units, gross floor area, seating capacity, or other units of measurement specified herein, and which change in use or intensification of use creates a need for increase in the total number of required parking spaces of twenty-five percent (25%) or more, either with a single change or cumulative changes subsequent to the effective date of these provisions, then all outdoor lighting facilities shall meet the requirements of this chapter for the entire property, to the maximum extent possible as determined by the design review commission. For changes of use or intensity which require an increase in parking of less than twenty-five percent (25%) cumulative, the applicant shall only have to meet the requirements of this chapter for any new outdoor lighting provided.

(3) Nonconforming uses, structures or lots. Whenever a nonconforming use, structure or lot is abandoned for a period of ninety (90) consecutive days and then changed to a new use, then any existing outdoor lighting shall be reviewed and brought into compliance as necessary for the entire building, structure or premises, to the maximum extent possible as determined by the design review commission.

No outdoor lighting fixture which was lawfully installed prior to enactment of this chapter shall be required to be removed or modified except as expressly provided herein; provided, however, no modification or replacement shall be made to a nonconforming fixture unless the fixture thereafter conforms to the provisions of this chapter.

In the event that any nonconforming sign, as to lighting, is abandoned or is damaged, and the damage exceeds fifty percent (50%) of the replacement value, exclusive of foundations, to replace it, the sign shall be brought into conformance with the provisions of this chapter with respect to lighting as well as applicable provisions of the sign ordinance. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1003. Definitions**. The following words and terms related to outdoor lighting are defined as follows:

(1) "Direct illumination." Illumination resulting from light emitted directly from a lamp, luminary, or reflector and is not light diffused through translucent signs or reflected from other surfaces such as the ground or building faces.

(2) "Foot candle." A unit of measure for luminance. A unit of luminance on a surface that is everywhere one foot (1') from a uniform point source of light of one (1) candle and equal to one (1) lumen per square foot.

(3)     "Full cut-off type fixture."  A luminaire or light fixture that by design of the housing does not allow any light dispersion or direct glare to shine above ninety degrees (90°), horizontal plane from the base of the fixture.

(4)     "Fully-shielded light fixture."  A light fixture that is shielded in such a manner that light rays emitted by the fixture, either directly from the lamp or indirectly from the fixture, are projected below a horizontal plane running through the lowest point on the fixture where light is emitted.

(5)     "Glare."  The sensation produced by lighting that causes an annoyance, loss in visual performance and visibility to the eye. The magnitude of glare depends on such factors as the size, position, brightness of the source, and on the brightness level to which the eyes are adapted.

(6)     "Horizontal luminance."  The measure of brightness from a light source, usually measured in foot candles or lumens, which is taken through a light meter's sensor at a horizontal position.

(7)     "Illuminance."  The quantity of light measured in foot candles or lux.

(8)     "Light trespass."  Light from an artificial light source that is intruding beyond the boundaries of the property upon which the lighting is intended to serve.

(9)     "Lumen."  Unit used to measure the actual amount of visible light which is produced by a lamp as specified by the manufacturer.

(10)     "Luminaire." A complete lighting unit, including a lamp or lamps together with the parts designed to distribute the light, to position and protect the lamps, and to connect the lamps to the power supply.

(11)     "Luminance."  The physical and measurable quantity corresponding to the type of surface (e.g., a lamp, luminairies, reflecting material) in a specific area, with a luminance meter.

(12)     "Motion-sensing security lighting."  Any fixture designed, and properly adjusted, to illuminate an area around a residence or other building by means of switching on a lamp when motion is detected inside the area or perimeter, and switching the lamp off when the detected motion ceases.

(13)     "Lux." A unit of light intensity stated in lumens per square meter. There are approximately 10.7 lux per foot candle.

(14)     "Opaque." A material that does not permit light transmittal from an internal illumination source.

(15)     "Outdoor lighting fixture." An outdoor illuminating device, outdoor lighting or reflective surface, lamp or similar device, permanently installed or portable, used for illumination, decoration, or advertisement. Such devices shall include, but are not limited to lights used for:

        (a)     Buildings and structures;

        (b)     Recreational areas;

        (c)     Parking lot lighting;

        (d)     Landscape lighting;

        (e)     Architectural lighting;

    (f)    Signs;

    (g)    Street lighting;

    (h)    Product display area lighting;

    (i)    Building overhangs and open canopies; and

    (j)    Security lighting.

    (16)    "Outdoor recreation facility."  An area designed for active recreation, whether publicly or privately owned, including, but not limited to, parks, baseball fields, softball fields, soccer fields, football fields, golf courses and driving ranges, tennis courts, and swimming pools.

    (17)    "Semi cut-off light fixture." A luminaire that allows no more than six percent (6%) of the light from the lamp to be emitted above a horizontal plane passing through the luminaire's lowest light-emitting part.

    (18)    "Security light."  Lighting designed to illuminate a property or grounds for the purpose of visual security. This includes fully shielded lighting fixtures.

    (19)    "Unshielded light fixture."  Any fixture that allows light to be emitted above the horizontal directly from the lamp or indirectly from the fixture or reflector.

    (20)    "Uplighting." Any light source that distributes illumination above ninety degree (90°) horizontal plane.

    (21)    "Uniformity ratio."  Describes the average level of illumination in relation to the lowest level of illumination for a given area. For example, a uniformity ratio of 4:1 for a given area means the lowest level of illumination (1) should be no less than twenty-five percent (25%) or "four (4) times less" than the average (4) level of illumination.

    (22)    "Watt." The unit used to measure the electrical power used in the illumination of a light fixture.  (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1004.  Approval required**.  The design review commission shall review and approve a lighting plan as part of an application for development plan approval. Approval of a lighting plan from the design review commission is required prior to the issuance of a building permit, except for a grading permit and "foundation only" permit. All other outdoor lighting installations or replacements shall be approved by the design review commission unless otherwise authorized by this section.  (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1005.  General requirements (all zoning classifications)**.

    (1)    Site lighting shall minimize light spill into the dark night sky.

    (2)    Metal halide fixtures shall be permitted. The use of metal halide light fixtures shall be encouraged, when not required, for outdoor illumination whenever its use would not be detrimental to the use of the property.

(3)    Wherever practicable, it is encouraged that lighting installations include timers, dimmers, and/or sensors to reduce overall energy consumption and unnecessary lighting. Uses that can turn off their outdoor lighting during night hours are to be encouraged in residential districts with those requiring all night illumination to be discouraged where appropriate.

(4)    Exterior lighting installations shall be designed to avoid harsh contrasts in lighting levels.

(5)    Outdoor floodlighting by flood light projection above the horizontal plane is prohibited.

(6)    All light fixtures including street lights, shall be located, aimed or shielded so as to minimize stray light trespassing across property boundaries.

(7)    Search lights, laser light sources, or any similar high-intensity light shall not be permitted, except in emergencies by emergency response personnel.

(8)    Outdoor light fixtures installed on single family attached and detached properties shall be positioned so that there are no significant direct light emissions onto adjacent residential properties or public rights-of-way.

(9)    Illumination for outdoor recreation facilities must conform to the shielding requirements of this chapter, except when such shielding is determined to interfere with the intended activity. For such facilities, partially-shielded luminaires are permitted. Examples of activities where partially-shielded luminaires are permitted including, but are not limited to, baseball, softball, football, soccer and lacrosse. Specifically, tennis, volleyball, racquetball and handball courts and swimming pools must utilize fully-shielded luminaires.

(10)    Internal and external illumination of signs shall conform to the requirements of the sign ordinance.

(11)    Except as otherwise allowed for herein, exterior light fixtures on multi-family, office, commercial and industrial projects including planned developments which use the equivalent lumens per bulb of one hundred (100) watt or more incandescent bulbs shall conform with the Illuminating Engineer Society of North America (IESNA) criteria for full cutoff fixtures; that is, no significant amount of the fixture's total output may be emitted above a vertical cutoff angle of ninety (90°) degrees. Any structural part of the fixture providing this cutoff angle must be permanently affixed.

**Figure 10-1.**
**Example of Full Cut-off Fixture as Defined by IESNA.**

Full cut-off fixture as defined by IESNA.

(12) Lighting should meet the minimum IESNA standards in providing illumination and shall not exceed two hundred percent (200%) of the recommended values without specific written approval by the design review commission. Site lighting shall be designed as part of the architecture and landscaping themes of the site. Lighting should provide for appropriate and desirable nighttime illumination for all uses on and related to the site to promote a safe environment for inhabitants.

(13) Reference IESNA Recommended Practices RP-6 (Sports), RP-8 (Roadway), RP-20 (Parking Facilities) and RP-33 (Exterior Environment) for additional site lighting guidelines.

(14) Fixtures and lighting systems used for safety and security shall be in good working order and shall be maintained in a manner that serves the original design intent of the system.

(15) Glare and light trespass control shall be required to protect inhabitants from the consequences of stray light shining in inhabitant's eyes or onto neighboring properties. Light pollution control shall be required to minimize the negative effect of misdirected upward lighting.

(16) Where feasible, additional landscaping may be required by the design review commission to provide light screening between non-residential uses and residential districts to help prevent light spillage. Where landscaping

is used for light screening, the design review commission shall take into consideration the applicable landscaping standards found elsewhere in these regulations, the design standards found elsewhere in these regulations, the creation of excessive shadows or dark spaces, and views into and out of a site.

(17)    Vegetation and landscaping shall be maintained in a manner that does not obstruct security lighting and minimizes possible entrapment spaces.

(18)    To minimize the indiscriminate use of illumination, it is recommended that outdoor lighting, except as required for security, be extinguished during nonoperating hours,

(19)    Upward lighting of building facades, monument signs up to six feet (6') tall, and outdoor artwork is permissible so long as the lighting is aimed directly at the object to be illuminated, not aimed into the sky, and light spillage is avoided. Signs mounted at a height greater than six feet (6') from the ground shall not use upward lighting.  (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1006.  Total outdoor light output**. The maximum total amount of light, measured in lumens, shall be calculated from all outdoor light fixtures. For lamp types that vary in their output as they age (such as metal halide), the initial output, as defined by the manufacturer, is the value to be considered. For determining compliance with this chapter, the light emitted from outdoor light fixtures is to be included in the total output as follows:

(1)    Outdoor light fixtures installed on poles (such as parking lot luminaires) and light fixtures installed on the sides of buildings or other structures, when not shielded from above the structure itself as defined in subsections (2) and (3) below, are to be included in the total outdoor light output by simply adding the lumen outputs of the lamps used;

(2)    Outdoor light fixtures installed under canopies, building overhangs, or roof eaves where the center of the lamp or luminaire is located at least five feet (5') but less than ten feet (10') from the nearest edge of the canopy or overhang are to be included in the total outdoor light output as though they produced only one-quarter (1/4) of the lamp's rated lumen output;

(3)    Outdoor light fixtures located under the canopy and ten (10) or more feet from the nearest edge of a canopy, building overhang, or eave are to be included in the total outdoor light output as though they produced only one-tenth (1/10) of the lamp's rated lumen output.  (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1007.  Height**. The mounting height of light fixtures shall be as follows:

(1)    The mounting height of a light fixture shall be measured from the center of the lamp to the finished grade immediately below the light fixture,

(2) The height of wall-mounted light fixtures shall not exceed the height of the wall to which it is mounted and shall have the lamp source shielded from view to minimize glare.

(3) The height of light fixtures should be in proportion to the building structure (e.g. single story building should provide pedestrian-scale lighting).

(4) For multi-family residential, office, commercial, industrial, and mixed-use developments, exterior freestanding light fixtures shall be mounted using a full cut-off type light fixture as follows:

(a) Light fixtures located within a residential district shall not exceed fourteen feet (14') in height measured from finished grade.

(b) Within fifty feet (50') of a residential zoned parcel - fourteen foot (14') maximum height of fixture measured from finished grade.

(c) Fifty-one (51) - one hundred fifty feet (150') from a residential zoned parcel - twenty foot (20') maximum height of fixture measured from finished grade.

(d) One hundred fifty-one feet (151') or more from a residential zoned parcel twenty-five foot (25') maximum measured from finished grade.

(e) The use of a twenty-five foot (25') tall pole shall require pre-approval by the design review commission prior to approval of overall site lighting plan.

(5) For residential developments with fewer than twenty (20) dwelling units, exterior freestanding light fixtures shall be mounted no more than ten feet (10') high including base of post.

(6) Freestanding light fixtures installed along the right-of-way of Canada Road or Highway 70 shall be mounted no more than forty-five feet (45') high measured from finished grade of the centerline of the street.

(7) Freestanding light fixtures installed within public right-of-ways other than Canada Road and Highway 70 shall be mounted no more than thirty-five feet (35') high measured from finished grade of the centerline of the street. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1008.** **Parking lot lighting**. (1) Parking lot lighting shall not exceed light levels necessary for safety and located vehicles at night. To achieve this and minimize light spillage onto adjacent properties, fixtures which cut off light at ninety (90°) degrees or less from the vertical shall be used.

(2) The lighting plan shall be designed so that the parking lot is lit from the outside perimeter inward, and/or incorporate design features with the intent of reducing off-site light pollution.

(3) Illumination of parking areas shall be required for all parking areas with more than twenty (20) parking spaces.

(4) The illumination may be provided through the use of light fixtures mounted upon poles.

(5) The illumination of parking areas shall not be provided by building mounted light fixtures. Any building mounted fixtures shall be for aesthetic and security purposes only and shall be full cut-off style fixtures mounted near entryways.

(6) Lighting shall be designed to provide for uniform lighting throughout the site with no dark patches or pockets.

(7) No fixtures that shine outward and create a glare from a street right-of-way or residential property shall be permitted.

(8) Lighting used to illuminate parking areas shall be arranged, located or screened to direct light away from any adjoining or abutting residential district or any street right-of-way. Light poles and fixtures shall meet the following criteria:

(a) The style of light poles and fixtures should reflect the architectural character of the area and streetscape.

(b) Maintain parking lot poles/fixtures of the same style, height, color and intensity of lighting throughout the development site. Varying styles of fixtures may be permitted if it is demonstrated that the styles contribute to an overall theme for the area.

(c) Light fixtures shall be nonadjustable, horizontally mounted fixtures, or fixtures with ninety (90) degree or less luminaire cutoff. Fixtures that project light or glare toward a street right-of-way or neighboring property shall not be permitted.

(9) Illumination for parking areas shall be provided as follows:

(a) Average maintained footcandles. The maximum average maintained footcandles for all parking lots shall be three (3), unless otherwise approved by the design review commission. For purposes of this chapter, the average maintained foot-candles shall be calculated at eight-tenths (0.8) of initial footcandles.

(b) Minimum footcandles and uniformity ratio. The minimum amount of maintained illuminations for open parking shall be as provided in Table 10-1 below.

**Table 10.1**
**Minimum Footcandles and Uniformity Ratio (Max to Min)**

| Uses | Footcandles | Uniformity Ratio |
|---|---|---|
| Low Activity | 0.5 | 25:1 |
| Medium Activity | 1.0 | 20:1 |
| High Activity | 2.0 | 15:1 |

For purposes of interpreting Table 10-1 above, the following rules shall apply: high activity uses shall include athletic events, major cultural or civic events, major regional shopping centers and similar uses; medium activity uses include fast food restaurants, financial institutions, community shopping centers (fifteen (15) acres or more in land area), hospitals, residential complex parking and similar uses; low activity uses include local merchant parking (less than fifteen (15) acre sites), industrial and office park parking, educational parking and similar uses.

(c) The maximum maintained vertical footcandle at an adjacent residential district shall be one-half (0.5) footcandle measured five feet (5') above finished grade.

(d) The required illumination within a nonresidential development shall be measured at finished grade. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1009.** **Minimum perimeter lighting requirements**. (1) Lighting levels shall be based on initial lamp lumens and 1.0 maintenance factor.

(2) For lighting levels adjacent to commercial property, the lighting shall not exceed one (1) foot-candle of illumination at the property line, and shall not exceed one-half (1/2) foot-candle ten feet (10) over the property line.

(3) For lighting levels adjacent to residential zoned property, the lighting shall not exceed one-half (1/2) foot-candle of illumination at the property line and shall not exceed one-quarter (1/4) foot-candle ten feet (10') over the property line. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1010.** **Canopy lighting standards**. Lighting levels for canopies and aprons of commercial facilities shall be adequate only to facilitate the activities taking place in such location and shall not be used to attract attention to the business. It is recommended that the maximum level of illumination underneath the canopy not exceed ten (10) footcandles. The following standards shall be met:

(1) Light fixtures mounted on canopies shall be recessed so that the lens cover is recessed or flush with the bottom surface (ceiling) of the canopy and/or shielded by the fixture or the edge of the canopy so that light is restrained to no more than eighty-five (85°) degrees from vertical, as shown in Figure 10-2 below.

**Figure 10.2**
**Canopy Light Fixture Mount**

(2) All luminaires mounted on the under surface of a canopy shall be fully shielded and utilize flat glass or flat plastic (acrylic or polycarbonate) covers.

(3) The total light output used for illumination service station canopies, defined as the sum of all under-canopy initial bare-lamp outputs in lumens, shall not exceed twenty (20) lumens per square foot of canopy in the C-2, General Commercial District, and shall not exceed fifteen (15) lumens per square foot in the C-1, Neighborhood Commercial District. All lighting mounted under the canopy, including but not limited to luminaires mounted on the lower surface of the canopy and auxiliary lighting, is to be included toward the total permitted light output.

(4) Lights shall not be mounted on the top or sides (fascias) of the canopy, and the sides (fascias) of the canopy shall not be illuminated in whole or part.

(5) Canopies shall be constructed of non-light-emitting material. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1011. Park and common space lighting requirements**. Park and common open space lighting shall conform to the following requirements:

(1) Light fixtures in municipal parks, pocket parks, common open spaces, and athletic fields shall employ full cutoff fixtures or fixtures designed to direct light downward.

(2) Where it is established that there is a need for some up lighting, such as a baseball park, "sharp cutoff' fixtures, ones in which there is very good beam control of the light output, shall be used.

(3) Lighting is discouraged on undeveloped open space and passive recreation areas. Any lighting installed on open space lands shall be pedestrian-scale with preference for bollard-style lighting.

(4) Recreational facility. No outdoor recreational facility, public or private, shall be illuminated by nonconforming means after 11:00 P.M. except to conclude any recreational or sporting event or other activity conducted at the facility in progress prior to 11:00 P.M.

(5) Lighting for all recreational facilities shall be reviewed on a case by-case basis. New sports lighting systems shall be furnished with glare control. Lighting fixtures shall be mounted and aimed so that the illumination falls within the primary playing field and immediate surroundings so that no direct light illumination is directed off site. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1012. Lighting plan requirements**. A lighting plan, prepared to the same scale as the site plan, shall be submitted for approval by the design review commission. The lighting plan shall contain the following information:

(1) A site plan drawn to scale showing all existing and proposed buildings, landscaping, parking and loading areas, driveways and pedestrian ways, and proposed exterior lighting fixtures.

(2) Site plan depicting the location of all exterior light fixtures and a numerical grid of lighting levels (in footcandles) showing footcandle readings every twenty-five feet (25') within the property or site that the fixtures will produce on the ground (photometric analysis), and at ten feet (10') beyond the property lines at a scale specified on the site plan. An iso-footcandle contour line style plan is also acceptable. A report shall accompany the photometric plan that indicates the minimum, maximum and average foot-candle lighting levels, max-to-min ratio, and shall also indicate the light level at the property line.

(3) Exterior light fixtures installed under canopies, building overhangs, or roof eaves where the center of the lamp or luminaire is located at least five feet (5') but less than ten feet (10') from the nearest edge of a canopy, building overhang, or roof eave are to be included in the total outdoor light output as though they produced only one-quarter (1/4) of the lamp's rated lumen output.

(4) Exterior light fixtures located under the canopy and ten (10) or more feet from the nearest edge of a canopy, building overhang, or roof eave are to be included in the total outdoor light output as though they produced only one-tenth (1/10) of the lamp's rated lumen output.

(5) The calculation shall be measured at finished grade for light levels within the parking lot.

(6) Area of illumination.

(7) Indicate the means intended for on/off control of exterior lighting fixtures.

(8) Lamp type and wattage.

(9) Mounting height of all fixtures.

(10) A cut sheet of the proposed fixtures, including the candlepower calculation and an illustration depicting the design and finishes of all fixtures and designation as IESNA "cutoff" fixtures.

(11) Drawings of all relevant building elevations showing the location and aiming points of accent light fixtures.

**Figure 10.3**

(as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1013. Prohibited lighting**. The following lighting is prohibited as follows:

(1) Blinking and flashing lights.

(2) Mercury vapor lighting fixtures.

(3) Exposed strip lighting used to illuminate building facades or outline buildings or architectural features unless otherwise authorized by the design review commission.

(4) Neon tubing except as allowed as a means of illumination for signage in accordance with the Sign Ordinance of the City of Lakeland.

(5) Any light that may be confused with or construed as a traffic control device except as authorized by the federal government, State of Tennessee, or City of Lakeland.

(6) Beacons and search lights, except as used for rescue operations by the City of Lakeland and Shelby County. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1014. Exemptions**. Provided that no dangerous glare is created on adjacent streets or properties, the following lighting is exempt from the regulations of this section:

(1) Holiday-style lighting;

(2) Street lighting installed by MLGW upon authorization by the City of Lakeland for the benefit of public health, safety and welfare. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

**14-1015. Mixed use developments**. To allow the desired mixing and integration of uses, streetscapes, and innovative design treatments for mixed use or traditional neighborhood design developments, these design guidelines may be waived, so long as the development is a planned development, and so long as the development complies with all prior approvals of the City of Lakeland. All waived portions of the guidelines must be specifically identified in writing and approved by the planning commission, otherwise the applicable design guidelines of this chapter shall apply. (as added by Ord. #04-69, Sept. 2004, and replaced by Ord. #07-101, Feb. 2007)

## CHAPTER 11

## ARCHITECTURAL DESIGN STANDARDS

**SECTION**

14-1101. Purpose.
14-1102. Procedure.
14-1103. Definitions.
14-1104. Arrangement and orientation of buildings.
14-1105. Facades and exterior walls.
14-1106. Detail features.
14-1107. Mixed use developments.

**14-1101. Purpose**. The purpose of these design standards is to augment the existing design criteria in the Zoning Ordinance and Subdivision Regulations with more specific design standards that apply to the design of non-residential structures including those found in retail and office and mixed-use developments. These design standards require a basic level of architectural variety, compatible scale, pedestrian and bicycle access, and mitigation of negative impacts. (as added by Ord. #04-07, Sept. 2004, and replaced by Ord. #07-102, Feb. 2007)

**14-1102. Procedure**. The following design standards are intended to be used as a framework by developers proposing office, retail, industrial and planned developments and as an evaluation tool by staff and the design review commission in their review process. These standards shall apply to all projects in office, commercial and industrial zoning districts and also planned developments, which are processed according to the criteria for proposed development plans. These standards are to be used in conjunction with the Zoning Ordinance, Subdivision Regulations, and other applicable local regulations. (as added by Ord. #04-07, Sept. 2004, and replaced by Ord. #07-102, Feb. 2007)

**14-1103. Definitions**. (1) "Arcade." An area contiguous to a street or plaza that is open and unobstructed, and that is accessible to the public at all times. Arcades may include building columns, landscaping, statuary and fountains. Arcades do not include off-street loading/unloading areas, driveways or parking areas.

(2) "Articulate." To give emphasis to or distinctly identify a particular element. An articulated facade would be the emphasis of elements on the face of a wall including a change in setback, materials, roof pitch or height.

(3) "Berm." An earthen mound designed to provide visual interest on a site, screen undesirable views, reduce noise or provide a buffer from adjoining land uses.

(4)　　"Breezeway."  A structure for the principal purpose of connecting a main building or structure on a property with other buildings.

(5)　　"Buffer."  See also "screen." An area provided to reduce the conflict between two (2) different land uses. Buffers are intended to mitigate undesired views, noise and glare effectively providing greater privacy to neighboring land uses. Typical buffers consist of materials that serve this purpose and include, but are not limited to, plant materials, walls, fences, earthen mounds, and/or significant land area to separate land uses.

(6)　　"Buffer strip."  A portion of a lot or property used to visually separate one use from another through the use of vegetation, distance or other approved method.

(7)　　"Building face, public."  Any building face, which can be touched by a line drawn perpendicular to a street (public or private).

(8)　　"Building mass."  The building's expanse or bulk and is typically used in reference to structures of considerable size.

(9)　　"Design standards."  Statements and graphics intended to direct the planning and development of the built environment in a particular manner or style so that the end result contributes positively to the overall development and continuity with the surrounding community.

(10)　　"Dormer."  A window set vertically in a gable projecting from a sloping roof.

(11)　　"Facade."  The portion of any exterior elevation on the building extending from the finished grade to the top of the parapet, wall or eaves and extending the entire length of the building.

(12)　　"Front yard." The portion of the front yard extending the full width of the lot and measured between the front lot line and the parallel line across the front of the building. Corner and double lots shall adhere to the front yard setback(s) for each frontage.

(13)　　"Gable."  A triangular wall section at the end of a pitched roof, bounded by the two (2) roof slopes.

(14)　　"Hip roof."  Roof without gables.

(15)　　"Parapet."  The portion of a wall that extends above the roofline.

(16)　　"Pedestrian oriented development."  Development designed with an emphasis primarily on the street sidewalk and on pedestrian access to the site and buildings/structures rather than on auto access. The buildings/structures are generally located close to the public or private right-of-way and the main entrance(s) is (are) oriented to the street sidewalk. There are generally windows or display cases along building facades. Although parking is provided, it is generally limited in size and location to side and rear portions of this site.

(17)　　"Pedestrian walkway."  A surfaced walkway, separated from the travel portion of a public or private right-of-way or parking lot/driving aisle.

(18)　　"Portico."  A porch or walkway with a roof supported by columns, often leading to the entrance to a building.

(19) "Public right-or-way." Any public road or access easement intended to provide public access to any lot or development, but excluding any internal driving aisles (i.e., within parking lots).

(20) "Screen." See also "buffer." The sole purpose of a screen is to block views. A screen should be constructed of opaque materials and be of sufficient height to effectively obstruct unwanted or undesirable views. Screen materials may include, but are not limited to, evergreen landscaping materials planted in an intertwined manner, fences, and/or walls.

(21) "Setback." Within these standards, the term also refers to the minimum distance and area measured from the property line to the interior of a parcel where buildings may be constructed, the required distance and the area between the edge of the parking lot pavement/curb and the property line or buildings/structures, and placing a building face on a line to the rear of another building line.

(22) "Streetscape." All elements of a development or area that in view from other points along a street. (as added by Ord. #04-07, Sept. 2004, and replaced by Ord. #07-102, Feb. 2007)

**14-1104. Arrangement and orientation of buildings**. Arrange buildings to orient to and help define the street, to frame corners, to encourage pedestrian activity and define public spaces.

(1) Compact building arrangements should be used in commercial districts to reduce the feeling of seas of parking, encourage pedestrian activity and define public space.

(2) Building arrangement should be contiguous along street faces to avoid large breaks between buildings.

(3) Deep setbacks behind parking areas should be avoided.

(4) Outparcel buildings should be used to frame corners, define street edges, and orient traffic toward primary and secondary entrances from public rights-of-way.

(5) Site new buildings so that they relate to adjoining buildings and developments.

(a) If existing buildings front the street, new buildings should have similar orientation.

(b) Relate setbacks of new construction to setbacks of surrounding existing buildings or developments.

(c) Orient a portion of retail or office development to adjoining neighborhoods and to local streets leading into the adjoining neighborhood including provisions for pedestrian connectivity.

(d) Provide breaks in large developments and building masses to allow pedestrian connections between developments.

(e) Around common open space and plazas, use buildings to define edges and provide comfortable scale.

(f) Buildings should be arranged so as to provide an attractive termination of vistas.

(g) Avoid orienting service areas toward primary elevations of adjoining developments. (as added by Ord. #04-07, Sept. 2004, and replaced by Ord. #07-102, Feb. 2007)

**14-1105.** **Facades and exterior walls**. Facades should be articulated to reduce the massive scale and the uniform, impersonal appearances of buildings and provide visual interest that will be consistent with the community's identity, character and scale. The intent is to encourage a more human scale that residents of Lakeland will be able to identify with their community. The resulting scale will ensure a greater likelihood of reuse of structures by subsequent tenants.

(1) Buildings with facades less than one hundred (100') feet in linear length shall incorporate wall projections or recesses a minimum of two (2') feet in depth and a minimum of ten (10) contiguous feet within each thirty (30') feet of facade length. The street level facade of such buildings shall be transparent between the height of three (3') feet and eight (8') feet above the walkway grade for no less than sixty (60%) percent of the horizontal length of the building facade. Windows shall be recessed and should include visually prominent sills, shutters, or other such forms of framing. The remaining forty (40%) percent of the street level facade shall use animating features such as arcades, display windows, entry areas, or awnings.

(2) Buildings with facades one hundred feet (100') or more in linear length shall incorporate wall projections or recesses a minimum of three feet (3') and a minimum of twenty (20) contiguous feet within each one hundred (100) linear feet of facade length and shall extend over twenty (20%) percent of the facade. Buildings shall use animated features such as arcades, display windows, entry areas, or awnings along at least sixty (60%) percent of the facade. (as added by Ord. #04-07, Sept. 2004, and replaced by Ord. #07-102, Feb. 2007)

**14-1106.** **Detail features**. (1) Buildings should have architectural features and patterns that provide visual interests, at the scale of the pedestrian, reduce massive aesthetic effects, and recognize local character. The elements in the following standard should be integral parts of the building fabric, and not superficially applied trim or graphics, or paint.

(a) Building facades shall include a repeating pattern that shall include no less than three of the elements listed below. At least one (1) of these elements shall repeat horizontally. All elements shall repeat at intervals of no more than thirty feet (30'), either horizontally or vertically.

(i) Color change;
(ii) Texture change;
(iii) Material module change;

(iv) Expression of architecture or structural bay through a change in plane no less than eighteen inches (18") in width, such as an offset, reveal, or projecting rib.

**Figure 11.1.**
**Examples of Architectural Detail Features**
**Depicting Building Wall and Structural Bay Layouts**





(b) Roofs. Variations in roof lines should be used to add interest to, and reduce the massive scale of large buildings. Roof features should compliment the character of adjoining neighborhoods.

(i) Roof lines shall be varied with a change in height everyone hundred (100) linear feet in the building length. Parapets, mansard roofs, gable roofs, hip roofs, or donners shall be used to conceal flat roofs and roof top mechanical equipment from public view. Alternating lengths and designs may be acceptable upon approval by the design review commission.

**Figure 11.2**
**Example of Varying Rooflines and Architectural Detailing**

(iii) Roof materials. Roof materials shall compliment the building architecture. Architectural shingle, metal, and other forms of metal roofing are considered acceptable roofing materials for non-residential construction applications. Rubberized membrane roofing is acceptable so long as it is not visible from the public right-of-way or adjoining residential properties.

(c) Materials and colors. Exterior building materials and colors comprise a significant part of the visual impact of a building. Therefore, they should be aesthetically pleasing and compatible with materials and colors used in adjoining neighborhoods.

(i) Predominant exterior building materials shall be high quality materials. These include, but are not limited to, the following materials:

(A) Brick;

(B) Sandstone;

(C) Other native stone;

(D) Tinted, textured, concrete masonry units;

(E) Stucco;

(F) Treated and stained wood (including cementous board materials).

(ii) Facade colors shall be low reflectance, subtle, neutral, or earth tone colors. The use of high intensity colors, metallic colors, black or fluorescent colors is prohibited.

(iii) Building trim and accent areas may feature brighter colors, but neon tubing is prohibited for building trim or accent areas.

(iv) Predominant exterior building materials as well as architectural accents should not include the following:

(A) Smooth-faced concrete block;

(B) Tilt-up concrete panels (smooth finish);

(C) Pre-fabricated steel panels;

(D) Untreated wood.

(d) Entryways. Entryway design elements and variations should give orientation and aesthetically pleasing character to the building. The standards identify desirable entryway design features.

(i) Each principal building on a site shall have clearly defined, highly visible customer entrances featuring no less than four (4) of the following:

(A) Canopies or porticos;

(B) Overhangs;

(C) Recesses/projections;

(D) Arcades;

(E) Raised corniced parapets over the door;

(F) Peaked roof forms;

(G)   Arches;

(H)   Outdoor patios;

(I)   Display windows;

(J)   Architectural details such as tile work and moldings which are integrated into the building structure and design;

(K)   Integral planters or wing walls that incorporate landscaped areas and/or places for sitting.

(e)   Entrances for large retail establishments.  Large retail establishments containing more than one hundred thousand (100,000) square feet of gross leasable floor area should feature multiple entrances. Multiple building entrances reduce walking distances from automobiles, facilitate pedestrian and bicycle access from public sidewalks, and provide convenience where certain entrances offer access to individual stores, or identified departments in a store. Multiple entrances also mitigate the effect of the unbroken walls and neglected areas that often characterize building facades that face bordering land uses.

(i)   All sides of a principal building that directly face an abutting public right-of-way shall feature at least one (1) customer entrance. Where a principal building directly faces more than two (2) abutting public rights-of-way, this requirement shall apply only to two (2) sides of the building, including the side of the building facing the primary street, and another side of the building facing a secondary street.

(ii)   The number of entrances for the principal building shall be addressed during the review of the preliminary development plan. Where additional stores or offices will be located in the principal building, each such store shall have at least one (1) exterior customer entrance, which shall conform to the above requirements.

(iii)   The rear or sides of buildings often present an unattractive view of blank walls, loading areas, storage areas, mechanical units and meters, garbage receptacles, and other such features. Architectural and landscaping features should be utilized to mitigate these impacts. Any back or side of a building visible from a public street or residential district shall be designed in accordance with provisions governing front facades of buildings relative to facades and exterior walls, detail features, roofs, and materials and colors.

(A)   Where the facade faces adjacent residential uses an earthen berm shall be installed, no less than six feet (6') in height, containing at a minimum, a double row of evergreen trees planted at intervals of fifteen feet (15') on

center. Deciduous trees may only be used for visual interest on the berm.

(B) Additional landscaping may be required by the design review commission to effectively buffer adjacent residential land uses as deemed appropriate.

**Figure 11.3**
**Example of Entrance Configuration for Retail Development**



(f)     Screening requirements for mechanical systems, outdoor storage and trash collection areas.  Outdoor storage areas and trash collection facilities often exert visual and noise impacts on surrounding property. These areas, when visible from adjoining property and/or public streets, should be screened, recessed or enclosed. While screens and recesses can effectively mitigate impacts, the selection of inappropriate screening materials can exacerbate the impacts to adjoining property. Appropriate locations for outdoor storage areas including areas between buildings, where more than one building is located on a site and such buildings are not more than forty feet (40') apart, or on those sides of building that do not have customer entrances.

(i)     Unattractive elements such as outdoor storage, trash collection or compaction, truck parking and loading areas are to be located out of public view from streets, adjacent residential property, and other highly visible areas such as parking lot access drives.

(ii)     No areas for outdoor storage, trash collection or compaction, loading, or other such uses shall only be located in a side or rear yard and shall not be within twenty feet (20') of any internal sidewalk or pedestrian way.

(iii)     Refuse collection areas shall be fully enclosed and screened from public view on at least three (3) sides with a six to eight foot (6'-8') opaque screen of masonry or equivalent material similar to the primary building material used on the principal structure and shall be supplemented with evergreen trees and shrubbery that blend into the overall landscape treatment for the development

(iv)     Outdoor storage, utility meters, HVAC and other mechanical equipment, trash dumpsters and receptacles, trash compaction, and other service functions shall be incorporated into the overall design of the building and the landscaping so that the visual and acoustical impacts of these functions are fully contained and out of view from adjacent properties and public streets, and no attention is attracted to the functions by the use of screening materials that are different from or inferior to the principal materials of the building and landscaping.

(v)     Exterior ground-mounted or building-mounted equipment including, but not limited to, mechanical equipment, utilities' meter banks and coolers shall be screened from public view with landscaping or with an architectural treatment compatible with the building architecture.

(vi)     Non-enclosed areas for the storage and sale of seasonal inventory shall be permanently defined and screened with walls and/or fences. Materials, colors and design of screening walls and/or fences and the cover shall conform to those used as

predominant materials and colors of the building. If such areas are to be covered, then the covering shall conform to those used as predominant materials and colors on the building.

(vii) All roof-top equipment shall be screened from public view with an architectural treatment which is compatible with the building architecture and integral to the overall appearance of the building. The methods of screening of rooftop equipment include, but are not limited to, encasement or partition screens. Equipment screens shall be required at a height that is as high as or higher than the equipment being screened. After submittal of justification and careful analysis (i.e., site line visibility study), the design review commission may grant exceptions to the screening requirements if one of the following exception criteria is valid.

(A) A building is located at a high elevation in relation to surrounding properties and it is demonstrated that rooftop equipment will not be visible.

(B) A building is located in the middle of a commercial or office development and the rooftop equipment is not visible from arterial or collector right-of-ways, residential properties, nor will it have a negative impact upon any sensitive areas or scenic view or vistas.

(C) A building is sited in a manner where the location and setback of rooftop equipment from the building edge in relation to the elevation and visibility of surrounding properties is such that the equipment will not be visible from any distance and additional screening measures are not required. (as added by Ord. #04-07, Sept. 2004, and replaced by Ord. #07-102, Feb. 2007)

**14-1107. Mixed use developments**. To allow the desired mixing and integration of uses, streetscapes, and innovative design treatments for mixed use or traditional neighborhood design developments, these design guidelines may be waived, so long as the development is a planned development, and so long as the development complies with all prior approvals of the City of Lakeland. All waived portions of the guidelines must be specifically identified in writing and approved by the planning commission, or the applicable design guidelines of this chapter shall apply. (as added by Ord. #07-102, Feb. 2007)